## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **CTI FOODS, LLC**, *et al.*, | : | **Case No. 19-10497 (      )** |
|  | : |  |
|  | : |  |
| **Debtors.**[1] | : | **(Joint Administration Requested)** |

------------------------------------------------------------ x

### DECLARATION OF KENT PERCY IN SUPPORT OF
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Kent Percy, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Restructuring Officer ("**CRO**") of CTI Foods, LLC and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**," "**CTI**," or the "**Company**").  In my capacity as CRO, I am generally familiar with CTI's day-to-day operations, business and financial affairs, and books and records.  Prior to becoming CRO of CTI, I advised the Company in my capacity as a Managing Director of AlixPartners, LLC ("**AlixPartners**") from October 2018 to March 2019.  I have over 20 years of experience as a financial professional.  I have worked in the AlixPartners restructuring practice for 17 years and have served as a Managing Director there since January 2018.  Prior to that time, I was a Vice President of the venture capital firm MC Capital, where I

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Chef Holdings, Inc. (8070); Chef Intermediate, Inc. (8653); CTIF Holdings, Inc. (0046); Chef Investment, LLC (3918); CTI Foods Acquisition LLC (3918); CTI Foods Holding Co., LLC (8320); CTI Services Corporation (2331); CTI Foods, LLC (3673); CTI Arlington, LLC (6103); CTI Saginaw I, LLC (6133); CTI King of Prussia, LLC (4771); CTI-SSI Food Services, LLC (8322); S & S Foods LLC (7447); Custom Food Products Holdings, LLC (2697); Custom Food Products, LLC (0697); Liguria Holdings, Inc. (8652); and Liguria Foods, Inc. (6446).  The Debtors' mailing address is 504 Sansom Blvd., Saginaw, Texas 76179.

managed the investment of early stage capital in startup companies.  Before joining MC Capital,

I spent three years in the Business Recovery Services group at PricewaterhouseCoopers LLP.

2.      Over the past 20 years, I have advised senior management and boards of

directors of companies in numerous industries to devise and implement sound turnaround and

restructuring strategies in out-of-court turnarounds, chapter 11 restructurings, and foreign

insolvency proceedings.  In addition, I have advised creditor constituencies that often become the

new owners of a business upon consummation of a restructuring.  During the course of my

career, I have been involved in numerous large and complex restructurings, including, but not

limited to, Caesars Entertainment Operating Company, Eastman Kodak Company, Advantage

Rent A Car, Toys R Us, Comverse Technology, Inc., Dana Incorporated, Gymboree Group, Inc.,

Fairpoint Communications, Inc., Milacron, Inc., Nebraska Book Company, and think3, Inc.  I am

a Certified Insolvency & Restructuring Advisor and a Certified Public Accountant.  I received a

Bachelor of Arts in Economics from the University of Texas at Austin and earned a Master of

Business Administration from the Goizueta Business School at Emory University.

3.      On the date hereof (the "**Petition Date**"), the Debtors each commenced

with the Court a voluntary case under chapter 11 of title 11 of the United States Code

(the "**Bankruptcy Code**").  I am knowledgeable and familiar with the Debtors' day-to-day

operations, books and records, and business and financial affairs, and the circumstances leading

to the commencement of these chapter 11 cases.

4.      I submit this declaration (the "**Declaration**") to assist the Court and other

parties in interest in understanding the circumstances and events that led to the commencement

of these chapter 11 cases and in support of the motions and applications that the Debtors have

filed with the Court, including the "first-day" pleadings (the "**First-Day Pleadings**").  Except as

otherwise indicated herein, the facts in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      This Declaration is divided into six sections.  Section I provides an overview of the Debtors and these chapter 11 cases, including a description of the Prepackaged Plan (as defined below).  Section II describes the Debtors' business.  Section III describes the Debtors' corporate and capital structure.  Section IV describes the circumstances that led to the commencement of these chapter 11 cases.  Section V describes the proposed debtor-in-possession financing.  Section VI provides a summary of the First Day Pleadings and factual bases for the relief requested therein.

## I.    Overview

6.      CTI is one of the leading independent providers of custom food solutions to major chain restaurants in North America.  With a focus on blue-chip customers, CTI supplies food products to some of the most recognized restaurants in the country, including several of the top hamburger, sandwich, and Mexican restaurant chains.  The Company differentiates itself from competitors by offering a wide range of high quality, customized products and has cultivated strong relationships with key customers.

7.      Yet, as described in detail below, a combination of changed market dynamics, certain unexpected operational issues, and a large interest payment pushed CTI to evaluate options with respect to its current capital structure and diminishing near-term liquidity.  Consequently, the Company explored various ways to inject new capital into its business and restructure its debt obligations with minimal disruption to its day-to-day operations.

8.    Today, after extensive negotiations with its major stakeholders, CTI is pleased to present the Court with the *Joint Prepackaged Chapter 11 Plan of Reorganization of CTI Foods, LLC and Its Affiliated Debtors* (the "**Prepackaged Plan**"), filed concurrently herewith.  Importantly, the Prepackaged Plan has the overwhelming support of CTI's major stakeholders, as evidenced by a restructuring support agreement (the "**Restructuring Support Agreement**"), a copy of which is annexed hereto as **Exhibit A**.  With the support of key creditors and the Prepackaged Plan, the Company expects to emerge from chapter 11 chapter expeditiously with a healthier balance sheet and the ability to continue to provide high quality products and service to its customers.

9.    On March 7, 2019, the Company entered into the Restructuring Support with (a) members of an ad hoc group (the "**Ad Hoc Group**" and, collectively with other creditors that sign joinders to the Restructuring Support Agreement, the "**Consenting Creditors**") that hold approximately 74.23% of the outstanding principal amount under that certain First Lien Term Loan Agreement, dated as of June 28, 2013 (as amended, modified, or otherwise supplemented from time to time, the "**First Lien Term Loan Agreement**") and approximately 25.24% of the outstanding principal amount under that certain Second Lien Term Loan Agreement, dated as of June 28, 2013 (as amended, modified, or otherwise supplemented from time to time, the "**Second Lien Term Loan Agreement**") and (b) the prepetition equity sponsors (the "**Consenting Sponsors**"), which own or control approximately 94.31% of the outstanding equity interests in Chef Holdings, Inc. (which directly or indirectly owns or controls one hundred percent (100%) of the prepetition interests in the other Debtors).  As a result of additional creditors joining the Restructuring Support Agreement, the Debtors now have the

support of Consenting Creditors holding approximately 78.70% of First Lien Term Loan Claims[2]

and 52.31% of Second Lien Term Loan Claims.  The Debtors and the Ad Hoc Group anticipate

that the percentages of holders of First Lien Term Claims and Second Lien Term Loan Claims

that become Consenting Creditors will continue to increase in the coming days.

       10.     Pursuant to the Restructuring Support Agreement, the Consenting

Creditors agreed to vote in favor of and support confirmation of the Prepackaged Plan, which,

upon implementation, provides for the Debtors to emerge from these chapter 11 cases

substantially de-levered.  The following table illustrates the difference in the Debtors' capital

structure as of the Petition Date compared to the capital structure contemplated by the

Prepackaged Plan upon emergence from chapter 11.

| Pre-Restructuring | | Post-Restructuring | |
|---|---|---|---|
| ABL Claims | $93,500,000 | Exit ABL | $50,000,000 |
| First Lien Term Loan Claims | $347,000,000 | Exit First Lien Term Loan | $125,000,000 |
| Second Lien Term Loan Claims | $140,000,000 | | |
| **Total Funded Debt** | **$580,500,000** | **Total Funded Debt** | **$175,000,000** |

## A.    Transaction Contemplated by Prepackaged Plan

       11.     As described in greater detail below, the Prepackaged Plan will de-lever

the Company by (a) replacing a portion of each First Lien Term Loan Claim with new debt in the

form of "last-out" obligations under the Exit First Lien Term Loan, (b) equitizing the remaining

portion of each First Lien Term Loan Claim, (c) either equitizing or cancelling all $140 million

of the Second Lien Term Loan Claims, and (d) cancelling existing equity.  Importantly, the

Company's trade creditors will ride through these chapter 11 cases unimpaired.

       12.     The broader restructuring transaction contemplated by the Restructuring

Support Agreement and the Prepackaged Plan, which are described in more detail in Section

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Prepackaged Plan.

IV.F. below, also provides the Company with a $75 million injection of new capital in the form

of the DIP Term Loan Facility, and provides CTI with continued access to working capital

during these chapter 11 cases through a $80 million DIP ABL Facility (together with the DIP

Term Loan Facility, the "**DIP Financing**").  Funds from the DIP Financing will also be used to

pay in full the prepetition ABL Obligations (defined below) during these chapter 11 cases.

Pursuant to the Prepackaged Plan, upon the Debtors' emergence from chapter 11, outstanding

amounts under the DIP Term Loan Facility will be replaced with new debt in the form of "first-

out" obligations under the Exit Term Loan Facility.  All outstanding amounts under the DIP

ABL Facility will be paid in cash with proceeds from a new $110 million Exit ABL Facility and

the Reorganized Debtors will also be able to use the upsized Exit ABL Facility to fund general

working capital and for other general corporate purposes.

13.    CTI believes that the restructuring transaction contemplated by the

Restructuring Support Agreement and the Prepackaged Plan is the best available path forward to

address its near-term liquidity shortfall and strengthen the Company by de-levering its balance

sheet, while allowing business operations to continue without unnecessary interruption.

**B.    Proposed Timeline**

14.    Prior to the Petition Date, on March 8, 2019, the Company commenced

the solicitation of votes on the Prepackaged Plan through the *Disclosure Statement for Joint*

*Prepackaged Chapter 11 Plan of CTI Foods, LLC and Its Affiliated Debtors* pursuant to sections

1125 and 1126(b) of the Bankruptcy Code.  The Company expects that, pursuant to the

Restructuring Support Agreement, most classes entitled to vote on the Prepackaged Plan will

vote to accept in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy

Code.

15.     The below table highlights the Debtors' proposed key dates for these chapter 11 cases:

| Proposed Timeline[3] | |
|---|---|
| Voting Record Date | March 6, 2019 |
| Commencement of Solicitation | March 8, 2019 |
| Petition Date | March 11, 2019 |
| Plan Voting Deadline | April 1, 2019 |
| Plan/Disclosure Statement Objection Deadline | April 11, 2019 |
| Reply Deadline | April 16, 2019 |
| Combined Hearing | April 18, 2019 |
| Section 341(a) Meeting / Schedules and Statements Deadline (unless waived) | May 3, 2019 |

## II.     Debtors' Business

### A.     History and Formation

16.     CTI was first formed in 1984 as SSI Food Services, LLC and began as a protein processor for a quick service hamburger chain with a single production facility in Wilder, Idaho.  Over time, the Company expanded its business both geographically and in terms of product lines.  By 1990, CTI was producing frozen hamburger patties and taco meat for quick service restaurants, and by 1997, it was serving customers in the southwestern United States through a new production facility in Azusa, California.  The Company continued growing over the following two decades and by 2018, it was producing hundreds of different products, including value-added proteins (hamburgers, cooked sausage patties, grilled chicken, shredded beef and chicken, fajita meat, ham, Philly steak, and more), dry sausage, beans, soups, macaroni & cheese, chili, sauces, and other sheet pan and retail meals through seven production facilities strategically located across the United States.

---

[3] The proposed timeline is subject to Court approval and availability.



17.     A fundamental reason for CTI's success over time has been the strong relationships it holds with key customers.  For example, the Company has maintained 20+ year relationships with several of its largest customers, as well as relationships of over 10 years with other key customers.  In addition to strengthening existing customer relationships, CTI has driven its organic growth historically through large new customer wins, new product development, and geographic expansion.  The Company also grew through strategic acquisitions, including of the KOP Facility (defined below) in July 2012, Custom Food Products, LLC in December 2012, and Liguria Foods, Inc. in February 2016.

**B.      Debtors' Current Business Operations**

18.     As noted, the Debtors are a leading independent provider of custom food solutions to major chain restaurants in North America.  The Company services many of the most recognized quick-service and fast casual restaurants and also has a growing position supplying custom products to blue-chip consumer packaged foods companies.  CTI currently supplies four of the top six hamburger restaurant chains, four of the top six sandwich chains, and the top Mexican restaurant chain.

19.     CTI also differentiates itself from its competitors by offering innovative, customized food solutions across multiple product categories, providing fast response times, and increasing customers' speed to market.  The Company's products are developed by classically trained chefs and research & development specialists in its state-of-the-art test kitchens.  The majority of Company's management team operates out of its Saginaw, Texas offices, with the remainder based in Meridian, Idaho, and the Company manufactures its products at seven production facilities strategically located throughout the U.S.  The following chart identifies the scope of products processed at each of CTI's production facilities.

| Facility Location | Production |
|---|---|
| Wilder, Idaho ("**Wilder Facility**") | Burgers, taco meat, fajita meats, cooked proteins |
| Azusa, California ("**Azusa Facility**") | Burgers, taco meat, fajitas, chicken, soups, sides, sauces |
| Saginaw, Texas ("**Saginaw Soups Facility**") | Tacos, soups, sides, sauces, chili, macaroni & cheese |
| Saginaw, Texas ("**Saginaw Beans Facility**") | Refried beans |
| King of Prussia, Pennsylvania ("**KOP Facility**") | Individual quick frozen ("IQF") burgers, sausage |
| Owingsville, Kentucky ("**Owingsville Facility**") | Burgers, ham, sausage, fajita meats, chicken, cheesesteak |
| Humboldt, Iowa ("**Humboldt Facility**") | Dry sausage, pepperoni, salami |

20.     CTI owns each of its production facilities except the Azusa Facility, which the Company leases.

21.     In total, CTI directly employs approximately 1,900 active personnel (the "**Employees**"), approximately 1,875 of which are employed full-time, and 25 of which are employed part-time.  Of the Employees, approximately 260 (11%) are represented by unions. The average tenure of the Employees varies from plant to plant, but ranges from approximately

three to eight years.  In addition to the Employees, the Company also utilizes services of

approximately 165 temporary employees and/or independent contractors.

22.    For the year ended December 28, 2018, the unaudited consolidated

financial statements of CTI reflected total revenues of approximately $1.2 billion and EBITDA

of approximately $29 million.  As of December 28, 2018, CTI's unaudited consolidated financial

statements reflected assets totaling approximately $667 million and liabilities totaling

approximately $655 million.

### 1.    Recent Operational Initiatives

23.    Over the past few years, the Company has increased its emphasis on

operational efficiency and the production of high-quality food products.  Beginning in 2016, the

Company embarked on a determined effort to enhance corporate efficiency—an initiative that

included talent upgrades not only at the senior corporate management level, but also at each of

the plant leadership levels.  In this regard, the Company hired approximately 40% of its current

professional level Employees within the past three years.

24.    One of the initial focuses of CTI's corporate efficiency strategy was to

restructure the operations of the Liguria business, which had been recently acquired to expand

CTI's product portfolio to pepperoni and dry sausage.  Beginning in the fall of 2016, CTI

identified a number of inefficiencies in the Liguria business's Humboldt Facility's operations.  In

response, and over the past two years, the Company has invested substantial resources to

improve the business mix, planning, and scheduling at the plant, with an increased focus on

product quality and customer service.

25.    CTI has also invested significant time and expense into improving its

operations across each of its other facilities.  In the fall of 2017, CTI engaged AlixPartners to

help identify ways to improve operational efficiency and to execute on such opportunities in the

Company's Owingsville Facility.  As that engagement succeeded in identifying and

implementing operational improvements, the Company worked with AlixPartners to expand the

effort, developing and implementing a comprehensive transformation program (the "**F1**

**Program**") across all of CTI's facilities.  The F1 Program identifies, tracks, implements, and

measures business improvements in manufacturing, procurement, transportation,

commercialization, sales and operations planning, and finance and organizational effectiveness,

with an increased emphasis on operational productivity.

26.    Since its inception, the F1 Program has yielded significant improvements

across CTI, and particularly in its manufacturing operations.  For example, the F1 Program

resulted in a 50% reduction in overtime labor costs at one facility; an 80–90% reduction in

product giveaway from overfilled packages; and improved scheduling efficiency through

detailed sales forecasting and operational coordination.  Overall, in 2018, the F1 Program led to

approximately $17 million in cost savings, and the Company projects approximately $27 million

in cost savings during 2019.

**2.    Recent Food Safety and Quality and Employee Safety Initiatives**

27.    Company-wide, CTI has also dedicated significant resources toward

enhancing food safety and quality at its production facilities, such as by performing detailed

inspections of the plant and retaining experts to audit the facilities and identify any areas for

improvement.  Further, in the fall of 2018, CTI hired a new Senior Vice President of Quality

Assurance with extensive experience in the food production industry.

28.    Additionally, beginning in 2015, the Company placed a renewed focus on

its employee safety program and initiated an effort to enhance the safety-focused culture across

all Company facilities.  CTI's efforts have already produced meaningful results.  After CTI

began executing its new employee safety initiatives, the Company cut its Total Reported Incident

Rates[4] by more than half between 2015 and 2017, and the rate has continued to decline through the Petition Date.

### III.   Debtors' Corporate and Capital Structure

**A.   Corporate Structure**

29.   CTI is a privately held company, which Thomas H. Lee Partners ("**T.H. Lee**") and Goldman Sachs & Co. ("**Goldman Sachs**") acquired from Littlejohn & Co., LLC in June 2013.  CTI's current corporate structure is the result of organic growth coupled with the strategic acquisitions of the KOP Facility, Custom Food Products, LLC, and Liguria Foods, Inc. The Debtors' seven production facilities are operated by the following distinct Debtor entities:

| Debtor Entity | Facility |
|---|---|
| CTI Arlington, LLC | Saginaw Soups Facility |
| CTI Saginaw I, LLC | Saginaw Beans Facility |
| CTI King of Prussia, LLC | KOP Facility |
| CTI-SSI Food Services, LLC | Wilder Facility |
| S & S Foods LLC | Azusa Facility |
| Custom Food Products, LLC | Owingsville Facility |
| Liguria Foods, Inc. | Humboldt Facility |

30.   CTI's organizational structure, as of the Petition Date, is illustrated by the below chart:

---

[4] The "Total Reported Incident Rate" is a metric used by the Occupational Safety and Health Administration to compare injury rates among businesses.  The Total Reported Incident Rate is calculated as: (number of injuries and illnesses) x (200,000) / (employee hours worked)



31.    Furthermore, the following table sets forth the names and positions of the

Debtors' executive management team:

| Name | Position |
|---|---|
| Michael Buccheri | President and Chief Executive Officer |
| Kent Percy | Chief Restructuring Officer |
| Jonathon Spiller | SVP and General Counsel |
| Yogesh Sabnis | SVP Operations |
| Sharon Beals | SVP Food Safety and Quality |
| Rajan Nagarajan | SVP Supply Chain and Process Transformation |
| Kathy Schaaf | SVP and Chief HR Officer |

B.    **Capital Structure**

1.    **Prepetition Funded Indebtedness**

32.    The following table provides a summary of the Company's prepetition funded debt capital structure:[5]

|  | Interest Rate | Maturity Date | Outstanding Principal |
|---|---|---|---|
| ABL Revolver | L + 1.75% | Mar. 28, 2020 | $93,500,000 |
| Initial First Lien Term Loan | L + 3.50% | June 28, 2020 | $322,000,000 |
| Incremental First Lien Term Loan | L + 5.50% | June 28, 2020 | $25,000,000 |
| **Total First Lien Debt** | | | **$440,500,000** |
| Second Lien Term Loan | L + 7.25% | June 28, 2021 | $140,000,000 |
| **Total Funded Debt** | | | **$580,500,000** |

(i)    **ABL Revolver**

33.    Certain of the Debtors (the "**Obligor Debtors**")[6] are party to that certain Revolving Credit Agreement, dated as of June 28, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**"), with Wells Fargo Bank, National Association, as administrative agent (the "**ABL Agent**"), and certain other lenders party thereto (collectively, the "**ABL Lenders**").  Pursuant to the ABL Credit Agreement, the ABL Lenders provide the Company with an asset-based revolving credit facility in an amount up to $143 million, subject to a borrowing base formula (the "**ABL Revolver**").  Up to $50 million of the ABL Revolver is available for issuances of letters of credit (the "**Letters of Credit**"), and any such Letters of Credit reduce the amount available under the ABL Revolver on a dollar-for-dollar basis.

---

[5] The Company is also party to several capital leases, on which an aggregate of approximately $12 million remained outstanding and owing to lessors as of the Petition Date.  The Company intends to assume all of these capital leases pursuant to the Prepackaged Plan.

[6] The specific Debtor entities obligated under the ABL Credit Agreement are indicated in the organizational chart provided above.

34.    Obligations under the ABL Revolver ("**ABL Obligations**") are secured by (i) a first-priority interest in all UCC Article 9 (a) accounts (excluding rights to payment for any property which specifically constitutes Term Loan Collateral (as defined below) which has been sold, leased, licensed, assigned, or otherwise disposed of), (b) chattel paper, (c) deposit accounts, (d) inventory, (e) certain investment-related property, (f) certain general intangible property, letters of credit, letter-of-credit rights, instruments, and documents, (g) insurance, (h) supporting obligations, (i) commercial tort claims in excess of $10,000,000, (j) certain books and records, customer lists, credit files, and related general intangibles, and (k) certain cash proceeds of the Obligor Debtors (the "**ABL Collateral**") and (ii) a third-priority interest, junior to the interests securing obligations outstanding under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement, in, to the extent not constituting ABL Collateral, (a) certain cash accounts (depositing proceeds of sales or dispositions of Term Loan Collateral), (b) equipment, (c) fixtures, (d) certain general intangible property, including contracts and contract rights arising thereunder, (e) letters of credit, letter-of-credit rights, instruments, and documents, (f) investment related property, (g) intellectual property, (h) commercial tort claims in excess of $10,000,000, (i) real property, (j) other personal property, (k) insurance, (l) supporting obligations, (m) certain books and records, customer lists, credit files, and related general intangibles, and (n) certain cash proceeds of the Obligor Debtors (collectively, the "**Term Loan Collateral**").

35.    Availability under the ABL Credit Agreement is capped by a borrowing base, which is calculated based on percentages of the value of certain of the Debtors' inventory, receivables and cash, and is subject to certain reserves and sub-limits.  The ABL Revolver matures on March 28, 2020.  As of the date hereof, the aggregate principal amount outstanding under the ABL Revolver facility is $93,500,000.

(ii)    **First Lien Term Loan**

36.    The Obligor Debtors are also party to the First Lien Term Loan Agreement with Morgan Stanley Senior Funding, Inc., as administrative agent, and other lenders party thereto (collectively, the "**Initial First Lien Lenders**").  Pursuant to the First Lien Term Loan Agreement, the Company borrowed an aggregate principal amount of $322 million in term loans (collectively, the "**Initial First Lien Term Loan**") from the Initial First Lien Lenders.

37.    On February 12, 2016, in connection with the Company's acquisition of Liguria Foods, Inc., the Obligor Debtors entered into that certain First Amendment to the First Lien Term Loan Agreement (the "**Term Loan Amendment**") with Antares Holdings LP ("**Antares**" and, together with the Initial First Lien Lenders, the "**First Lien Term Loan Lenders**").  Pursuant to the Term Loan Amendment, the Company borrowed an incremental principal amount of $25 million (the "**Incremental First Lien Term Loan**" and, together with the Initial First Lien Term Loan, the "**First Lien Term Loan**") from Antares.

38.    Obligations under the First Lien Term Loan (the "**First Lien Obligations**") are secured by (i) a first-priority interest in the Term Loan Collateral and (ii) a second-priority interest in the ABL Collateral, junior to the interests securing obligations outstanding under the ABL Revolver.  The Initial First Lien Term Loan bears an interest rate of LIBOR plus 3.50% and matures on June 28, 2020, while the Incremental First Lien Term Loan bears an interest rate of LIBOR plus 5.50% and matures on June 28, 2020.  As of the Petition Date, the aggregate principal amounts outstanding under the Initial First Lien Term Loan and the Incremental First Lien Term Loan are approximately $322 million and $25 million, respectively, plus accrued and unpaid interest thereon and out-of-pocket costs and expenses of the administrative agent.

### (iii)    Second Lien Term Loan

39.    The Obligor Debtors are also party to the Second Lien Term Loan Agreement with the lenders party thereto (collectively, the "**Second Lien Term Loan Lenders**").  Pursuant to the Second Lien Term Loan Agreement, the Company borrowed an aggregate principal amount of $140 million in term loans (collectively, the "**Second Lien Term Loan**") from the Second Lien Lenders.

40.    Obligations under the Second Lien Term Loan (the "**Second Lien Obligations**") are secured by (i) a second-priority interest in the Term Loan Collateral, junior to the interests securing obligations outstanding under the First Lien Term Loan, and (ii) a third-priority interest in the ABL Collateral, junior to the interests securing obligations outstanding under the ABL Revolver and the First Lien Term Loan.  The Second Lien Term Loan bears an interest rate of LIBOR plus 7.25% and matures on June 28, 2021.  As of the Petition Date, the aggregate principal amount outstanding under the Second Lien Term Loan is approximately $140 million, plus accrued and unpaid interest thereon and out-of-pocket costs and expenses of the administrative agent.

### (iv)    Intercreditor Agreement

41.    The relative contractual rights of the holders of the ABL Obligations, the First Lien Obligations, and the Second Lien Obligations are governed by that certain Intercreditor Agreement, dated as of June 28, 2013 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**").  The Intercreditor Agreement controls the rights and obligations of holders of the Debtors' obligations outstanding under the ABL Revolver, the First Lien Term Loan, and the Second Lien Term Loan with respect to, among other things, priority, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

2. **Equity Ownership**

42.     CTI is a privately held company.  As of the Petition Date, affiliate entities of Goldman Sachs and T.H. Lee collectively hold approximately 94.31% of outstanding shares in Chef Holdings, Inc., with the remainder disparately held by former and existing management members.  All other Debtors are all wholly-owned direct or indirect subsidiaries of Chef Holdings, Inc.[7]

IV.     **Events Leading to Commencement of Chapter 11 Cases**

43.     While the Debtors' business as a whole remains operationally sound, a number of market factors and other unexpected events have led to a decline in profitability and a liquidity shortfall for the Company.  Specifically, and as described in greater detail below, the Debtors have experienced increased competition, market softness with certain key customers, high upfront costs in connection with improving food safety and quality, a capital expenditure dispute, and large interest payments due under the First Lien Term Loan Agreement and Second Lien Term Loan Agreement.  Consequently, the Debtors have negotiated the Prepackaged Plan with their key creditor constituencies to de-lever their balance sheet and increase operational liquidity.

A.     **Sales Decline from Market Competition with Recent Improvements**

44.     CTI's recent profitability decline is attributable in part to an increase in the number of protein processors in competitive segments of the food manufacturing and foodservice industries, which led to losses in customer shares and a decrease in new business for the Company.  Simultaneously, as described below in more detail, the Company's costs have increased over time.  The combination of increased competition and increased costs resulted in

---

[7] Certain non-Debtor individuals hold non-voting "Profit Units" in Chef Investment, LLC, but all Preferred Units and Common Units are held by Chef Holdings, Inc. and CTIF Holdings, Inc.

lower volumes and narrower profit margins.  The losses were particularly acute for taco meat

production—historically one of CTI's top three products by sales volume—with an

approximately 43.1% decline in volume sold between 2016 and 2018.  While the issue was most

severe for its taco meat production, the Company's overall volume sold declined by

approximately 13.6% over the same two-year period.

45.    Nonetheless, CTI's recent business performance provides signs of an

upward trend.  In its fourth quarter of 2018, CTI achieved an EBITDA equal to the first three

quarters of the year combined.  These recent results were obtained through the reacquisition of

lost business with existing customers, incremental sales to new customers, and the development

of innovative products for new business channels.

**B.    Operational and Food Safety Cost Expenditures**

46.    CTI's recent profitability decline is also partly attributable to a spike in

operational costs.  First, as described above, the Company has lately expended a significant

amount of resources to improve the productivity and food safety levels across all of its facilities.

The Company has generated some initial returns on those investments already, such as with the

decrease in plant safety incidents.  Yet much of CTI's recent corporate improvement efforts—

such as investing in customer partnerships and overhauling its R&D and sales approaches—will

likely require a longer time horizon before the Company is able to realize the bulk of the returns

on its investments.

47.    The Company has also been exposed to a number of unexpected

operational costs.  For example, CTI acquired Liguria in 2016 expecting to capitalize

immediately on Liguria's presence in a niche market of the protein processing industry, and to

incorporate Liguria's products into the menu of options available to CTI's other customers.

Shortly after the acquisition, however, the Company discovered a number of issues at the

Humboldt Facility that delayed CTI's ability to take advantage of the Liguria acquisition and incorporate the Liguria business into the rest of the Company effectively. Although the Company has made much headway in stabilizing the Liguria business, as with the Company's other corporate efficiency initiatives, it will likely take additional time before the Company is fully able to realize the benefits of its investment.

48.    Other segments of CTI's business experienced a number of recent financial and operational setbacks as well. For example, after expansion of its Owingsville Facility, the Company has been in the process of transitioning the production of certain meat products to the expanded Owingsville Facility. The Company has come across a number of difficulties in effecting that expansion and transition, largely due to the more complex operational processes and products. Additionally, several of the Company's customer contracts provide that the Company bear the cost of freight. Consequently, after a substantial uptick in freight costs, CTI incurred expenses that were significantly greater than anticipated.

49.    The Company's profitability also suffered from food quality incidents in 2017 and 2018. Although the Company quickly identified and remedied the issues, those occurrences led to a loss of customer sales and to the incurrence of significant costs in remedying the situation and ensuring the integrity of products manufactured on a go-forward basis. These costs, albeit temporary, have collectively had a material impact on the Company's recent profitability levels.

C.    **Capital Expenditure Reimbursement Issue**

50.    CTI has also experienced diminished liquidity due to a capital recovery dispute with one of its customers. Specifically, in connection with one of CTI's product lines at the Owingsville Facility, the Company invested in certain specialized packaging equipment at the customer's request. CTI initially paid for the upfront costs of the equipment with the

agreement that it would recover such costs through reimbursement payments during the life of the contract; however, the customer subsequently unilaterally stopped making the reimbursement payments.  As of the Petition Date, approximately $4.4 million in capital recovery expenses remain outstanding from the customer for the packaging equipment and CTI continues to evaluate potential resolutions.

**D.    Interest Payment**

51.    Lastly, the immediate catalyst leading to the commencement of these chapter 11 cases is the approximately $9.25 million interest payment on the First Lien Term Loan and Second Lien Term Loan that became due and owing on January 8, 2019 (the "**January Interest Payment**").

**E.    Debtors' Prepetition Restructuring Efforts**

52.    On June 25, 2018, the Debtors engaged Centerview Partners LLC ("**Centerview**"), as investment banker, to assist with, among other things, identifying and developing potential restructuring options.  On August 9, 2018, the Debtors also engaged Weil, Gotshal & Manges, LLP ("**Weil**") as restructuring counsel.

53.    In the time leading up to the Petition Date, the Debtors have taken significant steps to evaluate and implement strategies to increase liquidity and restore profitability.  For example, the Company, with the assistance of its advisors, (i) implemented a series of cost-saving measures and productivity improvements through the F1 Program discussed above and (ii) explored various potential alternative transactions.

54.    In early November 2018, the Debtors and their advisors also began engaging in arms' length negotiations with the Ad Hoc Group to develop a comprehensive financing and restructuring plan.  Further, in November 2018, CTI's board of directors

established an independent restructuring committee (the "**Restructuring Committee**") to evaluate and negotiate a potential restructuring transaction for the Company, among other things.

55.    On November 20, 2018, the Restructuring Committee separately retained Katten Muchin Rosenman LLP ("**Katten**") as independent counsel. Specifically, the Restructuring Committee, with the assistance of Katten, conducted a thorough investigation into whether any potentially material claims or causes of action existed against directors, officers, or existing equity holders of the Debtors, including Goldman Sachs and T.H. Lee. Katten made extensive diligence requests to the Debtors, reviewed materials provided in response, interviewed several potential witnesses, and prepared a report for the Restructuring Committee evaluating the strengths and weaknesses of any such potential claims or causes of action. Ultimately, based on that investigation and the report prepared in connection therewith, the Restructuring Committee determined it was unlikely that any such meritorious claims or causes of action exist that ought to be pursued.

56.    By January 8, 2019, the Debtors, the Ad Hoc Group, and the ABL Agent had not reached a final agreement on the terms of a consensual restructuring transaction, but remained engaged in good faith negotiations. To allow all parties to continue such discussions while mitigating concerns over the January Interest Payment, the Debtors, the Ad Hoc Group, and the ABL Agent entered into forbearance agreements (the "**Forbearance Agreements**") pursuant to which the Ad Hoc Group and the ABL Agent agreed to forbear from exercising remedies under the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, and the ABL Credit Agreement until January 31, 2019. Certain of the parties subsequently agreed to extend the terms of the Forbearance Agreements to February 28, 2019.

**F.      Restructuring Support Agreement and Prepackaged Plan**

57.      On March 7, 2019, after months of negotiations, the Debtors, with the aid of their advisors and the approval of the Restructuring Committee and the board of directors, executed the Restructuring Support Agreement with the Consenting Creditors and the Consenting Sponsors in support of the restructuring.  The restructuring transaction contemplated by the Restructuring Support Agreement, as further detailed in the Prepackaged Plan, will effectuate a debt-for-equity swap that deleverages the Company's balance sheet, increases its liquidity, and allows CTI to continue operating in the ordinary course of business with minimal disruption.

58.      Upon its full implementation, the Prepackaged Plan will reduce the Company's balance sheet liabilities from approximately $580 million in prepetition funded debt down to approximately $175 million in funded debt.  In addition to reducing its funded debt burden by approximately 70%, the Company will emerge from chapter 11 with access to a new working capital facility that will provide sufficient liquidity to allow the Company to continue funding business operations.

59.      Under the terms of the Prepackaged Plan, in full and final satisfaction of their prepetition claims, holders of First Lien Term Loan Claims will receive their pro rata shares of:

    (i)     97% of the equity in the reorganized Debtors (the "**New Common Shares**"),[8] subject to dilution by New Common Shares issued on account of a proposed management incentive plan and a backstop fee; and

    (ii)    a $50 million last-out tranche of loans under a first lien exit term loan facility (the "**Exit Term Loan Facility**").

---

[8] If holders of Second Lien Term Loan Claims do not vote to accept the Prepackaged Plan, holders of First Lien Term Loan Claims will also receive their pro rata shares of an additional 3% of New Common Shares, subject to dilution by New Common Shares issued on account of a proposed management incentive plan and a backstop fee.

60.     Distributions to holders of Second Lien Term Loan Claims will depend upon whether that class of holders (the "**Second Lien Class**") votes to accept the Prepackaged Plan.  If the Second Lien Class votes to accept, then each holder of Second Lien Term Loan Claims will receive its pro rata share of 3% of the New Common Shares, subject to dilution by New Common Shares issued on account of a proposed management incentive plan and a backstop fee.  If the Second Lien Class does not vote to accept the Prepackaged Plan, however, then holders of Second Lien Term Loan Claims will not receive any distributions.

61.     Irrespective of how the Second Lien Class votes on the Prepackaged Plan, General Unsecured Claims will be paid in the ordinary course and will be otherwise unimpaired, subject to all other rights or defenses the Company may otherwise have outside of chapter 11. Existing equity interests in Chef Holdings, Inc. will be cancelled on the Effective Date.

62.     Through the Restructuring Support Agreement, the Company has secured substantial support for the Prepackaged Plan from key stakeholders.  The Restructuring Support Agreement, among other things, commits T.H. Lee and Goldman Sachs, as the Consenting Sponsors, and the Consenting Creditors to support the Prepackaged Plan and the broader restructuring transaction by, among other things:

- Voting to accept the Prepackaged Plan;

- Agreeing to provide the releases set forth in the Prepackaged Plan;

- Supporting and taking all commercially reasonable steps to consummate the Prepackaged Plan;

- Refraining from taking any action that would delay or impede consummation of the Prepackaged Plan;

- Agreeing to certain procedures governing the transfer of the claims or interests held by the Consenting Creditors or Consenting Sponsors, as applicable; and

- With respect to the Consenting Creditors, agreeing to forbear from exercising certain rights or remedies under the prepetition loan documents.

63.     Together, the Restructuring Support and the Prepackaged Plan provide a pathway toward a comprehensive restructuring of the CTI's prepetition obligations, preserve the going-concern value of the Company's business, maximize creditor recoveries, and provide for an equitable distribution to the Company's stakeholders, all while minimizing disruption to day-to-day operations.

## V.     Debtors' Need for DIP Financing and Use of Cash Collateral

64.     As discussed above, CTI's rapidly diminishing liquidity has necessitated the filing of these chapter 11 cases.  In light of those liquidity issues, the Debtors require immediate access to debtor-in-possession financing and the authority to use cash collateral to ensure that they have sufficient working capital to operate their businesses and to administer their estates.  The combination of market changes, unanticipated operational issues, and unsustainable interest expenses has led to an acute deterioration of the Company's cash flows, which, if unaddressed, will stymie the Debtors' business operations.

65.     In the fall of 2018, the Company and its advisors began evaluating the Company's cash flow and liquidity needs in a chapter 11 scenario to determine how much postpetition financing would be required to operate the Debtors' business and pay administrative costs during a chapter 11 process, including the financing costs of postpetition credit facilities. Among other things, they analyzed the potential acceleration of demands on available liquidity following the commencement of these chapter 11 cases, including potential working capital contraction and incremental letter of credit posting requirements.  Based on this analysis, the Debtors and their advisors concluded that the Debtors would require access to at least

approximately $140 million in cash to finance their operations and maintain sufficient liquidity

assuming a potential six-month duration for these chapter 11 cases.

66.     As of the Petition Date, the Debtors have only a small amount of cash on

hand and require immediate access to postpetition financing and authority to use cash collateral.

Absent the proposed DIP Financing,[9] the Debtors will not have the liquidity necessary to, among

other things, fund payroll and satisfy their other working capital and general corporate purposes.

Access to sufficient working capital and liquidity is necessary and vital to avoid the liquidation

of CTI and for the preservation of its going concern value and successful reorganization for the

benefit of all of its stakeholders.

67.     Absent the authority to enter into and access the DIP Financing, even for a

limited period of time, the Company will be unable to continue operating its businesses, which

will cause irreparable harm to CTI and its stakeholders.  I believe that the current DIP Budget (as

attached to the DIP Motion as **Exhibit D**) provides an accurate reflection of the Debtors' funding

needs over the identified period and is reasonable and appropriate given the circumstances.

68.     It is also imperative to have sufficient DIP Financing in place because,

without confirmation of the same, CTI's business partners, employees, and customers may

question whether the Company will be well-capitalized during these chapter 11 cases in order to

ensure the business will continue as usual.  It has become apparent through the ongoing dialogue

between the Debtors and their advisors, on the one hand, and the Company's customers and

vendors, on the other, that any concerns regarding the Company's go-forward liquidity and

---

[9] Capitalized terms used but not otherwise defined in this Section V shall have the meanings ascribed to such terms in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 363 and 364 For Entry Of Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**DIP Motion**"), filed contemporaneously herewith.

ability to operate the business may result in a decision to use alternative suppliers, which in turn

would create a potential outflow of business that would irreparably harm the Company.  To

avoid losses to key customers and business partners, and to minimize unnecessary disruption to

business operations, I believe it is crucial that CTI convey to the market that it will be able to

sustain itself through these chapter 11 proceedings and continue to operate in the ordinary course

of business.  Consequently, I believe that the proposed DIP Financing is in the best interests of

the Company and its stakeholders.

## VI.    First Day Pleadings

69.    The First Day Pleadings seek relief to allow the Debtors to meet necessary

obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of

each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary

to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and

value, constitutes a critical element in achieving a successful reorganization of the Debtors, and

best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day

Pleading are incorporated herein by reference.  Capitalized terms used but not otherwise defined

in this section of this Declaration shall have the meanings ascribed to them in the relevant First

Day Pleadings.  Below is an overview of each of the First Day Pleadings.

**A.    Administrative Motions and Applications**

**1.    Joint Administration Motion**

70.    Pursuant to the *Motion of Debtors pursuant to Fed. R. Bankr. P. 1015(b)*

*For Entry of Order Directing Joint Administration of Chapter 11 Cases* (the "**Joint**

**Administration Motion**"), the Debtors request entry of an order directing consolidation of their

chapter 11 cases for procedural purposes only.  There are 17 Debtors, and I have been informed

that there are approximately 18,000 creditors and several other parties in interest in these cases.  I

believe that joint administration of these cases will save the Debtors and their estates substantial

time and expense because it would remove the need to prepare, replicate, file, and serve

duplicative notices, applications, and orders.  Joint administration will also relieve the Court

from entering duplicative orders and maintaining duplicative files and dockets.  Importantly, I do

not believe that joint administration will adversely affect the substantive rights of any parties in

interest because the administrative consolidation of the estates would only be for procedural

purposes.  Based on the foregoing, I believe that the relief requested in the Joint Administration

Motion should be approved.

<h3 style="text-align:center">2.    Prime Clerk Retention Application</h3>

71.    Pursuant to the *Application of Debtors Pursuant to 11 U.S.C §105(a) and 28 U.S.C. §156(c) For Appointment of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Petition Date* (the "**Prime Clerk Retention Application**"), the Debtors request entry of

an order appointing Prime Clerk LLC as claims and noticing agent ("**Claims and Noticing Agent**") in the Debtors chapter 11 cases, in accordance with the terms and conditions of that

certain Engagement Agreement dated December 5, 2018, by and between Chef Holdings, Inc.

and Prime Clerk effective as of the Petition Date.  Prime Clerk's duties will include preparing

and serving required notices and documents in these chapter 11 cases in accordance with the

Bankruptcy Code and the Bankruptcy Rules in the form and manner directed by the Debtors.

The terms of Prime Clerk's retention are set forth in the Engagement Agreement attached to, and

filed contemporaneously therewith, the Prime Clerk Retention Application.

72.    I understand Prime Clerk is comprised of leading industry professionals

with significant experience in both the legal and administrative aspects of large, complex

chapter 11 cases.  Prime Clerk's professionals have experience in noticing, claims

administration, solicitation, balloting and facilitating other administrative aspects of chapter 11

cases and experience in matters of this size and complexity.  I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  Moreover, I understand that in view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.   Based on the foregoing, I believe that the relief requested in the Prime Clerk Retention Application should be approved.

**B.      Operational Motions Requesting Immediate Relief**

      **1.      Cash Management Motion**

      73.      Pursuant to the *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Check Stock, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Prepetition Obligations Related Thereto, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (the "**Cash Management Motion**"), the Debtors request: (i) authority to (a) continue using their existing Cash Management System, Bank Accounts, and check stock, (b) implement changes to their Cash Management System in the ordinary course of business, including, without limitation, opening new or closing existing Bank Accounts, and (c) honor certain prepetition obligations related to the Cash Management System, (ii) administrative expense priority for postpetition Intercompany Claims, (iii) a waiver or an extension of time to comply with certain requirements of section 345(b) of the Bankruptcy Code, and (iv) related relief.

      74.      I understand that the Cash Management System is tailored to meet the Debtors' operating needs as a provider of custom foods solutions to major chain restaurants in

North America.  The Cash Management System enables the Debtors to collect and disburse cash generated by their business efficiently, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data.  I believe it is critical that the Cash Management System remain intact during these chapter 11 cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.

75.     The Company also maintains a Corporate Credit Card Program, pursuant to which certain employees use credit cards issued by Wells Fargo to incur travel and meal expenses, business office expenses, postage, parking, and certain other Business Expenses in connection with their employment duties.  I understand the Company incurs on average approximately $325,000 of aggregate Business Expenses through the Corporate Credit Card Program each month.  CTI remits the requisite payments for the Corporate Credit Card Program directly to Wells Fargo on a monthly basis.  I believe the Corporate Credit Card Program is essential to the Debtors' operations.  The Corporate Credit Card Program enables CTI's employees to conduct business more efficiently by purchasing goods and services that benefit the Debtors' business on the Debtors' behalf.  Without the program, I believe employees would likely either have to pay for the upfront costs of business travel and corporate expenses and then wait for reimbursement, or lose the ability to pay for such Business Expenses.  I believe continuation of the Corporate Credit Card Program will help minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' business.

76.     I understand that, in light of the Debtors' corporate structure, the Cash Management System relies in part on the Debtors' ability to engage in various Intercompany

Transactions in the ordinary course of business. The Debtors generally track all Intercompany Transactions and Intercompany Claims electronically in their centralized accounting system, the results of which are recorded concurrently on the applicable Debtor's balance sheets and regularly reconciled. I am informed that the accounting system requires that all general ledger entries be balanced at the legal entity level, and, therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet. This results in a net balance of zero when consolidating all intercompany accounts. In the past, Liguria Foods, Inc. has also made certain interest payments to CTI Foods Holding Co., LLC pursuant to that certain *Promissory Note*, dated February 12, 2016, entered into between Enzo Holdings, Inc., as the borrower, and CTI Foods Holding Co., LLC, as the lender (the "**Intercompany Note**").[10] I understand that the Intercompany Note was initially issued in connection with the Company's acquisition of the Liguria Business in 2016 in order to optimize the tax efficiency of the corporate enterprise as a whole. However, no payments have been made on account of the Intercompany Note since June 2018 and the Company does not anticipate any payments to occur during these chapter 11 cases.

77.     If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, I believe their operations would experience severe disruptions, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates. Based on the foregoing, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

---

[10] At the time of execution of the Intercompany Note, Liguria Foods, Inc. operated under the name Enzo Holdings, Inc.

2.      **Employees Motion**

78.      Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefit Programs and Pay Related Obligations, and (C) Pay Prepetition Employment Expenses, and (II) Granting Related Relief* (the "**Employees Motion**"), the Debtors request authority to, in their sole discretion, (a) pay Employee Compensation Obligations and Employee Benefit Obligations, related expenses, and fees and costs incident to the foregoing, including amounts owed to third-party service providers and administrators and tax authorities, and (b) maintain, continue to honor, and pay amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course of business.

79.      As described more fully in the Employees Motion, compensation of the Debtors' approximately 1,900 Employees, and Supplemental Workforce of between 130 and 170 temporary employees and independent contractors, is critical to the Debtors' continued operations and successful reorganization.  I believe the Employees and Supplemental Workforce are critical to the success of the Debtors' business, given that they are responsible for ensuring, among other things, that operations at each of the Debtors' seven facilities continue running smoothly and customer satisfaction is met on a daily basis.  I believe that any delay in paying or failure to pay the prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  Failure to pay the Employee Obligations could also inflict a significant financial hardship on the Employees' and the Supplemental Workforce personnel's families.  The Debtors

cannot risk such a substantial disruption to their business operations, especially at this critical

juncture, and it is inequitable to put Employees and the Supplemental Workforce at risk of such

hardship.  Without this relief, otherwise-loyal Employees may seek other employment

opportunities, thereby putting at risk the Debtors' continued operation as a reorganized

enterprise.

80.    I similarly believe that payment of prepetition amounts incurred in

connection with the Debtors' Reimbursement Programs is necessary because any other treatment

of Employees would be highly inequitable and risk alienation of the Debtors' workforce.

Employees who have incurred expenses in reliance on the Debtors' historical practice of

reimbursing Employees for such expenses should not be forced personally to bear the cost,

especially because those Employees incurred such expenses for the Debtors' benefit, in the

course of their employment by the Debtors, and with the understanding that they would be

reimbursed for doing so.

81.    I understand that, in the ordinary course of business, the Debtors make

certain deductions from Employees' gross pay—in some cases because the deductions are

required by law—on account of certain things such as garnishments, child support, spousal

support, service charges and similar deductions, as well as other pre- and post-tax deductions

payable pursuant to certain employee benefit plans discussed in the Employees Motion.  In

addition to these Deductions, I understand that certain laws require the Debtors to withhold

amounts from the Employees' gross pay related to federal, state, and local income taxes, Social

Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing

authority, which the Debtors must match, from their own funds, amounts for Social Security and

Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance.

82.     The Debtors also make certain Employee Benefits available to eligible Employees.  The Employee Benefits fall within the following categories: (a) paid time off, including personal time off and holidays; (b) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, short and long term disability insurance, certain voluntary insurance programs, certain mental health and wellness support services, and health savings accounts; (c) retirement savings plans, including a 401(k) plan; (d) severance; and (e) certain other benefits.  I believe that maintaining the Employee Benefits are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits, including the Debtors' competitors.

83.     As described in the Employees Motion, in certain instances the Debtors pay fees to third-party administrators and servicers of Employee Compensations Obligations and the Employee Benefits.  Third-party administrators assist the Debtors with, among other things, servicing the Health Benefits Claims, administering the Employee Benefits, and payroll servicing and payroll transfer administration in connection with the Employee Compensation Obligations.  I believe that continued payment to such third-party administrators is necessary, and without the continued service of these administrators, the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

84.     With respect to the Supplemental Workforce, I believe the Debtors require the services provided by the Supplemental Workforce engaged through the Employment Agencies.  The Supplemental Workforce includes individuals who have expertise related to the

Debtors' operations and provide services in specific areas, including accounting, asset protection, real estate, marketing, operations, communications, merchandising, maintenance, and human resources.  I believe that the relief sought in the Employees Motion in connection with the Supplemental Workforce is necessary and critical to avoid immediate and irreparable harm to the Debtors, and is in the best interests of the Debtors, their estates, and all parties in interest.

85.    I also believe that the total amount sought to be paid pursuant to the Employees Motion is modest compared to the magnitude of the Debtors' overall business. Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations. Accordingly, I believe the relief requested in the Employees Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**3.    All Trade Motion**

86.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 for an Order (I) Authorizing Payment of Prepetition Trade Claims in the Ordinary Course of Business and (II) Granting Related Relief* (the "**All Trade Motion**"), the Debtors request (i) authority to pay Trade Creditors, in the ordinary course of business, undisputed prepetition claims for goods and services related to the Debtors' operations and other ordinary course claims and (ii) related relief.  The Debtors also request authority to condition the payment of Trade Claims upon the Trade Creditors' agreeing to maintain or reinstate Customary Trade Terms during the pendency of these chapter 11 cases that are at least as favorable as those existing on or prior to the Petition Date or such other Customary Trade Terms acceptable to the Debtors in their sole discretion.

87.    To operate in the ordinary course of business, the Debtors utilize a number of Trade Creditors to provide the goods and services that facilitate such operations.  These essential goods and services include logistics and transportation services, equipment, supply and packaging materials, technology support, raw materials, facilities maintenance, utilities, professional services, marketing services, and other items.  I believe that Trade Creditors could refuse to continue doing business with the Debtors without the risk of incurring material damages or other contractual obligations.  Such actions, however, would cause significant disruption to the Debtors' business.

88.    For the 12 months prior to the Petition Date, the Debtors' average monthly payment to Trade Creditors was approximately $86,280,000.  The Debtors estimate, as of the Petition Date.  The following table summarizes the Debtors' estimate of the total amount of each category of Trade Claims outstanding as of the Petition Date, including estimates for amounts coming due within 21 days of the Petition Date.

| Type of Claim | Estimated Total Amount Outstanding as of Petition Date | Estimated Amount Due Within 21 Days of Petition Date |
|---|---|---|
| Logistics and Transportation | $1,908,000 | $1,822,000 |
| PACA/PASA Claims | $12,232,000 | $10,476,000 |
| Miscellaneous Lien Claims | $4,127,000 | $3,593,000 |
| 503(b)(9) Claims | $6,466,000 | $5,162,000 |
| Non-Priority Trade Claims | $9,042,000 | $8,245,000 |
| **Total:** | **$33,775,000** | **$29,298,000** |

89.    Notably, the majority of Trade Claims are held by the Debtors' raw goods suppliers, including the Debtors' meat distributors, many of which are sole source and "directed-buy" suppliers that are critical to meeting customer needs and difficult to replace.  Moreover,

many of the Trade Creditors are not subject to long term contracts and instead operate under spot purchase orders such that they would have no obligation to continue shipping goods to the Debtors on a go-forward basis if the Debtors were to refuse or delay payment of their Trade Claims.  Further, due to the perishable nature of raw materials, the Debtors require constant deliveries of such goods, making the Debtors highly dependent on many of the Trade Creditors. Accordingly, if Trade Creditors were to refuse to continue doing business with the Debtors, the Debtors business would be disrupted significantly.

90.     In addition, because the Trade Creditors are already familiar with the Debtors' assets and business needs, often as a result of years-long relationships, I believe they are in the best position to provide the necessary goods and services to the Debtors and are the most likely to do so on commercially reasonably terms.  Forcing the Debtors to obtain replacement goods and services, if replacement is an option, would likely cause substantial delay and significant costs.

91.     Further, the relief requested reflects only a difference in when Trade Creditors will be paid, not in how much.  As indicated above, through the Prepackaged Plan, the Debtors intend to deleverage their balance sheet without interruption to their business operations. In this regard, the Consenting Creditors have agreed to the unimpaired treatment of Other Secured Claims, Other Priority Claims, and General Unsecured Claims under the Plan – one of which applies to each of the Trade Claims.

92.     I believe that paying the Trade Claims – approximately 6% of the total debt in these chapter 11 cases – in the ordinary course is prudent when compared to the amount the Debtors' stakeholders stand to lose if the Debtors' businesses were to be interrupted. Further, I understand that certain of the Trade Creditors may be entitled to assert liens, including

mechanic's liens, against the Debtors' property for their respective Trade Claims arising from improvements and repairs made to the Debtors' property and equipment, as well as impose statutory trusts on certain of the Debtors' inventory and proceeds arising therefrom under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.*, and Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 et seq.  Therefore, in light of the above, I believe that the relief requested in the All Trade Motion furthers the Debtors' overarching restructuring goals without prejudice to the Debtors' stakeholders.

> **4.    Taxes Motion**

93.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541(d) and Fed. R. Bankr. P. 6003 and 6004 for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* (the "**Taxes Motion**"), the Debtors request authority to satisfy, in the Debtors' sole discretion, all Taxes and Fees due and owing to various local, state, and federal Taxing Authorities that arose prior to the Petition Date, including all Taxes and Fees subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date.

94.    The Taxes and Fees the Debtors typically incur in the ordinary course of business generally fall into the following categories: (a) franchise taxes, (b) property taxes, (c) sales and use taxes, (d) excise taxes, (e) income taxes, and (e) governmental fees.  In the 12 months prior to the Petition Date, the Debtors paid approximately $3,227,000 in Taxes and Fees, and I understand that approximately $1,384,000 of the Taxes and Fees relating to the prepetition period will become due and payable after the Petition Date, with approximately $250,000 coming due within the 21 days following the Petition Date.

95.    Further, I believe that the failure to pay the aforementioned Taxes may cause the Taxing Authorities to take actions that would interfere with the Debtors' continued

operations and potentially impose significant costs on the Debtors' estates.  Additionally, I

understand that failure to satisfy the prepetition Taxes and Fees may jeopardize the Debtors'

maintenance of good standing to operate in the jurisdictions in which they do business.

Moreover, to the extent any prepetition Taxes and Fees remain unpaid by the Debtors, I

understand that the Debtors' officers and directors may be subject to lawsuits or criminal

prosecution.  Based on the foregoing, I believe that the relief requested in the Taxes Motion is in

the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### 5.    Utilities Motion

96.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and 366

and Fed. R. Bankr. P. 6003 and 6004 for Entry of Interim and Final Orders (I) Approving

Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II)

Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility

Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief*

(the "**Utilities Motion**"), the Debtors request (a) approval of the Debtors' proposed form of

adequate assurance of payment to the Utility Companies, (b) establishment of procedures for

resolving objections by the Utility Companies relating to the adequacy of the proposed adequate

assurance, (c) prohibition of the Utility Companies from altering, refusing, or discontinuing

service to, or discriminating against, the Debtors on account of the commencement of these

chapter 11 cases or outstanding prepetition invoices, and (d) related relief.

97.    As more fully described in the motion, in the ordinary course of business,

the Debtors incur utility expenses, including on account of electricity, water, natural gas,

information technology, waste, and other Utility Services from a number of Utility Companies,

which the Debtors rely on to provide necessary support to their employees, vendors, and

customers.  I believe that preserving Utility Services on an uninterrupted basis is essential to the

Debtors' ongoing operations and restructuring process.  I believe that any interruption in Utility

Services—even for a brief period—would seriously disrupt the Debtors' ability to continue their

loan origination and servicing operations.  This disruption would adversely impact customer

relationships and would result in a decline in the Debtors' revenues.  Such a result could

seriously jeopardize the Debtors' restructuring efforts to the detriment of all parties in interest.

Therefore, I believe it is critical that Utility Services continue uninterrupted during these

chapter 11 cases.

98.     My understanding is that the Debtors intend to pay postpetition obligations

owed to the Utility Companies in a timely manner.  The Debtors expect that cash flows from

operations and their DIP Financing will be sufficient to pay postpetition obligations related to

their Utility Services in the ordinary course of businesses.  Based on a monthly average for the

12 months prior to the Petition Date, the Debtors estimate that their cost of Utility Services for

the next 30 days will be approximately $1,541,000.  As of the Petition Date, the Debtors estimate

that the total amount of the Adequate Assurance Deposit will be approximately $625,000.

99.     I believe the Adequate Assurance Deposit, in conjunction with the

Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes

sufficient adequate assurance to the Utility Companies.  Moreover, I believe the proposed

Adequate Assurance Procedures are reasonable because they will ensure that the Utility Services

continue while providing a streamlined process for Utility Companies to challenge the adequacy

of the Proposed Adequate Assurance or seek an alternative form of adequate assurance.  As a

result, I believe that the relief requested in the Utilities Motion should be granted.

### 6.    Insurance Motion

100.     Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a),*

*362(d), and 363(b) and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Orders*

*(I) Authorizing Debtors to Continue their Insurance Programs and Pay All Obligations with Respect Thereto and (II) Granting Related Relief* (the "**Insurance Motion**"), the Debtors request authority to (a) continue all Insurance Programs in accordance with the applicable insurance policies and to perform with respect thereto in the ordinary course of business, (b) pay any prepetition obligations arising under the Insurance Programs, and (c) modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

101.    In the ordinary course of business, the Debtors maintain a workers' compensation insurance program and various liability, property, and other insurance programs that provide the Debtors with insurance related to, among other things, general liability, directors' and officers' liability, fiduciary liability, and property, crime, contamination, and umbrella coverage through several Insurance Carriers.

102.    Under the laws of the various states in which they operate, I understand that the Debtors are legally and contractually required to maintain certain Insurance Programs, including under state laws mandating that the Debtors maintain workers' compensation coverage for their employees.  The Insurance Carriers may also advance any part or all of the per claim retention under the Workers' Compensation Program on behalf of the Debtors.  Although the Debtors generally pay all deductibles in full themselves, in connection with the large deductible program, Arch Insurance Company may advance any part or all of the per claim retention on behalf of the Debtors.  As a result, the Debtors were required to provide collateral to Arch Insurance Company in the form of a letter of credit issued under the ABL Credit Agreement, which Arch Insurance Company may draw upon in the event the Debtors fail to make the

deductible payments and it provides an advance.  I understand that, as of the Petition Date, the

face value of the applicable letter of credit is approximately $7,850,000, and there are

approximately 110 open claims under the Workers' Compensation Program.

103.    Through a variety of Insurance Carriers, the Debtors maintain various

Liability and Property Insurance Programs, which provide the Debtors with insurance coverage

for liabilities relating to, among other things, accidental contamination, property damage, general

commercial crime, employment practices, automobile liability, umbrella, foreign liability, and

various other property-related and general liabilities.  The Liability and Property Insurance

Programs help the Debtors manage the various risks associated with their businesses, and I

understand that some of the Liability and Property Insurance Programs are also required by

certain regulations, laws, and contracts that govern the Debtors commercial activities.

Consequently, I believe that continuation of the Liability and Property Insurance Programs is

essential to the ongoing operations of the Debtors' businesses and the preservation of their

estates.

104.    In addition to the Liability and Property Insurance Programs, the Debtors

are party to four Professional Liability Programs that provide the Debtors with insurance

coverage for directors' and officers' liability, fiduciary liability, and professional liability.  The

Debtors incur premiums under the Professional Liability Programs based upon fixed rates

established and billed by the applicable Insurance Carriers, in addition to various deductibles.

105.    The Debtors utilize Marsh USA, Inc. as their insurance agent and broker

for the Professional Liability Programs, as well as certain policies encompassed in the Liability

and Property Insurance Programs, including the policies for contamination, employment

practices, and commercial crime.  The Debtors utilize Arthur J. Gallagher & Co. as their

insurance agent and broker for all other policies.  The Insurance Brokers assist the Debtors with the procurement and negotiation of the applicable Insurance Programs and, in most circumstances, to remit premium payments to the Insurance Carriers on behalf of the Debtors. Additionally, the Insurance Brokers assist the Debtors with identifying and reviewing claims and other loss control and prevention services in connection with the Insurance Programs they brokered.

106.    The Debtors pay the Insurance Brokers certain Brokers' Fees for their services.  Marsh is paid on a commission basis for Insurance Programs procured by Marsh, with such commissions being earned upon inception of the applicable policy term.  The Debtors pay Gallagher an annual fee of $190,000, which is paid on a quarterly basis.  The Debtors may, however, credit against this annual fee the amount they pay Gallagher in commissions for procuring certain of the Insurance Programs.  As of the Petition Date, the Debtors are not aware of any outstanding prepetition amounts owed to the Insurance Brokers on account of the Brokers Fees.

107.    In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain the Insurance Programs and that they obtain authority to pay all Insurance Obligations related thereto.   I believe the Debtors' use of estate funds to pay the Insurance Obligations is justified because such obligations are necessary costs of preserving the Debtors' estates. Furthermore, I understand that the Debtors are legally and contractually required to maintain certain Insurance Programs, including under state laws mandating that the Debtors maintain workers' compensation coverage for their employees.  Further, based on the Debtors' current circumstances, I believe it is unlikely that the Debtors will be able to renew or replace their

existing Insurance Programs on terms more favorable than those currently offered by the

Insurance Carriers, and the process of establishing new programs would also be burdensome and

costly to the Debtors.

108.    In this regard, I believe the Insurance Programs are essential to the

Debtors' operations, as the Debtors would be exposed to significant liability if the Insurance

Programs were allowed to lapse or terminate, which exposure could detrimentally impact the

Debtors' ability to reorganize successfully.  It is similarly critical that the Debtors have the

authority to supplement, amend, extend, renew, or replace their Insurance Programs as needed, in

their business judgement.  Based on the foregoing, I believe that the relief requested in the

Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest

and should be approved

## 7.    Customer Programs Motion

109.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a),*

*363(b), and 507(a) and Fed. R. Bankr. P. 6003 and 6004 for an Order (I) Authorizing Debtors*

*(A) to Honor Certain Prepetition Obligations to Customers and Continue Customer Programs in*

*the Ordinary Course of Business and (B) File Under Seal Certain Supplements to the Debtors'*

*Creditor Matrix, Professional Retention Applications, Affidavits of Service, and Related*

*Documents and (II) Granting Related Relief* (the "**Customer Programs Motion**"), the Debtors

request authority, in their sole discretion, to maintain and administer customer-related programs,

promotions, and practices, and pay and otherwise honor their obligations to customers relating

thereto, whether arising prior to or after the Petition Date.

110.    The Debtors' businesses depend upon the loyalty of the Debtors'

customers.  To maximize customer loyalty, the Debtors have maintained and followed, in the

ordinary course of business, certain Customer Programs for the benefit of their customers,

including, rebate programs, customer bank programs, marketing programs, and research and conference programs.  Many, if not all, of the Customer Programs are standard in the food service industry. Without the ability to continue their Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing market share and value of their businesses.  The Customer Programs include: (a) the Rebate Program, (b) the Customer Banks, and (c) the Research and Conference Programs.

111.     The ability to continue administering the Customer Programs without interruption is essential to the Debtors' valuable Customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.   I believe that if the Debtors are unable to continue the Customer Programs postpetition or honor the Customer Program Obligations, the Debtors risk alienating certain Customer constituencies, which may then form relationships with the Debtors' competitors.

112.     The Customer Programs also are essential strategies for attracting new Customers and increasing sale volumes from existing Customers.  Failure to continue the Customer Programs will place the Debtors at a significant – and potentially insurmountable – competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 cases.  The relief requested in the Customer Programs Motion will pay dividends with respect to their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.

113.     Additionally, the Debtors' business relationships with their Customers are a commercially sensitive matter.  The Debtors are required by code and local rule to file a creditor matrix, professional disclosure schedules, and service affidavits which would necessarily

include the identities of, or other identifying information regarding, one or more of the Debtors'

Customers.  Such information, however, is not publicly known and is generally subject to

confidentiality limitations contained in the Debtors' Customer contracts.

114.    The Debtors are party to confidentiality agreements that prohibit public

disclosure of certain of their customer relationships.  Violation of those agreements could lead to

a loss of business not only under such agreements but also on a wider scale to the extent that

Customers perceive that their confidences cannot be kept by the Debtors.  Disclosure of such

relationships through public filing of the Confidential Customer Information could have a

negative impact on the Debtors' ability to retain and attract Customers and could also cause the

Debtors to breach the terms of key Customer contracts that they wish to assume as part of the

chapter 11 process.

115.    Accordingly, I believe that the Debtors have shown cause sufficient to

warrant the authority to continue administering the Customer Programs, to honor any Customer

Obligations relating thereto, and to file Confidential Customer Information under seal.

## Conclusion

116.    This Declaration illustrates the factors that have precipitated the

commencement of these chapter 11 cases and the critical need for the Debtors to implement the

reorganization strategy embodied in the Prepackaged Plan.

117.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed: March 11, 2019

Respectfully submitted,

By:    */s/ Kent Percy*
Name:   Kent Percy
Title:    Chief Restructuring Officer


on behalf of


**CTI FOODS, LLC**
**CHEF HOLDINGS, INC.**
**CHEF INTERMEDIATE, INC.**
**CTIF HOLDINGS, INC.**
**CHEF INVESTMENT, LLC**
**CTI FOODS ACQUISITION LLC**
**CTI FOODS HOLDING CO., LLC**
**CTI SERVICES CORPORATION**
**CTI ARLINGTON, LLC**
**CTI SAGINAW I, LLC**
**CTI KING OF PRUSSIA, LLC**
**CTI-SSI FOOD SERVICES, LLC**
**S & S FOODS LLC**
**CUSTOM FOOD PRODUCTS HOLDINGS, LLC**
**CUSTOM FOOD PRODUCTS, LLC**
**LIGURIA HOLDINGS, INC.**
**LIGURIA FOODS, INC.**

## Exhibit A

**Restructuring Support Agreement**

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of March 7, 2019 is entered into by and among:

(a)       Chef Holdings, Inc. ("***Holdings***"), Chef Intermediate, Inc., CTIF Holdings, Inc., Chef Investment, LLC, CTI Foods Acquisition LLC, CTI Foods Holding Co., LLC, CTI Services Corporation, CTI Foods, LLC, CTI Arlington, LLC, CTI Saginaw I, LLC, CTI King of Prussia, LLC, CTI-SSI Food Services, LLC, S & S Foods LLC, Custom Food Products Holdings, LLC, Custom Food Products, LLC, Liguria Holdings, Inc., and Liguria Foods, Inc., each such entity a subsidiary of Holdings (collectively with Holdings, the "***Company***");

(b)       Thomas H. Lee Equity Fund VI, L.P., Thomas H. Lee Parallel Fund VI, L.P., Thomas H. Lee Parallel (DT) Fund VI, L.P., Great-West Investors LP, Putnam Investments Employees' Securities Company III, LLC, THL Coinvestment Partners, L.P., THL Operating Partners, L.P., Broad Street Principal Investments, L.L.C., MBD 2013 Holdings, L.P., and Bridge Street 2013 Holdings, L.P. (collectively, in their capacities as such, the "***Consenting Sponsors***"); and

(c)       the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain First Lien Term Loan Agreement, dated as of June 28, 2013 (as amended, modified, or otherwise supplemented from time to time, the "***First Lien Term Loan Agreement***"), by and among CTI Foods Holding Co., LLC, each of the guarantors named therein, Cortland Capital Markets Services LLC, as successor administrative agent and collateral agent, and the lenders holding outstanding loans issued thereunder (the "***First Lien Term Loans***") party thereto from time to time (the "***First Lien Lenders***" and, the undersigned First Lien Lenders, together with their respective successors and permitted assigns and any subsequent First Lien Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting First Lien Creditors***") and/or that certain Second Lien Term Loan Agreement, dated as of June 28, 2013 (as amended, modified, or otherwise supplemented from time to time, the "***Second Lien Term Loan Agreement***"), by and among CTI Foods Holding Co., LLC, each of the guarantors named therein, Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent, and the lenders holding outstanding loans issued thereunder (the "***Second Lien Term Loans***") party thereto from time to time ("***Second Lien Lenders,***" together with their respective successors and permitted assigns and any subsequent Second Lien Lender that becomes party thereto in accordance with the terms hereof, the "***Consenting Second Lien Creditors***" and, together with the Consenting First Lien Creditors, the ***Consenting Creditors***").

The Company, each Consenting Creditor, each Consenting Sponsor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and each individually as a "***Party***."  Capitalized terms used but not defined herein shall have the meanings ascribed to them, as applicable, in the Plan (as defined below) attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto).

When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement

unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS**, the Parties have agreed to a restructuring of the Company's capital structure (the "***Restructuring***"), which is anticipated to be implemented through a prepackaged plan of reorganization (as may be supplemented, amended, or modified from time to time in accordance with the terms hereof, the "***Plan***"), a solicitation of votes thereon (the "***Solicitation***") pursuant to chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), and the commencement by the Company of voluntary cases (the "***Chapter 11 Cases***") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

**WHEREAS**, as of the date hereof, the Consenting Sponsors, directly or indirectly, hold approximately 94.31% of the outstanding equity interests in Holdings;

**WHEREAS**, as of the date hereof, the Consenting Creditors hold, in the aggregate, approximately 74.23% of the aggregate outstanding principal amount of the First Lien Term Loans;

**WHEREAS**, as of the date hereof, the Consenting Creditors hold, in the aggregate, approximately 25.24% of the aggregate outstanding principal amount of the Second Lien Term Loans;

**WHEREAS**, certain of the Consenting Creditors (in such capacity, each a "***DIP Term Loan Commitment Party***") have agreed to commit to provide the DIP Term Loan Facility, and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code), in accordance with and subject to the terms and conditions set forth in the DIP Term Loan Term Sheet and pursuant to the terms and conditions set forth in the DIP Orders;

**WHEREAS**, the Restructuring will include the grant of a new Management Incentive Plan consistent in form and substance with the term sheet attached hereto as **Exhibit B**;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in the Plan and this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and

WEIL:\96772473\31\39681.0001

sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "*Alternative Restructuring*" means any dissolution, winding up, liquidation, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale, financing (debt or equity), plan proposal, or restructuring of the Company, other than the Plan.

(b)    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(c)    "*Confirmation Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan in the Chapter 11 Cases.

(d)    "*Consenting Class*" means either the First Lien Lenders or the Second Lien Lenders, as applicable.

(e)    "*Consenting Creditor Counsel*" means Davis Polk & Wardwell LLP, as counsel to a group of the Consenting Creditors.

(f)    "*Consenting Second Lien Creditor Consent Right*" means the right of a majority of Consenting Second Lien Creditors to consent to or approve Definitive Documents or actions, as applicable, which right shall apply solely to the extent such Definitive Documents or actions, as applicable, (i) adversely affect any of the rights or benefits granted to or received by, or proposed to be granted to or received by, the Consenting Second Lien Creditors pursuant to this Agreement or the Plan, (ii) affect the releases in favor of the Consenting Second Lien Creditors provided, or proposed to be provided, under any Definitive Document, or (iii) adversely affect any obligation the Consenting Second Lien Creditors may have pursuant to this Agreement or the Plan.

(g)    "*Consenting Sponsor Consent Right*" means the Consenting Sponsors' right to consent to or approve Definitive Documents or actions, as applicable, which right shall apply solely to the extent such Definitive Documents or actions, as applicable, (i) adversely affect any of the rights or benefits granted to or received by, or proposed to be granted to or received by, the Consenting Sponsors pursuant to this Agreement or the Plan, (ii) affect the releases in favor of the Consenting Sponsors provided, or proposed to be provided, under any Definitive Document, or (iii) adversely affect any obligation the Consenting Sponsors may have pursuant to this Agreement or the Plan.

(i)    "*Definitive Documents*" means any material documents (including any material related orders, agreements, instruments, schedules, or exhibits) that are described in or contemplated by this Agreement and the Plan and necessary or desirable to implement the Restructuring, including (i) this Agreement, (ii) the Plan, (iii) the Disclosure Statement, (iv) the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation procedures, (v) the Confirmation Order, (vi) the motion seeking approval by the Bankruptcy Court

of the DIP Facilities and the interim and final orders of the Bankruptcy Court approving the same (the "***Interim DIP Order***" and the "***Final DIP Order***," respectively), (vii) the DIP Term Loan Agreement, (viii) the Plan Supplement, including the New Corporate Governance Documents, (ix) the DIP ABL Agreement, (x) the Exit Facilities, (xi) the Exit Term Loan Agreement and the Exit ABL Agreement, and (xii) the first day motions, second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions.

(h)      "***DIP ABL Agreement***" means the credit agreement evidencing the DIP ABL Facility.

(i)      "***DIP ABL Facility***" means a debtor-in-possession asset-based revolving facility provided by the DIP ABL Lenders in an aggregate principal amount of $80,000,000 pursuant to the terms and conditions of the DIP Orders.

(j)      "***DIP ABL Lenders***" means Barclays Bank PLC and Wells Fargo Bank, N.A.

(k)      "***DIP ABL Term Sheet***" means the term sheet describing the terms of the DIP ABL Facility attached hereto as **Exhibit C**.

(l)      "***DIP Facilities***" means, collectively, the DIP ABL Facility and the DIP Term Loan Facility.

(m)      "***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

(n)      "***DIP Term Loan Agreement***" means the credit agreement evidencing the DIP Term Facility.

(o)      "***DIP Term Loan Commitment***" means the commitment of a DIP Term Loan Commitment Party to provide the DIP Term Loan Facility in accordance with the terms set forth in the DIP Term Loan Term Sheet.

(p)      "***DIP Term Loan Facility***" means the debtor-in-possession term loan facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, as set forth in the DIP Term Loan Term Sheet, and pursuant to the terms and conditions of the DIP Orders.

(q)      "***DIP Term Loan Term Sheet***" means the term sheet describing the terms of the DIP Term Loan Facility attached hereto as **Exhibit D**.

(r)      "***Disclosure Statement***" means the disclosure statement in respect of the Plan attached hereto as **Exhibit E**, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

(s)      "***Effective Date***" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

(t)        "*Exit ABL Facility*" means the DIP ABL Facility as amended, refinanced, or otherwise modified in connection with the consummation of the Plan.

(u)        "*Exit ABL Term Sheet*" means the term sheet describing the terms of the Exit ABL Facility attached hereto as **Exhibit F**.

(v)        "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit Term Loan Facility.

(w)        "*Exit Term Loan Facility*" means, collectively, the Exit First Out Term Loans and the Exit Last Out Term Loans, which shall be consistent with the terms and conditions set forth in the Exit Term Loan Term Sheet.

(x)        "*Exit Term Loan Term Sheet*" means the term sheet describing the terms of the Exit Term Loan Facility attached hereto as **Exhibit G**.

(y)        "*Loan Documents*" means the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement.

(z)        "*Loans*" means the First Lien Term Loans and the Second Lien Term Loans.

(aa)       "*Management Incentive Plan*" means the post-restructuring equity-based management incentive plan to be adopted on the Effective Date.

(bb)       "*New Corporate Governance Documents*" means (i) the Amended By-Laws, (ii) the Amended Certificate of Incorporation, and (iii) any other applicable material governance and/or organizational documents of the Reorganized Debtors.

(cc)       "*Requisite Creditors*" means, as of the date of determination, Consenting Creditors holding at least a majority of the outstanding First Lien Term Loans held by the Consenting Creditors as of such date.

(dd)       "*Securities Act*" means the Securities Act of 1933, as amended.

(ee)       "*Specified Defaults*" means, collectively, (i) the Event of Default under the First Lien Term Loan Agreement as a result of the Company's failure to make a payment of interest on December 31, 2018 with respect to the First Lien Term Loans; (ii) the Event of Default under the First Lien Term Loan Agreement as a result of the Company's failure to make an amortization payment with respect to certain First Lien Term Loans; (iii) the Event of Default under the Second Lien Term Loan Agreement as a result of the Company's failure to make a payment of interest on December 31, 2018 with respect to the Second Lien Term Loans; (iv) any defaults under the Loan Agreements as a result of cross-defaults caused by the forgoing; and (v) any Events of Default or defaults under the Loan Agreements as a result of the Solicitation, the filing of the Chapter 11 Cases, the entry into the Definitive Documents, or the implementation of the Restructuring.

WEIL:\96772473\31\39681.0001

(ff)    "*Supermajority Requisite Creditors*" means, as of the date of determination, Consenting Creditors holding at least 66⅔% of the outstanding First Lien Term Loans.

(gg)    "*Supermajority Consent Documents*" means (i) the Exit Facilities, (ii) the Confirmation Order, and (iii) the New Corporate Governance Documents.

(hh)    "*Support Effective Date*" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) Consenting Creditors holding at least 66⅔% in the aggregate principal amount outstanding of the First Lien Term Loans, and (iii) the Consenting Sponsors.

(ii)    "*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 6 hereof and (ii) the Effective Date.

2.    **Bankruptcy Process; Plan of Reorganization.**

(a)    The Plan.  The Plan is expressly incorporated herein and made a part of this Agreement.  The terms and conditions of the Restructuring are set forth in the Plan; *provided, however*, that the Plan is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan shall govern.  No material modifications shall be made by the Debtors to any substantive provisions of the Plan without the consent of the Supermajority Requisite Creditors; *provided, however*, that the foregoing shall not modify or otherwise impair (i) the Consenting Sponsor Consent Right over the Plan or any other Definitive Documents as provided herein or (ii) the Consenting Second Lien Creditor Consent Right over the Plan or any other Definitive Documents as provided herein.

(b)    Definitive Documents.  Each of the Definitive Documents shall (i) contain terms and conditions consistent in all material respects with this Agreement and the Plan and (ii) otherwise be in form and substance reasonably acceptable to (A) the Requisite Creditors, (B) solely to the extent required under the Consenting Sponsor Consent Right, the Consenting Sponsors, and (C) solely to the extent required under the Consenting Second Lien Creditors Consent Right, the Consenting Second Lien Creditors.  Notwithstanding anything to the contrary in this Agreement, (w) any documentation relating to the DIP Term Loan Facility, the motion seeking authority to enter into the DIP Facilities, and the DIP Orders shall contain terms and conditions consistent in all respects with this Agreement and otherwise be in form and substance acceptable to the DIP Term Loan Commitment Parties, (x) the DIP ABL Agreement shall be consistent in all respects with the ABL DIP Term Sheet, (y) the Plan, the Plan Supplement, and the order regarding cash management shall contain terms and conditions consistent in all respects with this Agreement and otherwise be in form and substance acceptable to the Requisite Creditors, and (z) the Supermajority Consent Documents shall contain terms and conditions consistent in all respects with this Agreement and otherwise be in form and substance acceptable to the Supermajority Requisite Creditors; *provided, however*, that the Supermajority Requisite Creditors shall be deemed to have consented to any provisions in the Exit Facilities that are consistent in all respects with the Exit ABL Term Sheet and Exit Term Loan Term Sheet, as applicable.

6

(c)     <u>Commencement of the Chapter 11 Cases</u>.  The Company hereby agrees that, as soon as reasonably practicable, but in no event later than two (2) days after the Support Effective Date, the Company will commence Solicitation.  Provided that the Support Effective Date has occurred, the Company further agrees that, as soon as reasonably practicable, but in no event later than March 11, 2019 (the "**Outside Petition Date**") (the date on which such filing occurs, the "**Petition Date**"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases.

(d)     <u>Filing of the Plan and Disclosure Statement</u>.  No later than the close of business on the next business day following the Petition Date, the Company shall file the Plan and the Disclosure Statement with the Bankruptcy Court.

(e)     <u>Confirmation of the Plan</u>.  The Company shall use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Creditor and each Consenting Sponsor shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(f)     <u>DIP Financing and Cash Collateral</u>.  No later than the close of business on the next business day following the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking entry of the DIP Orders.

3.     **Agreements of the Consenting Creditors.**

(a)     <u>Voting; Support</u>.  Each Consenting Creditor agrees that, for the duration of the Support Period applicable to such Consenting Creditor, such Consenting Creditor shall:

     i.     timely vote or cause to be voted any Claims it holds against the Company (including First Lien Term Loan Claims and Second Lien Term Loan Claims) to accept the Plan by delivering its duly executed and completed ballot or ballots and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party, on a timely basis following commencement of the Solicitation;

     ii.     not change or withdraw (or cause or direct to be changed or withdrawn) any such vote or release described in clause (i) above; *provided*, *however*, that notwithstanding anything in this Agreement to the contrary, a Consenting Creditor's vote and release may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the termination of this Agreement pursuant to the terms hereof with respect to such Consenting Creditor;

     iii.     timely vote (or cause to be voted) any Claims it holds against the Company (including First Lien Term Loan Claims and Second Lien Term Loan Claims) to reject any Alternative Restructuring;

7

iv.    not directly or indirectly, through any Person (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring; *provided*, *however*, that (A) if the Supermajority Consent Documents have not been agreed to by the Supermajority Requisite Creditors within twenty (20) days from the date hereof or (B) a proposed material modification by the Debtors to any substantive provision of the Plan has not been agreed to by the Supermajority Requisite Creditors within the later of (y) twenty (20) days from the date hereof or (z) ten (10) days from the date of such proposed material modification, Consenting Creditors may engage in negotiations in connection with or participate in the formulation or preparation of, any Alternative Restructuring, with (1) the Company and (2) the DIP ABL Lenders, the First Lien Lenders, the Second Lien Lenders, or the Consenting Sponsors;

v.    not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor shall direct and use its commercially reasonable efforts to cause such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action;

vi.    neither object nor directly or indirectly support an objection, and hereby agree, to the payment of $312,500 in Cash on account of management and advisory fees due from the Company under that certain Advisory Services Agreement dated as of June 28, 2013 (the "***Advisory Services Agreement***") to the Managers (as defined in the Advisory Services Agreement) as Allowed General Unsecured Claims under the Plan on or prior to the Effective Date;

vii.    support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation, approval and entry of the DIP Orders, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement; and

viii.    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(b)    <u>Rights of Consenting Creditors Unaffected</u>.  Nothing contained herein shall limit:

i.    the rights of a Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including appearing as a party in interest and to be heard in any matter concerning or arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is consistent with this Agreement and such Consenting Creditor's obligations hereunder;

ii.    the ability of a Consenting Creditor to purchase, sell, or enter into any transactions in connection with its Claims or interests, in compliance with the terms hereof and applicable law;

iii.    subject to the terms and obligations hereof (including section 3(f)) and applicable law, including the Bankruptcy Code, any right of a Consenting Creditor under the Loan Documents, any other applicable agreement, instrument, or document that gives rise to a Consenting Creditor's Claims or Interests, as applicable, or constitute a waiver or amendment of any provision of any such agreement, instrument, or document;

iv.    subject to any confidentiality provisions in this Agreement, the Loan Documents, or any other confidentiality agreement entered into by the Company and a Consenting Creditor, the ability of a Consenting Creditor to consult with any other Parties or entities; or

v.    the ability of a Consenting Creditor to enforce any right, remedy, condition, consent, or approval requirement under this Agreement or under any of the Definitive Documents.

(c)    <u>Transfers</u>.  Each Consenting Creditor agrees that, for the duration of the Support Period applicable to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any Claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such Claims or interests), unless the transferee thereof (i) is a Consenting Creditor or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims or other claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit H** (the "***Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days following such execution, to Weil, Gotshal & Manges LLP ("***Weil***"), as counsel to the Company, and the Consenting Creditor Counsel, in which event (A) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.

WEIL:\96772473\31\39681.0001

Each Consenting Creditor agrees that any Transfer of any Claim or interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer. Notwithstanding anything to the contrary herein, a Consenting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker[1] without the requirement that the Qualified Marketmaker become a Party; *provided*, *however*, that (x) such Qualified Marketmaker must Transfer such right, title, or interest by the earlier of seven (7) calendar days following its receipt thereof and the Voting Deadline, (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such transfer, and (z) such Consenting Creditor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this <u>Section 3</u>.

(d)    <u>Additional Claims</u>.    To the extent any Consenting Creditor (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan, or (iii) Transfers any Claims, then, in each case, each such Consenting Creditor shall, through the Consenting Creditor Counsel, promptly notify Weil.  Each such Consenting Creditor agrees that such additional Claims or other claims shall be subject to this Agreement and that, for the duration of the Support Period applicable to such Consenting Creditor, it shall vote (or cause to be voted) any such additional Claims or other claims entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with <u>Section 4(a)</u> hereof.

(e)    <u>Additional Lenders</u>.    Any First Lien Lender or Second Lien Lender may, at any time after the Support Effective Date, become a party to this Agreement as a Consenting First Lien Lender and/or Consenting Second Lien Lender, as applicable (an "***Additional Consenting Lender***"), by executing a Joinder Agreement, pursuant to which such Additional Consenting Lender shall be bound by the terms of this Agreement as a Consenting First Lien Lender and/or Consenting Second Lien Lender, as applicable, hereunder and shall be deemed a Consenting Creditor for all purposes hereunder.

(f)    <u>Forbearance</u>.    Solely during the Support Period applicable to such Consenting Creditor and without prejudice to any right such Consenting Creditor has or may have with respect to anything other than a Specified Default (all of which are expressly reserved subject to the terms of this Agreement and the Definitive Documents), each Consenting Creditor agrees to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Loan Documents and any agreement contemplated thereby, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to the Specified Defaults; *provided, however,* that, in accordance with the applicable Loan Documents, the accrual of interest (including default interest, if any) shall be unaffected by the terms hereof and continue during the

---

[1] As used herein, the term "***Qualified Marketmaker***" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims against the Company (or enter with customers into long and short positions in Claims against the Company), in its capacity as a dealer or marketmaker in Claims against the Company and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

Support Period, subject to applicable law and the Definitive Documents, with respect to the First Lien Term Loans and the Second Lien Term Loans.  Each Consenting Creditor further agrees that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions.

(g)    D&O Claims.  Regardless of whether or not the Bankruptcy Court approves the releases set forth in the Plan against the Released Parties, each Consenting Creditor hereby covenants and agrees not to pursue any claims that such Consenting Creditor may have against the Released Parties.

(h)    DIP Term Loan Commitments.

i.    Subject to the conditions set forth in the DIP Term Loan Term Sheet, each DIP Term Loan Commitment Party, severally and not jointly, agrees to provide (or cause any of its designees to provide) its share of the DIP Term Loan Commitments as set forth in **Exhibit I** attached hereto on the terms and conditions substantially as set forth in the DIP Term Loan Term Sheet.  For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the DIP Term Loan Commitment Parties made pursuant to this Section 3(h) to enter into the DIP Term Loan Agreement and provide its share of the DIP Term Loan Commitments as set forth in **Exhibit I** shall terminate; *provided*, *however*, that upon the closing of the DIP Term Loan Agreement, the DIP Term Loan Agreement shall govern the DIP Term Loan Commitments and any termination thereof.

ii.    The DIP Term Loan Commitment Parties listed on **Exhibit J** attached hereto (the "***Backstop Parties***") agree to backstop (or cause any of its designees to backstop) the DIP Term Loan Facility on the terms and conditions substantially as set forth in the DIP Term Loan Term Sheet and in the percentages set forth opposite such Backstop Party's name on **Exhibit J**.  In consideration for providing such backstop, the Company shall pay to the Backstop Parties the Backstop Commitment Fee on the Effective Date and subject to the terms and conditions of the Definitive Documents.

(i)    New Corporate Governance Documents.  The Consenting Creditors hereby agree to provide drafts of the New Corporate Governance Documents acceptable to the Supermajority Requisite Creditors as provided herein through the Consenting Creditor Counsel to Weil no later than ten (10) calendar days before the Voting Deadline.

4.    **Agreements of the Consenting Sponsors.**

(a)    Voting; Support.  Each Consenting Sponsor agrees that, for the duration of the Support Period, such Consenting Sponsor shall:

i.      if solicited, timely vote or cause to be voted its Claims or Interests to accept the Plan by delivering its duly executed and completed ballot or ballots on a timely basis following the commencement of the Solicitation;

ii.      not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (i) above or release described in clause (iii) below; *provided*, *however*, that notwithstanding anything in this Agreement to the contrary, a Consenting Sponsor's vote and release may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by a Consenting Sponsor at any time following the termination of this Agreement pursuant to the terms hereof with respect to such Consenting Sponsor;

iii.      agree to provide, and to not opt out of or object to, the releases set forth in the Plan against each Released Party;

iv.      if solicited, timely vote (or cause to be voted) its Claims or Interests (as defined in the Bankruptcy Code) against any Alternative Restructuring;

v.      not directly or indirectly, through any Person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

vi.      except as otherwise provided in sections 3(a)vi and 5(a)ix of this Agreement or any Definitive Document, not request or be entitled to (A) any other management or similar fees payable by the Company and hereby waives the right to receive payment on account of any such fees, or (B) any dividends, distributions, or other payments in respect of its Claims and Interests except as otherwise provided in this Agreement or any Definitive Document;

vii.      support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement; and

viii.      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(b)      Transfers.  Each Consenting Sponsor agrees that, for the duration of the Support Period, it shall not, directly or indirectly, sell, transfer, assign, or otherwise dispose of any of its Claims (if any) against, or Interests in, the Company (including grant any proxy or deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement

WEIL:\96772473\31\39681.0001

with respect thereto).  For the avoidance of doubt, affiliates of the Consenting Sponsors shall not be subject to the limitations set forth in this section 4(b) when acting in their capacity as Qualified Marketmakers.

5.    **Agreements of the Company.**

(a)    <u>Covenants</u>.  Holdings agrees that, for the duration of the Support Period, Holdings shall, and shall cause each of its subsidiaries included in the definition of Company, to:

i.    use commercially reasonable efforts to (A) obtain approval of the Plan and consummate the Restructuring, including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases or for relief that (1) is inconsistent with this Agreement in any respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, (B) obtain orders of the Bankruptcy Court in respect of the Restructuring, and (C) support the release and exculpation provisions contained in the Plan;

ii.    (A) seek entry of the DIP Orders and, if necessary, timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any Person with respect to entry of the DIP Orders or with respect to any adequate protection proposed to be granted or granted to the Consenting Creditors pursuant to the DIP Orders, (B) subject to professional responsibilities, prosecute and defend any appeals related to the Restructuring, (C) execute and deliver any other required agreements to effectuate and consummate the Restructuring, and (D) operate its business in the ordinary course, taking into account the Restructuring;

iii.    provide reasonably prompt written notice (in accordance with Section 20 hereof) to the Consenting Creditors and the Consenting Sponsors during the Support Period of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause any condition precedent contained in the Plan not to timely occur or become impossible to satisfy, (B) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any material notice, including from any governmental unit with jurisdiction, of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any respect the transactions contemplated by the Restructuring, and (D) any failure of the Company to comply with or satisfy, each in any material respect, any covenant, condition, or agreement to be complied with or satisfied by it hereunder;

iv.    not amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents or any other document related to the DIP

WEIL:\96772473\31\39681.0001

Term Loan Facility or the Restructuring in a manner that is inconsistent with this Agreement;

v.      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any;

vi.      not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members, or partners, as applicable, of the Company; *provided*, *however*, that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan;

vii.      pay all the reasonable and documented fees and expenses, subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be, and any applicable law or orders of the Bankruptcy Court, of (a) Consenting Creditor Counsel and (b) Evercore Group L.L.C, as financial advisor to the Consenting Creditors; *provided*, *however*, that the Company shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; *provided*, *further*, *however*, that any invoices shall not be required to contain individual time detail;

viii.      provide draft copies of all material motions or applications and other material documents related to the Restructuring (including all "first day" and "second day" motions and orders, the Plan, the Disclosure Statement, ballots, and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed Confirmation Order) the Company intends to file with the Bankruptcy Court to the Consenting Creditor Counsel, if reasonably practicable, at least two (2) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders, or materials at least two (2) business days in advance is not reasonably practicable prior to filing, such motion, order, or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with the Consenting Creditor Counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

ix.      neither object nor directly or indirectly support an objection, and hereby agree, to the payment of $312,500 in Cash on account of management and advisory fees due from the Company under the Advisory Services Agreement to the Managers (as defined in the Advisory Services Agreement) as Allowed General Unsecured Claims under the Plan on or prior to the Effective Date;

14

x.      timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization; and

xi.      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(b)      <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); *provided*, *however*, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

6.      **Termination of Agreement.**

(a)      This Agreement shall terminate as to all Parties two (2) business days following the delivery of written notice (in accordance with <u>Section 20</u> hereof): (i) from the Requisite Creditors to the other Parties at any time after and during the continuance of any Creditor Termination Event (as defined below); (ii) from Holdings to the other Parties at any time after the occurrence and during the continuance of any Company Termination Event (as defined below); or (iii) from a Consenting Sponsor to the other Parties at any time after the occurrence and during the continuance of any Consenting Sponsor Termination Event (as defined below); *provided*, *however*, that this Agreement shall be deemed to have been terminated only as to such Consenting Sponsor providing notice of a Consenting Sponsor Termination Event and shall continue in full force and effect in respect to all other Parties.  Notwithstanding any provision to the contrary in this <u>Section 6</u>, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of a Creditor Termination Event, Company Termination Event, or Consenting Sponsor Termination Event specified herein.  This Agreement shall terminate on the Effective Date without any further required action or notice.

(b)      A "<u>Creditor Termination Event</u>" shall mean any of the following:

i.      the breach by the Company or the Consenting Sponsors of any of the undertakings, representations, warranties, or covenants of the Company or the Consenting Sponsors, to the extent applicable, set forth herein in any material respect that remains uncured for a period of five (5) business days after the receipt

15

of written notice of such breach pursuant to this <u>Section 6</u> and in accordance with <u>Section 20</u> (as applicable);

    ii.      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) days after such issuance;

    iii.     if, as of 11:59 p.m. prevailing Eastern Time on March 8, 2019, the Company has not commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code;

    iv.     if, as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, the Chapter 11 Cases have not been filed;

    v.      if, as of 11:59 p.m. prevailing Eastern Time on the date that is five (5) days after the Petition Date, the Interim DIP Order has not been entered by the Bankruptcy Court;

    vi.     if, as of 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) days after the Petition Date, the Final DIP Order has not been entered by the Bankruptcy Court;

    vii.     if, as of 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) days after the Petition Date, the Supermajority Requisite Creditors have not consented to the Supermajority Consent Documents;

    viii.    if, as of 11:59 p.m. prevailing Eastern Time on the date that is the later of (A) forty-five (45) days after the Petition Date or (B) ten (10) days after a proposed material modification by the Debtors to any substantive provision of the Plan, the Supermajority Requisite Creditors have not consented to such proposed material modification;

    ix.     if, as of 11:59 p.m. prevailing Eastern Time on the date that is ninety (90) days after the Petition Date, the Confirmation Order has not been entered by the Bankruptcy Court;

    x.      if, as of 11:59 p.m. prevailing Eastern Time on the date that is one hundred and five (105) days after the Petition Date, the Effective Date has not occurred (the "***Outside Date***"); *provided*, *however*, that the Outside Date shall be automatically extended one (1) day for each day that the Requisite Creditors fail to deliver drafts of the New Corporate Governance Documents to Weil in accordance with the deadline set forth in <u>Section 3(i)</u> hereof;

16

xi.     the Company withdraws the Plan or Disclosure Statement, or the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Plan and such motion or pleading has not been withdrawn prior to the earlier of (A) two (2) business days after the Company receives written notice from the Requisite Creditors (in accordance with Section 20 hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

xii.    the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases, or (C)  dismissal of one or more of the Chapter 11 Cases;

xiii.   the Bankruptcy Court enters an order (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

xiv.    the Company (A) files any motion seeking to avoid, disallow, subordinate, or recharacterize any First Lien Term Loan Claim or Second Lien Term Loan Claim, lien, or interest held by any Consenting Creditor arising under or relating to the First Lien Term Loan Agreement or Second Lien Term Loan Agreement or (B) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents (without the written consent of the Requisite Creditors) to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

xv.     on or after the date hereof, the Company engages in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as permitted under the DIP Facilities, or (C) with the written consent of the Requisite Creditors;

xvi.    the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed, or vacated within fifteen (15) business days after the date of such issuance;

xvii.   the Company files, propounds, or otherwise supports any plan of reorganization other than the Plan;

17

xviii.    on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

xix.    the failure of the Company to comply with the DIP Orders, which remains uncured for a period of five (5) business days after the receipt of written notice of such event, or is not otherwise waived in accordance with the terms thereof;

xx.    notice of an "Event of Default" (as defined in the DIP Term Loan Agreement or the DIP ABL Agreement, as applicable) has been given or declared under either the DIP Term Loan Facility or the DIP ABL Facility and has not been waived or timely cured in accordance therewith;

xxi.    the termination of this Agreement as to the Consenting Sponsors or the Company;

xxii.    the Company makes any payment to the Consenting Sponsor, other than as provided in this Agreement or any agreements relating to the Restructuring; or

xxiii.    the entry by the Company into any material non-ordinary course transaction or payment by the Company of any material non-ordinary course payment in either case inconsistent with this Agreement or the Plan, including entry into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation without the written consent of the Requisite Creditors.

(c)    A "Company Termination Event" shall mean any of the following:

i.    the breach by one or more of the Consenting Creditors holding First Lien Term Loan Claims of any of the undertakings, representations, warranties, or covenants of the Consenting Creditors set forth herein in any material respect that remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 20 hereof (as applicable), with such written notice to simultaneously be provided to the Consenting Sponsors, but only if the non-breaching Consenting Creditors in the applicable Consenting Class hold less than 66⅔% of the aggregate principal amount of Claims in such Class;

ii.    the board of directors, managers, members, or partners, as applicable, of any Company entity party hereto reasonably determines in good faith based upon the advice of counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, however, that such Company entity provides written notice of such determination to the Consenting Creditors within three (3) business days after the date thereof;

18

iii.    if, as of 11:59 p.m. prevailing Eastern Time on March 8, 2019, the Support Effective Date has not occurred;

iv.    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) days after such issuance;

v.    the termination of this Agreement as to the Consenting Creditors (with such termination by the Requisite Creditors);

vi.    the Bankruptcy Court enters an order (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases; or

vii.    the occurrence of the Outside Date if the Effective Date has not occurred.

(d)    A "Consenting Sponsor Termination Event" shall mean any the following:

i.    the breach by any of the other Parties hereto, of any of the undertakings, representations, warranties, or covenants of such Party set forth herein in any material respect, only if such breach adversely affects the treatment, rights, or obligations under this Agreement or the Plan of the Consenting Sponsor seeking such termination and remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 20 hereof;

ii.    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) days after such issuance;

iii.    a Definitive Document modifies, removes, or impairs any of the rights or benefits to be granted to a Consenting Sponsor under this Agreement or the Plan and such Consenting Sponsor has not consented to such modification, removal, or impairment, in each case, subject to the Consenting Sponsor Consent Right;

iv.    the Company modifies the treatment of a Consenting Sponsor under the Plan or files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case, that adversely impacts or would reasonably be expected to adversely impact such Consenting Sponsor; or

WEIL:\96772473\31\39681.0001

v.      the occurrence of the Outside Date if the Effective Date has not occurred.

Notwithstanding the foregoing, any of the dates or deadlines set forth in (i) <u>Section 6(b)</u> and <u>6(c)</u>, except for <u>Section 6(b)x</u> and <u>6(c)vii</u>, may be extended by Agreement of the Company and the Requisite Creditors and (ii) <u>Section 6(b)x</u>, <u>6(c)vii</u>, and <u>6(d)v</u> may be extended by Agreement of the Company, the Requisite Creditors, the Consenting Second Lien Creditors holding a majority of the Second Lien Term Loan Claims, and the Consenting Sponsors.

(e)    <u>Mutual Termination</u>.    This Agreement may be terminated by mutual agreement of the Company and the Requisite Creditors upon the receipt of written notice delivered in accordance with <u>Section 20</u> hereof.

(f)    <u>Effect of Termination</u>.   Subject to the provisions contained in <u>Section 6(a)</u> and <u>Section 14</u> hereof, upon the termination of this Agreement in accordance with this <u>Section 6</u>, this Agreement shall forthwith become null and void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; *provided*, *however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.   Upon a termination of this Agreement, each Consenting Creditor and each Consenting Sponsor may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void ab initio and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement.   If this Agreement has been terminated as to any Consenting Creditor or any Consenting Sponsor in accordance with Section 6 hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdraw) of its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor or any Consenting Sponsor to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in Section 13 hereof.   Nothing herein shall be construed to prohibit the Company from contesting the validity of any purported termination of this Agreement pursuant to Section 6 hereof.

(g)    If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.   Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

(h)    <u>Consenting Second Lien Creditor Termination</u>.   Notwithstanding anything to the contrary herein, any Consenting Second Lien Creditor may terminate this Agreement solely as to such Consenting Second Lien Creditor if (i) the treatment of Second Lien Term Loan Claims

WEIL:\96772473\31\39681.0001

under the Plan or this Agreement, or any recovery granted to such Consenting Second Lien Creditor, is modified in any manner adverse to such Consenting Second Lien Creditor; (ii) a Creditor Termination Event occurs under Sections 6(b)ii, 6(b)xi, 6(b)xiv (but solely with respect to the avoidance, disallowance, subordination, or recharacterization of any Second Lien Term Loan Claim, lien, or interest held by such Consenting Second Lien Creditor arising under or relating to the Second Lien Term Loan Agreement), 6(b)xvii, 6(b)xviii, or 6(b)xxi (but solely with respect to termination by the Company) of this Agreement; or (iii) the class of the holders of Second Lien Term Loan Claims has voted to reject the Plan.

### 7.    Definitive Documents; Good Faith Cooperation; Further Assurances.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall (i) take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and (ii) refrain from taking any action that would frustrate the purposes and intent of this Agreement.

### 8.    Representations and Warranties.

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

i.    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

ii.    the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

iii.    the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with,

21

consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

        iv.    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

        (b)    Each Consenting Creditor severally (and not jointly) represents and warrants to the other Parties that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the owner of the aggregate principal amount of the Loans set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not own any other Loans, and/or (ii) has, with respect to the beneficial owners of such Loans, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Loans or to exchange, assign, and transfer such Loans, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

        (c)    Each Consenting Sponsor severally (and not jointly) represents and warrants to the other Parties that such Consenting Sponsor holds of record and owns beneficially the number of shares of common stock of Holdings set forth below such Consenting Sponsor's name on its signature page to this Agreement, free and clear of any restrictions on transfer, liens or options, warrants, purchase rights, contracts, commitments, claims, and demands.

9.      **Disclosure; Publicity.**

        The Company shall submit drafts to the Consenting Creditor Counsel and the Consenting Sponsors of any press releases that constitute disclosure of the existence of the terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any Person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Loans held by any Consenting Creditor without such Consenting Creditor's consent; *provided, however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Loans held by all Consenting Creditors, collectively, on a facility by facility basis. Notwithstanding the provisions in this <u>Section 9</u>, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

10.    **Amendments and Waivers.**

(a)    Other than as set forth in <u>Section 10(b)</u>, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except with the written consent of the Company, the Requisite Creditors, the Consenting Sponsors (in the case of the Consenting Sponsors, such consent shall be limited solely to the Consenting Sponsor Consent Right, the definition of which, for the avoidance of doubt, shall not be modified, amended, or changed without the consent of the Consenting Sponsors), and the Consenting Second Lien Creditors (in the case of the Consenting Second Lien Creditors, such consent shall be limited solely to the Consenting Second Lien Creditor Consent Right, the definition of which, for the avoidance of doubt, shall not be modified, amended, or changed without the consent of the Consenting Second Lien Creditors);

(b)    Notwithstanding <u>Section 10(a)</u>:

i.    any waiver, modification, amendment, or supplement to this <u>Section 10</u> shall require the written consent of all of the Parties;

ii.    any modification, amendment, or change to the definition of "Requisite Creditors" shall require the written consent of each Consenting Creditor included in such definition and the Company;

iii.    any modification, amendment, or change to the definition of "Supermajority Requisite Creditors" shall require the written consent of each Consenting First Lien Creditor and the Company;

iv.    any modification, amendment, or change to the definition of the "Outside Date" shall require the written consent of Consenting Creditors owning at least 75% of the outstanding relevant First Lien Term Loan Claims and Second Lien Term Loan Claims, as applicable, held by the Consenting Creditors and the Company; and

v.    any change, modification, or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditor's respective holdings in the Company and the recoveries contemplated by the Plan (as in effect on the date hereof)) shall require the written consent of such materially adversely and disproportionately affected Consenting Creditor.

(c)    Notwithstanding the foregoing, in the event that a materially adversely and disproportionately affected Consenting Creditor ("***Non-Consenting Creditor***") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification, or amendment receives the consent of the Requisite Creditors, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect to

23

all other members of the Consenting Class from time to time without the consent of any Consenting Creditors who have so consented.

11.    **Effectiveness.**

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; *provided*, *however*, that signature pages executed by Consenting Creditors shall be delivered to (i) other Consenting Creditors and the Consenting Sponsors in a redacted form that removes such Consenting Creditors' holdings of the Loans and (ii) the Company, Weil, and Consenting Creditor Counsel in an unredacted form (to be held by Weil and Consenting Creditor Counsel on a professionals' eyes only-basis).

12.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("*NY Courts*") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding relating to this Agreement or the Restructuring except in the NY Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any NY Courts. Each of the Parties further agrees that notice as provided in Section 20 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 12(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED

WEIL:\96772473\31\39681.0001

HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

13.   **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

14.   **Survival.**

Notwithstanding the termination of this Agreement pursuant to <u>Section 6</u> hereof, the agreements and obligations of the Parties in this <u>Section 14</u> and <u>Sections 3(g)</u>, <u>6(f)</u>, <u>6(g)</u>, <u>9</u>, <u>12</u>, <u>13</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u> and <u>21</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

15.   **Headings.**

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.   **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that nothing contained in this <u>Section 16</u> shall be deemed to permit Transfers of the Loans or Claims arising under the Loans other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions

WEIL:\96772473\31\39681.0001

contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations, and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

17. **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person shall be a third-party beneficiary hereof.

18. **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Plan), constitutes the entire agreement of the Parties and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

19. **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20. **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses:

(1)    If to the Company, to:

Chef Holdings, Inc.
3405 E. Overland Rd., Suite 360
Meridian, ID 83642
Attention:  Jonathon Spiller
(jspiller@ctifoods.com)

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Matt Barr, Esq.
(matt.barr@weil.com)
Ronit J. Berkovich, Esq.
(Ronit.Berkovich@weil.com)
Lauren Tauro, Esq.

WEIL:\96772473\31\39681.0001

(lauren.tauro@weil.com)

(2)    If to a Consenting Creditor, or a transferee thereof, to the addresses set forth below the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:   Damian Schaible, Esq.
                     (damian.schaible@davispolk.com)
                     Michelle McGreal, Esq.
                     (michelle.mcgreal@davispolk.com)
                     Stephen Piraino, Esq.
                     (stephen.piraino@davispolk.com)

(3)    If to the Consenting Sponsors, to the addresses set forth below each Consenting Sponsor's signature, with copies to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Attention:   Jason Rubin, Esq.
                     (jrubin@akingump.com)
                     Ira Dizengoff, Esq.
                     (idizengoff@akingump.com)

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

21.    **No Solicitation; Representation by Counsel; Adequate Information.**

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

WEIL:\96772473\31\39681.0001

(c)    Each Consenting Creditor and Consenting Sponsor acknowledges, agrees, and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's or Consenting Sponsor's, as applicable, representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor or such Consenting Sponsor, as applicable, is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**CHEF HOLDINGS, INC.**

By:
Name: Kent Percy
Title: Chief Restructuring Officer

**CHEF INTERMEDIATE, INC.**

By:
Name: Kent Percy
Title: Chief Restructuring Officer

**CTIF HOLDINGS, INC.**

By:
Name: Kent Percy
Title: Chief Restructuring Officer

**CHEF INVESTMENT, LLC**

By:
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI FOODS ACQUISITION LLC**

By:
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI FOODS HOLDING CO., LLC**

By:
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI SERVICES CORPORATION**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI FOODS, LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI ARLINGTON, LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI SAGINAW I, LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI KING OF PRUSSIA, LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**CTI-SSI FOOD SERVICES, LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

*[Signature Page to Restructuring Support Agreement]*

**S & S FOODS LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**CUSTOM FOOD PRODUCTS HOLDINGS, LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**CUSTOM FOOD PRODUCTS, LLC**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**LIGURIA HOLDINGS, INC.**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**LIGURIA FOODS, INC.**

By: _____
Name: Kent Percy
Title: Chief Restructuring Officer

**<u>EXHIBIT A</u>**

**CHAPTER 11 PLAN**

**[Omitted]**

**<u>EXHIBIT B</u>**

**MIP TERM SHEET**

<u>**Management Incentive Plan Term Sheet**</u>

The following describes the principal terms of the management incentive plan (the "<u>Plan</u>") to be adopted by Chef Holdings, Inc. or one of its subsidiaries (collectively, the "<u>Reorganized Company</u>") in connection with its chapter 11 plan of reorganization (the "<u>Plan of Reorganization</u>") and the initial grants of awards to certain officers and other key employees upon the Reorganized Company's emergence from chapter 11 (the "<u>Emergence Awards</u>").  This term sheet does not contain all of the terms and conditions of the Plan.

## <u>TERMS OF THE PLAN</u>

| | |
|---|---|
| **Effective Date** | The Plan and the Emergence Awards under the Plan will be effective on the effective date of the Plan of Reorganization (the "<u>Effective Date</u>").  The Plan and the terms of the Emergence Awards will be approved as part of the Plan of Reorganization. |
| **Administration** | The Board of Directors of the Reorganized Company (the "<u>Board</u>"), or a committee thereof, will administer the Plan. |
| **Participants** | Participants of the Plan will be officers and other key employees of the Reorganized Company. |
| **Award Pool** | 8% of the outstanding equity securities of the Reorganized Company (such securities, the "<u>NewCo Stock</u>"), on a fully diluted basis (including the Plan reserve) will be reserved for issuance under the Plan (the "<u>Award Pool</u>"), of which 4% will be allocated as of the Effective Date and the remainder will be reserved for future issuance.<br><br>If an outstanding award expires or is forfeited, cancelled, or otherwise terminated, the shares underlying such award will again be available under the Award Pool. |
| **Plan Awards** | The Plan will be an "omnibus" incentive plan that provides for the grant of various types of equity awards based on the value of the NewCo Stock, including stock options (ISOs and NQSOs), stock appreciation rights, restricted stock, restricted stock units, and other stock-based awards.<br><br>Emergence Awards will be granted in accordance with the terms set forth below. |
| **Corporate Reorganizations/ Change in Control** | Outstanding awards and the Award Pool will be subject to customary anti-dilution adjustments for changes in capitalization and other reorganization events.<br><br>Upon a "Change in Control," all outstanding awards will be fully vested.  "Change in Control" will be defined generally to include a sale, merger, or other corporate transaction involving a direct or indirect transfer of ownership of 50% or more of the stock or assets of the Reorganized Company; *provided*, *however*, that an acquisition by any Lender under the Prepetition First Lien Credit Agreement of more than 50% of the stock or assets of the Reorganized Company shall not constitute a Change in Control.<br><br>Upon a Change in Control, any portion of the Award Pool that has not been allocated (including any forfeitures) will be returned to the Company. |

**TERMS OF EMERGENCE AWARDS**

| | |
|---|---|
| **Emergence Award Pool** | 50% of the Award Pool (4% of fully diluted NewCo Stock) will be granted as Emergence Awards on the Effective Date.<br><br>The remaining 50% of the Award Pool will be reserved for future grants, on terms as determined by the Board, in consultation with the CEO. |
| **Form of Emergence Awards** | The Emergence Awards will be granted in the form of stock options, subject to the service-based vesting described below. |
| **Recipients of Emergence Awards** | The officers and key employees of the Reorganized Company identified on <u>Exhibit A</u> attached hereto will receive the Emergence Awards, in the amounts set forth thereon.[1] |
| **Vesting of Emergence Awards** | Subject to the continued employment of the participant on the vesting date (and certain exceptions as provided below), the Emergence Awards will become vested as follows:<br><br>• 25% will vest on the first anniversary of the Effective Date<br><br>• 25% will vest on the second anniversary of the Effective Date<br><br>• 25% will vest on the third anniversary of the Effective Date<br><br>• 25% will vest on the fourth anniversary of the Effective Date<br><br>Upon the date of a participant's death or termination due to disability, the participant's next scheduled tranche of the Emergence Awards will vest. Upon the date of a participant's termination by the Company without "cause," the next scheduled tranche of the Emergence Awards will vest pro rata based on the number of days elapsed since either the Effective Date or the most recent vesting date, as applicable; *provided, however*, that no Emergence Awards shall vest upon a termination without "cause" occurring prior to the first anniversary of the Effective Date. Any remaining unvested portion of the Emergence Awards and all unvested Emergence Awards upon the termination of a participant's employment for any other reason will be forfeited. Upon the termination of a participant's employment by the Reorganized Company for "cause" all unexercised Emergence Awards, vested and unvested, will be forfeited.<br><br>The Emergence Awards will become fully vested upon a Change in Control.<br><br>Stock options will have an exercise price equal to the fair market value of NewCo Stock on the grant date and will have a term of exercise equal to the shorter of (i) 10 years from the date of grant, and (ii) (a) 3 months following termination of employment by the Reorganized Company without "cause" or upon a participant's voluntary resignation for any reason, and (b) 12 months following the participant's death or termination of employment due to disability. Tax withholding may be satisfied through net exercise of the award, if elected by the participant. |
| **Transfer Restrictions** | NewCo Stock issued under the Plan will be subject to customary transfer restrictions, tag-along rights, registration rights, drag-along rights, put rights, and call rights at fair market value upon termination of employment, consistent with the terms and |

---

[1] Schedule of individual allocations for Emergence Awards to be agreed prior to plan confirmation.

|  | conditions of the Reorganized Company's stockholders' agreement. |
| --- | --- |
| **Clawback** | Upon a termination for "cause" or a voluntary resignation by a participant within 12 months from the Effective Date, all Emergence Awards shall be forfeited. |

**<u>Exhibit A</u>**

[Omitted]

**<u>EXHIBIT C</u>**

**DIP ABL TERM SHEET**

**Exhibit A**

## CONFIDENTIAL

**Barclays Bank PLC**

**Wells Fargo Bank, National Association**

**CTI FOODS HOLDINGS CO.  LLC**

**$80,000,000 Senior Secured Superpriority**

**Debtor-In-Possession Asset-Based Revolving Credit Facility
("DIP ABL Credit Facility")**

**Summary of Principal Terms and Conditions
("DIP Term Sheet")**

CTI Foods Holdings Co., LLC (the "Company"), CTI Foods Acquisition LLC ("Holdings"), Chef Holdings, Inc. ("Parent") and certain subsidiaries of the Parent have entered into an asset-based revolving credit facility for which Wells Fargo Bank, National Association ("Wells Fargo") is the administrative and collateral agent (as successor to Goldman Sachs Lending Partners, LLC, in such capacity) as set forth in the Revolving Credit Agreement, dated as of June 28, 2013, by and among the Company, Holdings and certain subsidiaries of the Company, Wells Fargo (as successor administrative and collateral agent to Goldman Sachs Lending Partners, LLC), and the Lenders party thereto including Barclays Bank PLC ("Barclays") (as the same has been amended, the "Existing Credit Agreement"). All capitalized terms used herein and not defined herein shall have the meanings given to them in the Commitment Letter to which this Exhibit A is attached (including the annexes and schedules hereto) or in the Existing Credit Agreement, as applicable.

| | |
|---|---|
| **Cases:** | Parent, Holdings, the Company and all of the Parent's Subsidiaries (collectively, the "Debtors" and each a "Debtor") will be debtors and debtors-in-possession in connection with their respective cases under chapter 11 (the "Cases") of title 11 of the United States Code (the "Bankruptcy Code"). |
| **Borrowers:** | The Company and any domestic subsidiaries of Holdings with assets to be included in the Borrowing Base (together with the Company, individually, a "Borrower" and collectively, the "Borrowers"). |
| **Guarantors:** | Parent and all of Parent's present and future domestic subsidiaries and any direct or indirect parent of the Company (individually, a "Guarantor" and collectively, the "Guarantors," and together with Borrowers, individually a "Loan Party" and collectively, "Loan Parties").  It is understood and agreed that each guarantor under the DIP Term Credit Facility, Pre-Petition First Lien Loan Agreement and/or the Pre-Petition Second Lien Loan Agreement (each as defined herein) shall be a Loan Party. |

| | |
|---|---|
| **Joint Lead Arrangers and Joint Bookrunners:** | Barclays and Wells Fargo (together, in such capacity, "<u>DIP Arrangers</u>"). |
| **Administrative and Collateral Agent:** | Barclays (in such capacity, "<u>DIP Agent</u>"). |
| **Lenders:** | Barclays, Wells Fargo and such other institutions that may become parties to the financing arrangements as lenders (collectively, "<u>DIP ABL Lenders</u>"). |
| **Letter of Credit Issuer:** | Barclays and Wells Fargo (in such capacity, "<u>DIP Issuing Banks</u>"). |
| **Swing Line Lender:** | Barclays (in such capacity, "<u>DIP Swing Line Lender</u>"). |
| **DIP Term Credit Facility:** | Concurrently with the entering into the DIP ABL Credit Facility (as defined below), the Company, certain of its subsidiaries, Holdings and the lenders thereto (those lenders, the "<u>DIP Term Lenders</u>") will enter into a secured debtor-in-possession term loan credit facility in an aggregate principal amount of up to $75,000,000 (the "<u>DIP Term Credit Facility</u>") of which the entire aggregate principal amount must be drawn not later than one (1) business day following the entry of the Final Financing Order; <u>provided</u> that the proceeds of any delayed draw loans, not to exceed $12,500,000, made upon the entry of the Final Financing Order shall be funded into a segregated deposit account subject to an account control agreement in favor of the administrative agent under the DIP Term Credit Facility (the "<u>DIP Term Funding Account</u>"). |
| **DIP ABL Credit Facility:** | The DIP ABL Credit Facility will consist of a senior secured superpriority debtor-in-possession asset-based revolving credit and letter of credit facility of up to $80,000,000 provided to Borrowers, each as a debtor and debtor-in-possession upon the commencement of the Cases, subject to such other limits as the Bankruptcy Court may require. |

The revolving loans under the DIP ABL Credit Facility ("<u>Revolving DIP Loans</u>") will be available to Borrowers in a maximum principal amount at any one time of up to the lesser of (a) the aggregate commitments of the DIP ABL Lenders in the DIP ABL Credit Facility or (b) the Borrowing Base as described below and subject to the terms and conditions of the DIP Loan Documents.

The term "Maximum Credit" as used herein means the aggregate of the commitments of the DIP ABL Lenders for the DIP ABL Credit Facility.  The term "Revolving DIP Loans" as used herein includes DIP Swing Line Loans (as defined below), except as otherwise provided herein.  In the event that the maximum amount of the DIP ABL Credit Facility is at any time less than the Maximum Credit based on any order of the Bankruptcy Court in the Cases or any agreement of the parties approved by the Bankruptcy Court, then Borrowers shall not be permitted to borrow in excess of the amount specified in such order or pursuant to such agreement and the term "Maximum Credit" as used herein shall mean such lesser amount.

Revolving DIP Loans may be drawn, repaid and reborrowed.

**Letters of Credit:**    A portion of the DIP ABL Credit Facility will be available for standby letters of credit arranged by the DIP Agent and issued by the DIP Issuing Banks (sharing ratably in the DIP Letter of Credit Sublimit commitment) ("DIP Letters of Credit") in an aggregate amount at any time outstanding not to exceed $40,000,000 (the "DIP Letter of Credit Sublimit").  DIP Letters of Credit will reduce the amount of the Revolving DIP Loans available under the Borrowing Base and the Maximum Credit.

DIP Letters of Credit will be issued by the DIP Issuing Banks and each DIP ABL Lender will purchase an irrevocable and unconditional pro rata participation in each DIP Letter of Credit.

**Swing Line Loans:**    A portion of the DIP ABL Credit Facility will be available as swing line loans ("DIP Swing Line Loans") with a sublimit on DIP Swing Line Loans to Borrowers outstanding at any time of $10,000,000. DIP Swing Line Loans will reduce the amount of the Revolving DIP Loans available under the Borrowing Base and the Maximum Credit.

DIP Swing Line Loans will be made available by the DIP Swing Line Lender, and each DIP ABL Lender will purchase an irrevocable and unconditional pro rata participation in each DIP Swing Line Loan.

**Borrowing Base:**    The Revolving DIP Loans and DIP Letters of Credit shall be provided to Borrowers subject to the terms and conditions of the DIP Loan Documents and availability under the Borrowing Base, which will be calculated as follows:

(a) 85% multiplied by the net amount of the eligible accounts of Borrowers, plus

(b) the amount equal to 85% of the NOLV Percentage of eligible inventory of Borrowers (net of reserves with respect to inventory not already reflected in the determination of the NOLV Percentage) multiplied by the value of such category of eligible inventory of Borrowers; minus

(c) reserves.

The "value" of each category of eligible inventory will be determined in accordance with the Existing Credit Agreement.

"NOLV Percentage" means, with respect to inventory of any person, the net orderly liquidation value of inventory, expressed as a percentage of value, net of all reasonable costs and expenses of liquidation thereof, as determined based upon the most recent inventory appraisal conducted in accordance with the DIP Loan Documents (or the Existing Credit Agreement, as the case may be).

The term "Permitted Discretion" as used in this DIP Term Sheet with reference to the DIP Agent or the DIP Arrangers, shall mean a determination made in

good faith in the exercise of their reasonable business judgment based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances at the time with the information then available to it.

**Eligibility; Reserves:** Substantially the same as the Existing Credit Agreement, provided, that, reserves will be established in respect of (a) the ABL Carve-Out Reserve Amount (as defined below), (b) the amount of any senior liens or claims in or against the Revolving Facility Priority Collateral that have priority over the liens and claims of DIP Agent, and (c) the amount of priority or administrative expense claims, which are superior to or rank in parity with DIP Agent's superpriority claim and which DIP Arrangers determine Loan Parties would be required to pay before the obligations due DIP Agent and Lenders during the Cases.

**Optional Prepayment and Commitment Reductions:** Substantially the same as the Existing Credit Agreement.

**Mandatory Prepayments:** Substantially the same as the Existing Credit Agreement.

**Interest and Fees:** See Schedules 1 and 2 to this DIP Term Sheet.

**Pre-Petition Facilities** The Existing Credit Agreement means that certain Revolving Credit Agreement, dated as of June 28, 2013, among the parties thereto. The "Secured Parties" thereunder are referred to herein as the "Pre-Petition ABL Secured Parties" and the "Administrative Agent" thereunder is referred to herein as the "Pre-Petition ABL Agent". The "Loan Documents" entered in connection with the Existing Credit Agreement are referred to as the "Pre-Petition ABL Documents."

"Pre-Petition First Lien Term Loan Agreement" means that certain First Lien Term Loan Agreement, dated as of June 28, 2013, among Holdings, the Company, the guarantors named therein, the financial institutions named therein, and Cortland Capital Markets Services LLC, as successor administrative agent (the "Pre-Petition First Lien Agent"). The "Secured Parties" thereunder are referred to herein as the "Pre-Petition First Lien Secured Parties." The "Lenders" thereunder are referred to herein as the "Pre-Petition First Lien Lenders."

"Pre-Petition Second Lien Term Loan Agreement" means that certain Second Lien Term Loan Agreement, dated as of June 28, 2013, among Holdings, the Company, the guarantors named therein, the financial institutions named therein, and an administrative agent to be appointed, as successor administrative agent (the "Pre-Petition Second Lien Agent"). The "Secured Parties" thereunder are referred to herein as the "Pre-Petition Second Lien Secured Parties and together with the Pre-Petition First Lien Secured Parties and Pre-Petition ABL Secured Parties, the "Pre-Petition Secured Parties." The "Lenders" thereunder are referred to herein as the "Pre-Petition Second Lien

Lenders."

The Pre-Petition First Lien Term Loan Agreement and the Pre-Petition Second Lien Term Loan Agreement are referred to herein as the "<u>Pre-Petition Term Loan Agreements</u>," and the secured obligations thereunder, collectively, the "<u>Pre-Petition Term Loan Secured Obligations</u>," and all collateral securing such Pre-Petition Term Loan Secured Obligations, together with collateral securing the Existing Credit Agreement, the "<u>Pre-Petition Collateral</u>."

The Pre-Petition First Lien Secured Parties and the Pre-Petition Second Lien Secured Parties are collectively referred to herein as the "<u>Pre-Petition Term Loan Secured Parties</u>."

"<u>Pre-Petition Intercreditor Agreement</u>" means that certain intercreditor agreement, dated as of June 28, 2013 (as amended, restated, supplemented or otherwise modified from time to time), among the Company, the other grantors party thereto, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Agent and the agent under the Existing Credit Agreement.

**Collateral:**   To secure all obligations of each Loan Party under the DIP ABL Credit Facility the following (the "<u>Collateral</u>"): (a) first priority, perfected security interest and lien on the collateral of each Loan Party that constitutes Revolving Facility Priority Collateral (to be defined in a manner consistent with Pre-Petition Intercreditor Agreement and such other modifications to reflect the commencement of the Cases and which will include unencumbered assets immediately prior to the Closing Date of the same type and similar nature as assets that secure on a first lien basis the Existing Credit Agreement); (b) junior priority (subject to certain specified permitted liens and otherwise subordinate only to the security interests and liens that secure the Pre-Petition First Lien Term Loan Agreement and, on a second lien basis, the Pre-Petition Second Lien Term Loan Agreement), perfected security interest and lien on the collateral of each Loan Party that constitutes the Term Loan Priority Collateral (to be defined in a manner consistent with Pre-Petition Intercreditor Agreement and such other modifications to reflect the commencement of the Cases and which will include unencumbered assets immediately prior to the Closing Date of the same type and similar nature as assets that secure on a first lien basis the the Pre-Petition First Lien Term Loan Agreement and the Pre-Petition Second Lien Term Loan Agreement), in each case subject to the Carve-Out, that is not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date (as defined below) or (y) valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, excluding avoidance actions but including, subject to entry of the Final Financing Order, avoidance proceeds and (c) be secured by a junior perfected security interest and lien on the Collateral (i) of each Loan Party that constitutes Revolving Facility Priority Collateral to the extent such Collateral is subject to (A) valid, perfected and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Existing Credit Agreement and (B) valid and non-avoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the

Bankruptcy Code, and (ii) of each Loan Party that constitutes Term Loan Priority Collateral  to the extent subject to Adequate Protection Liens in favor of either the Pre-Petition First Lien Secured Parties or the Pre-Petition Second Lien Secured Parties (the "<u>Pre-Petition Term Loan Secured Parties Adequate Protection Liens</u>").

The obligations secured may include hedging and bank product obligations of the Loan Parties where a DIP ABL Lender or an affiliate of a DIP ABL Lender is a counterparty.

For purposes of the DIP ABL Credit Facility, the Collateral will also include (i) subject to the entry of a Final Financing Order (as defined below), all present and future claims, rights, interests, assets, proceeds and properties recovered by or on behalf of each Loan Party or any trustee of any Loan Party (whether in the Cases or any subsequent case to which the Cases may be converted), including without, limitation, all such property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to, inter alia, Sections 542, 545, 548, 549, 550, 552 and 553 of the Bankruptcy Code and (ii) assets of each Loan Party of the type constituting Collateral existing on the date of the filing by each Loan Party of their petitions to commence the Cases (the "<u>Petition Date</u>") and arising or acquired after the Petition Date.

All amounts owing by the Loan Parties under the DIP ABL Credit Facility at all times will constitute allowed super-priority administrative expense claims in the Cases against each of the Loan Parties on a joint and several basis having priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out to the extent provided in any Financing Order (as defined below).

For purposes of the DIP ABL Credit Facility, all of the security interests and liens described herein shall be effective and perfected as of the entry of the Interim Financing Order (as defined in Annex I hereto) and without the necessity of the execution (or delivery or filing, as applicable) of mortgages, security agreements, pledge agreements, financing statements or other agreements, but without limitation of the right of the DIP Agent to reasonably require any such agreements.

The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Secured Parties) is granted the following adequate protection:

1. **Adequate Protection Liens**. Until the occurrence of the indefeasible payment and discharge of obligations under the Pre-Petition ABL Documents in accordance with the Financing Orders, a valid, perfected replacement security interest in and lien upon the Collateral to secure payment of any and all of the "Prepetition ABL Adequate Protection Claim," which is an amount equal to the aggregate diminution in the value of the Prepetition ABL Secured Parties' interest in the Pre-Petition Collateral.  The Adequate Protection Liens shall have the same priority vis-à-vis the other Pre-Petition Secured Parties as set forth in the Pre-Petition Intercreditor Agreement, and

shall be senior to all other liens on the Collateral except (i) the Carve-Out, (ii) permitted prior liens, (iii) Pre-Petition Term Loan Secured Parties Adequate Protection Liens (in respect of the Term Loan Priority Collateral), (iv) the liens securing the DIP ABL Credit Facility, and (v) the liens securing the DIP Term Credit Facility (in respect of the Term Loan Priority Collateral).

2. **Section 507(b) Claim**. Until the occurrence of the indefeasible payment and discharge of obligations under the Pre-Petition ABL Documents in accordance with the Financing Orders, the Prepetition ABL Secured Parties are granted against each of the Loan Parties on a joint and several basis an allowed superpriority administrative expense claims as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition ABL Adequate Protection Claim. The Section 507(b) Claim has the same priority vis-à-vis the other Pre-Petition Secured Parties as set forth in the Pre-Petition Intercreditor Agreement;

3. **Prepetition ABL Agent Fees and Expenses**. The Prepetition ABL Agent shall receive, for the benefit of the Prepetition ABL Secured Parties, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses incurred prior to the effectiveness of the indefeasible payment and discharge of the obligations under the Existing Credit Agreement; and

4. **Information Rights**. Until the occurrence of the indefeasible payment and discharge of obligations under the Pre-Petition ABL Documents in accordance with the Financing Orders, the Prepetition ABL Secured Parties are entitled to information rights as to be agreed, including, without limitation, reasonable access to the Company's officers, management, books and records, premises and properties.

5. The relative rights and priorities in the Collateral among the DIP Term Lenders and the DIP ABL Lenders will be set forth in an intercreditor agreement (the "<u>DIP ABL Intercreditor Agreement</u>"), in form and substance satisfactory to the DIP ABL Lenders and the DIP Term Lenders.

Notwithstanding anything to the contrary herein or in any loan document executed and delivered in connection with the DIP ABL Credit Facility, in no event shall the Collateral for the DIP ABL Credit Facility include the DIP Term Funding Account, which shall consist solely of up to $12,500,000 of loan proceeds funded under the DIP Term Credit Facility, and the Company shall not under any circumstances grant a security interest in and liens on the DIP Term Funding Account to secure the obligations under the DIP ABL Credit Facility.

**Carve-Out:**    "Carve-Out" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all

reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order or any other order of the Bankruptcy Court, all unpaid fees, costs, and expenses (the "Professional Fees") incurred or accrued by persons or firms retained by the Loan Parties pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any official committee of unsecured creditors (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the day of delivery by the DIP Agent of a Carve-Out Trigger Notice (defined below), plus Professional Fees incurred after the Carve-Out Trigger Notice in an amount not to exceed $3,000,000 of Debtor Professionals; *provided*, that under no circumstances shall any success, completion, or similar fees be payable from the Carve-Out following delivery of a Carve-Out Trigger Notice (collectively, the "Carve-Out Amount"), in each case subject to the limits imposed by the Financing Orders. Notwithstanding the foregoing, (x) the Prepetition ABL Secured Parties' and the DIP ABL Lenders' aggregate share of the Carve-Out shall not exceed an amount equal to the ABL Carve-Out Reserve Amount (defined below) and (y) the ABL DIP Liens, Prepetition ABL Adequate Protection Liens, ABL Indemnification Liens, and the DIP Superpriority Claims (each as defined in the Financing Orders) in favor of DIP ABL Lenders shall be subject to only the ABL Carve-Out Reserve Amount.

For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by any of the DIP Agents (as defined in the Interim Financing Order) describing the event of default that has occurred and is continuing under the applicable DIP Documents (as defined in the Interim Financing Order). Immediately upon delivery of a Carve-Out Trigger Notice, and prior to the payment to any Prepetition Secured Party on account of the Adequate Protection (as defined in the Interim Financing Order) or otherwise, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Agents or the Prepetition Agents (as defined in the Interim Financing Order) (the "Carve-Out Account"), an amount equal to the Carve-Out Amount. The funds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agents and the Prepetition Agents, each on behalf of itself and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall have a security interest upon any residual interest in the Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Carve-Out, and the priority of such lien on the residual should be consistent with the DIP ABL Intercreditor Agreement and the Interim Financing Order.

The DIP ABL Agent shall be entitled to maintain a reserve (the "ABL Carve-Out Reserve Amount") in an amount equal to (i) the amount of Professional Fees budgeted for Professional Persons employed by the Debtors in the Initial Budget or any subsequent Approved Budget, as applicable; plus (ii) $3,000,000.

8

No portion of the Carve-Out, any Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code), any other Collateral, or any proceeds of the DIP ABL Credit Facility, including any disbursements set forth in the Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any committee appointed in the Cases, in connection with challenging the DIP Agent's or the DIP ABL Lenders' liens or claims (including in connection with any pre-petition obligations under the Existing Credit Agreement that may remain outstanding) or initiating or prosecuting any claim or action against the DIP Agent or any DIP ABL Lender, or any pre-petition agent or lender party to the Existing Credit Agreement, (including, without limitation, (a) a request to use cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of DIP Arrangers, (b) a request, without the prior written consent of DIP Arrangers, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly repay in full in cash the obligations under the DIP ABL Credit Facility (and including any pre-petition obligations under the Existing Credit Agreement that may remain outstanding) on terms and conditions acceptable to DIP Arrangers, or (c) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of the DIP Agent or any Lender as set forth herein and in the other DIP Loan Documents, or which results in the occurrence of an Event of Default) other than with respect to seeking a determination that an Event of Default has not occurred or is not continuing and, with respect to the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders' liens and claims, the Investigation Budget Cap (defined below).

Proceeds from the DIP ABL Credit Facility and/or Cash Collateral not to exceed $50,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Professional Fees incurred by Committee Professionals in connection with the investigation of avoidance actions (but not the prosecution of such actions) on account of the Debtors' prepetition facilities (but not the DIP ABL Credit Facility), which obligations will benefit from the Carve-Out in an amount not to exceed the Investigation Budget Cap to the extent unpaid as of delivery of a Carve-Out Trigger Notice.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in the final DIP documents, the Carve-Out shall be senior to all liens and claims securing the DIP ABL Credit Facility, any adequate protection liens, if any, and superpriority claims (whether granted to secure the DIP ABL Credit Facility or as adequate protection), and any and all other liens or claims securing the DIP ABL Credit Facility.

**Use of Proceeds:**          The proceeds of the DIP ABL Credit Facility, together with a portion of the proceeds of the DIP Term Credit Facility, will be used to repay in full the obligations under the Pre-Petition ABL Documents in accordance with the Financing Orders, and for the working capital and general corporate purposes of Borrowers, including allowed administrative expenses incurred during the Cases, all substantially consistent with the 13-Week Budget (as defined below), provided, that, in no event shall any such use of proceeds result in

variances from the 13-Week Budget that would be a Material Budget Deviation (as defined below).

No portion of the administrative expenses or priority claims in the Cases, other than those directly attributable to the operation of the business of the Loan Parties or to which the DIP Arrangers have specifically agreed (including the Carve-Out), shall be funded with the Revolving DIP Loans or DIP Letters of Credit and the percentages and categories of permitted allocations of such claims and expenses shall be approved by the DIP Arrangers.

Notwithstanding the foregoing, proceeds shall not be used to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of (i) the DIP Agent's and the DIP ABL Lenders' liens, claims and rights or (ii) other than subject to the Investigation Budget Cap, the Pre-Petition Secured Parties' liens, claims and rights.

The Financing Orders shall authorize the Debtors to use the Loan Parties Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code) and other Collateral as provided in the 13-Week Budget and as otherwise provided herein and in the DIP Loan Documents.

| | |
|---|---|
| **Closing Date:** | For the DIP ABL Credit Facility, the date of the entry of the Interim Financing Order and satisfaction of the Conditions Precedent to Initial Borrowing (the "DIP Closing Date") |
| **Term:** | The DIP ABL Credit Facility shall be for a term ending on the earliest of: (a) 120 days after the date of the earliest commencement of the Cases (the "DIP Maturity Date"), (b) 30 days after the entry of the Interim Financing Order (as defined below) if the Final Financing Order has not been entered prior to the expiration of such 30 day period, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of an Acceptable Plan (as defined below) that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the acceleration of the loans and the termination of the commitments with respect to the DIP ABL Credit Facility in accordance with the DIP Loan Documents (which shall accelerate upon the occurrence of any Event of Default (as defined below)) or (e) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code (clauses (a) through (e), the "Termination Date"). |

Prior to the Termination Date, the Borrowers shall have the right to extend the DIP Maturity Date for a period of up to 60 days (the "Extended DIP Maturity Date"); provided that:

    (i) the Debtors have provided the DIP Arrangers with not less than 5 Business Days prior written notice of such extension,

    (ii) the Debtors shall have filed an "Acceptable Plan," defined as a chapter

11 plan of reorganization, in form and substance satisfactory to the Arrangers (and with respect to those provisions thereof that affect the rights and duties of the DIP Agent, satisfactory to the DIP Agent), which, among other things, (i) contains releases in favor of the DIP Agent, the DIP ABL Lenders, the Pre-Petition ABL Agent, the lenders under the Pre-Petition ABL Credit Agreement, and their respective affiliates, (ii) provides for the indefeasible payment in full in cash and full discharge of the Loan Parties' obligations under the DIP ABL Credit Facility at emergence, but excluding payment of contingent indemnity obligations, which shall survive confirmation of such a plan, and (iii) contains the termination of the unused commitments under the DIP ABL Credit Facility, confirmed by an order in form and substance satisfactory to the Arrangers (and with respect to those provisions thereof that affect the rights and duties of the DIP Agent, satisfactory to the DIP Agent), and the plan and confirmation order shall be in full force and effect and shall not have been stayed, modified, altered, amended or otherwise changed or supplemented without the prior written consent of the DIP Arrangers, all such consents not to be unreasonably withheld.  For the avoidance of doubt, the *Joint Prepackaged Chapter 11 Plan of CTI Foods, LLC and Its Affiliated Debtors*, filed on March 10, 2019, shall be deemed an "Acceptable Plan",

(iii) a hearing seeking confirmation with respect to such Acceptable Plan shall have been scheduled prior to the DIP Maturity Date (for the avoidance of doubt, such hearing may take place before the Extended DIP Maturity Date) and any continuance or adjournment to such hearing will require the written consent of the DIP Arrangers,

(iv) on or before the DIP Maturity Date, the Borrowers shall have delivered to the DIP Arrangers an updated 13-Week Budget and operating forecast covering the period up to the Extended DIP Maturity Date in form and substance reasonably acceptable to the DIP Arrangers,

(v) the Borrowers shall pay to the DIP Agent, for the account of the DIP ABL Lenders, an extension premium in an amount equal to 0.50% of the Maximum Credit;

(vi) no default or event of default under the DIP Loan Documents shall have occurred and be continuing.  It shall constitute an event of default in the event that Debtors propose to file a plan of reorganization in the Cases (other than an Acceptable Plan); and

(vii) the maturity date under the DIP Term Credit Facility shall have been extended to a date that is not earlier than the Extended DIP Maturity Date.

Any plan of reorganization or liquidation or confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Borrowers to the DIP ABL Lenders under the DIP

ABL Credit Facility and the DIP Loan Documents, other than after the indefeasible payment in full and in cash, to the DIP ABL Lenders of all obligations (other than indemnities and other contingent obligations not then due and payable) under the DIP ABL Credit Facility and the DIP Loan Documents on or before the effective date of an Acceptable Plan and the termination of the DIP ABL Credit Facility.

**Documentation:**    For the DIP ABL Credit Facility, definitive loan documentation (collectively, the "<u>DIP Loan Documents</u>") to reflect the terms hereof, and any other agreements and documents related to the foregoing, each in form and substance reasonably satisfactory to the DIP Arrangers and the Company.

It is anticipated that the DIP Loan Documents will be substantially similar in all material respects, taken as a whole, to the Existing Credit Agreement and such related documentation as in effect on the date hereof, subject to changes to reflect the commencement of the Cases, the terms and conditions set forth herein, the administrative requirements of the DIP Agent for financings under the Bankruptcy Code, changes in law, EU Bail-in language, the Beneficial Ownership Regulation (as defined below), the changes to the operational practices and procedures of the DIP Agent, the results of updated field examinations and other due diligence and subject to other changes as may be agreed by the DIP Arrangers and the Company.

**Representations and Warranties:**    Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein (and subject to customary modifications required to reflect the Cases), provided that, the DIP Loan Documents will include additional customary representations and warranties with respect to the Financing Orders, the super-priority administrative expense claim of the DIP Agent and the DIP ABL Lenders and related bankruptcy matters.

**Affirmative Covenants:**    Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein (and subject to customary modifications required to reflect the Cases), provided that, the affirmative covenants will include (i) that on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered a final financing order authorizing the secured financing under the DIP ABL Credit Facility on the terms and conditions contemplated by this DIP Term Sheet, granting to the DIP Agent the security interests and liens and super-priority administrative expense claim status described above, modifying the automatic stay and containing other provisions reasonably required by the DIP Arrangers and their counsel and consistent with the terms hereof and (ii) that simultaneously with the commencement of the Cases, the Debtors shall file a motion seeking approval of the commitment fees, expenses and obligations related to the exit financing, in form and substance satisfactory to Barclays Bank PLC, in its capacity as the Exit Arranger (the "<u>Exit Arranger</u>"), and within 30 days following the commencement of the Cases, the Bankruptcy Court shall have entered an order (which can be the confirmation order), approving the exit financing commitment, and all fees required to be paid in regards to the exit financing, as superpriority administrative expenses of each

of the Debtors, which order shall be in form and substance acceptable to the Exit Arranger.

The DIP Agent and the DIP ABL Lenders will not provide any Revolving DIP Loans or other credit under the DIP ABL Credit Facility other than those authorized under the Interim Financing Order which has been entered into on or before 5 days after the date of commencement of the Cases (or such other date as the DIP Arrangers may agree) and is in full force and effect and has not been vacated, reversed, modified, amended or stayed and is not subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by the DIP Arrangers, unless, on or before 30 days after the date of the commencement of the Cases (or such other date as the DIP Arrangers may agree), a final financing order shall have been entered and shall not have been reversed, modified, amended, stayed or vacated (except in the case of any modification or amendment as consented to by DIP Arrangers) and shall not be subject to a stay pending appeal, and there shall be no appeal or other contest with respect to any material matter in such order (except as DIP Arrangers may otherwise agree based on their review of such appeal or other contest) (such order to be acceptable to the DIP Arrangers and provide, among other things, for waiver of Bankruptcy Code  Section 506(c) and for waiver of the equities of the case exception of Bankruptcy Code Section 552(b) with respect to the DIP Agent, Lenders and Pre-Petition Secured Parties, the "<u>Final Financing Order</u>" and together with any Interim Financing Order, collectively, "<u>Financing Orders</u>" and individually, a "<u>Financing Order</u>").  In addition, the affirmative covenants will include the requirement that Loan Parties cooperate and provide information to any consultant engaged by DIP Agent and the reimbursement by Loan Parties for the fees and expenses of such consultant. The affirmative covenants will include the requirement that the Loan Parties reimburse the DIP Agent for fees and expenses of its counsel and any required local counsel for the DIP Agent, including in the jurisdiction of the Bankruptcy Court.

Affirmative covenants will require Loan Parties to comply with the Bankruptcy Milestones set forth in Annex II to the DIP Term Sheet, and any waivers thereof subject to consent of the DIP Arrangers.

Affirmative covenants will require that the Loan Parties provide drafts of all material Bankruptcy Court filings to the DIP Arrangers with commercially reasonable time to review and comment, including (but not limited to) first and second day motions/orders, any motions to approve bidding procedures for or to approve a sale of substantially all of the assets of the Loan Parties, any motions to extend exclusivity, any motions to approve a disclosure statement and seek confirmation with respect to a plan of reorganization filed by the Loan Parties, and any motions to approve deadlines and procedures related to the solicitation of votes on a plan of reorganization filed by the Loan Parties.

**Collateral Reporting:**     For the DIP ABL Credit Facility, collateral reporting shall be usual and customary for facilities of this nature and as may be deemed reasonably appropriate by DIP Arrangers including,

(a) as to borrowing base certificates, prior to the 23rd calendar day after the last day of each Fiscal Period;

(b) as to reports of prior week sales volume in pounds, weekly on the Wednesday of each week by 5:00 p.m. New York time; and

(c) other collateral reports otherwise substantially the same as provided in the Existing Credit Agreement. In addition, the ability to conduct a field examination and appraisal at the DIP Agent/ DIP Arrangers reasonable discretion.

**Financial Reporting:** Substantially the same as the Existing Credit Agreement and those additional items deemed reasonably appropriate by DIP Arrangers for this transaction, provided, that, for the DIP ABL Credit Facility, Borrowers shall only be required to (i) hold a weekly conference call with the DIP ABL Lenders and (ii) deliver to the DIP Arrangers (A) quarterly financial statements within 45 days following the end of each Fiscal Quarter other than the fourth Fiscal Quarter and within 90 days following the end of the fourth Fiscal Quarter, (B) unaudited annual financial statements within 90 days following the end of the fourth Fiscal Quarter, (C) monthly financial statements within 35 days following the end of each of the first two Fiscal Periods of each Fiscal Quarter, (D) a weekly liquidity certificate, (E) a weekly schedule of professional fees actually paid and (F) the following, which in the case of the initial 13-Week Budget (as defined below) shall be in form and substance satisfactory to the DIP Arrangers and in the case of each subsequent 13-Week Budget shall be in a form substantially consistent with the initial 13-Week Budget (and in the event that the Borrowers request that such subsequent 13-Week Budget replace the initial 13-Week Budget for purposes of calculating the variances described below under " Financial Covenant" be in substance reasonably satisfactory to the DIP Arrangers (and each referred to herein as a "13-Week Budget"):

(a) a 13-week statement of projected receipts, vendor disbursements, total disbursements, liquidity, professional fee expenses, net cash flow, net sales, loans and availability for the immediately following consecutive 13 weeks, set forth on a weekly basis, including the anticipated uses of the DIP ABL Credit Facility for such period, and at the end of each weekly period, an updated 13-Week Budget for the next succeeding 13-week period;

(b) a weekly 13-Week Budget variance report/reconciliation on Wednesday of each week by 5:00 p.m. New York time for the prior week and for the period from the commencement of the first such 13-Week Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts / collections, noting therein variances from values set forth for such periods in the 13-Week Budget, calculated on a rolling 4 week basis and on a cumulative basis (B) disbursements, noting therein variances from values set forth for such periods in the 13-Week Budget, calculated on a rolling 4 week basis and on a cumulative basis (C) net cumulative cash flow, (D) Excess Availability (as defined below) and (E) loan balance, noting therein variances from values set forth for such periods in the 13-Week Budget and (ii) a detailed narrative and

explanation for all material variances, certified by the chief financial officer of the Company.

Borrowers may provide an updated 13-Week Budget at any time; provided, that (a) the DIP Arrangers have received not less than three (3) Business Days' prior written notice of the delivery of such updated 13-Week Budget, (b) any such updated 13-Week Budget must be approved by the DIP Arrangers and no 13-Week Budget shall be effective for testing purposes until so approved, (c) to the extent any such updated 13-Week Budget is approved by the DIP Arrangers, the line item amounts set forth therein shall only be used to calculate the projected line items set forth above commencing with the week in which such updated 13-Week Budget is approved by the DIP Arrangers and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable rolling four week period shall be calculated using the projected line items set forth in the applicable previous approved 13-Week Budget. The DIP Arrangers upon three (3) Business Days' prior written notice may request from the Borrowers an updated 13-Week Budget.

**Cash Management:** For the DIP ABL Credit Facility, Loan Parties shall maintain their existing cash management system subject to any Financing Order consistent with the terms of the Existing Credit Agreement, except that the DIP Agent shall have the right to require the depository bank to transfer funds to the DIP Agent for application to the obligations owing to the DIP Agent and the DIP ABL Lenders upon a Cash Dominion Event (as defined below). Loan Parties will continue to direct all customers making payments on receivables to remit payments to deposit accounts that are the subject of control agreements (which shall be executed and effective within 10 business days following the Closing Date) among the applicable Loan Party, the DIP Agent, and the depository bank in form and substance reasonably satisfactory to the DIP Agent.

For the DIP ABL Credit Facility, "Cash Dominion Event" means, at any time (a) an event of default under the DIP ABL Credit Facility shall have occurred and be continuing, (b) a breach of the Minimum Liquidity covenant shall have occurred and be continuing or (c) Excess Availability shall have been less than the greater of (i) 12.5% of the Line Cap and (ii) $10,000,000 for five (5) consecutive business days and ending on the date that such event of default under the DIP ABL Credit Facility is no longer continuing, the Borrowers are in compliance with the Minimum Liquidity covenant or Excess Availability shall have been not less than such amount for 30 consecutive calendar days.

"Line Cap" means, at any time, the lesser of the Borrowing Base minus the ABL Carve-Out Reserve Amount at such time and the Maximum Credit.

"Excess Availability" means, an amount equal to (a) the Line Cap, minus (b) the amount of Revolving DIP Loans outstanding at such time.

**Negative Covenants:** Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein, provided that, the negative covenants for the DIP ABL Credit Facility will include additional provisions relating to bankruptcy matters and no restricted payments to

persons other than Loan Parties will be permitted.

**Financial Covenant:**   For the DIP ABL Credit Facility, Borrowers shall maintain Minimum Liquidity at all times of not less than $10,000,000.  Borrowers shall not be required to comply with the Fixed Charge Coverage Ratio in the Existing Credit Agreement during the Cases.

For the DIP ABL Credit Facility, "Minimum Liquidity" means, at any time, the sum of (a) Cash and Cash Equivalents held by the Borrowers and their subsidiaries, not to exceed $6,000,000, in which the DIP Agent has a first priority perfected security interest, plus (b) the Excess Availability.

The Borrowers shall be required to adhere to the 13-Week Budget as set forth below (subject to variances permitted below) which shall be tested on the Wednesday of each week following the Petition Date.  Additionally, the DIP Loan Documents will require that:

(a)  total disbursements (excluding professional fees) paid by the Borrowers shall not exceed the amounts in the 13-Week Budget by more than (i) 20% solely during each of the first two weeks ending after the commencement of the Cases, calculated on a cumulative basis for such two week period, (ii) 17.5% during the succeeding week, calculated on a cumulative basis for such three week period, and (iii) at all times thereafter, 15%, in each case on a rolling four week cumulative basis;

(b)  operating cash receipts shall not be less than (i) 80% of the amounts in the 13-Week Budget, solely during each of the first two weeks ending after the commencement of the Cases, calculated on a cumulative basis for such two week period, (ii) 82.5% of the amounts in the 13-Week Budget during the succeeding week, calculated on a cumulative basis for such three week period, and (iii) at all times thereafter, 85% of the amounts in the 13-Week Budget, calculated on a rolling four week cumulative basis; and

(c)  tested weekly, commencing on the first full calendar week following the DIP Closing Date, with respect to the cumulative period since the Closing Date, the positive variance of the actual professional fee amount as compared to the budgeted professional fee amount set forth in the initial 13-Week Budget must not exceed (x) for the first month following the Closing Date, $500,000 and (y) at all times thereafter, $1,000,000 (the "Initial Professional Fee Expense Covenant").

The violation of any of the foregoing budget covenants shall be referred to herein as a "Material Budget Deviation".

Any relief requested of the DIP Arrangers from the Initial Professional Fee Expense Covenant will need to be requested separately from the permitted updates of the 13-Week Budget, and the Initial Professional Fee Expense Covenant will not be reset automatically with each subsequent approved budget.  Additionally, requests to modify the forecast for professional fees must include an updated forecast by professional, through emergence.

**Events of Default:** Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein, provided, that, in addition, the events of default for the DIP ABL Credit Facility will include, but not be limited to, the following: (i) conversion of the Cases to Chapter 7 case(s); (ii) entry of an order authorizing the sale of substantially all assets of the Loan Parties, unless obligations under the DIP ABL Credit Facility are paid in full or the DIP Arrangers consent to such sale; (iii) entry of an order terminating the Loan Parties' exclusive right to file a plan, without consent of the DIP Arrangers; (iv) the dismissal of the Cases (or any subsequent Chapter 7 case); (v) the failure of any Loan Party to comply with the Affirmative Covenants (subject to exceptions and grace periods to be mutually agreed); (vi) the failure of any Loan Party to comply with the Bankruptcy Milestones; (vii) the failure of any Loan Party to comply with any Financing Order (subject to grace periods to be mutually agreed); (viii) any Financing Order is revoked, remanded, vacated, reversed, stayed or rescinded or modified (other than, in the case of a modification as consented to by DIP Arrangers); (ix) appointment of a trustee, examiner or disinterested person with expanded powers relating to the operations or the business of any Loan Party in the Cases or any administrative expense claim is allowed having priority or ranking in parity with the rights of the DIP Agent; (x) the Company or other debtor in a chapter 11 case proposes or otherwise supports any plan of reorganization that is not an Acceptable Plan, without the DIP Arrangers' consent; (xi) any plan of reorganization that is not an Acceptable Plan is confirmed without the DIP Arrangers' consent; (xii) payment of or granting adequate protection with respect to the Pre-Petition First Lien Loan Agreement and the Pre-Petition Second Lien Loan Agreement, other than to the extent permitted, and in a manner consistent with, the Pre-Petition Intercreditor Agreement and the Financing Orders, as approved by the Bankruptcy Court; (xiii) liens or super-priority claims with respect to the DIP ABL Credit Facility shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein; (xiv) the occurrence of a Material Budget Deviation as described under the heading "Financial Covenant" above; (xv) Company or any debtor in a chapter 11 case brings a cause of action or any suit against the Pre-Petition ABL Agent or Pre-Petition ABL Secured Parties relating to any debt or liens contemplated or provided by pursuant to the Existing Credit Agreement and other Pre-Petition ABL Documents; or (xvi) or the Final Financing Order is not entered, as described under the heading "Affirmative Covenants" above, on or prior to that date that is thirty (30) days after the Petition Date (or such later date as DIP Arrangers may reasonably agree).

The DIP Agent may exercise remedies consistent with the DIP Loan Documents and the Financing Orders on or after the date that is five (5) business days following delivery of written notice by the DIP Agent to counsel for Borrowers and the U.S. trustee of the occurrence of an event of default and declaring the DIP ABL Credit Facility obligations accelerated.

**Conditions Precedent to all Borrowings (other than Initial Borrowings):** Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein and also to include, (solely for purposes of this provision) receipt of executed Restructuring Support Agreement in effect as of the date hereof (as amended, modified or

supplemented in accordance with its terms) that shall be in full force and effect, and the Interim Financing Order or Final Financing Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the DIP ABL Lenders.

**Conditions Precedent to Initial Borrowings:**   The conditions precedent to the initial borrowings under the DIP ABL Credit Facility will consist of the conditions precedent set forth in Annex 1 to this DIP Term Sheet.

**Assignments; Participations:**   Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein including that consent of the Borrower Agent shall not be required for any assignment or participation.

**Amendments and Waivers:**   Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein.

**Governing Law:**   New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York.

The Loan Parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan and the other Loan Parties will submit to the exclusive jurisdiction and venue of any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan.

**Expenses, Waivers and Indemnity:**   Substantially the same as the Existing Credit Agreement, taken as a whole, as applicable, and subject to modification as provided herein.

In addition, for the DIP ABL Credit Facility, waivers to include a waiver of any right that any Loan Party may have to seek authority (i) to use Cash Collateral of the DIP Agent and the DIP ABL Lenders under Section 363 of the Bankruptcy Code except to the extent provided in any Financing Order and the Budget, without the prior written consent of the DIP Arrangers, (ii) to obtain post-petition loans or other financial accommodations, other than from the DIP Agent and the DIP ABL Lenders, pursuant to Sections 364(c) or (d) of the Bankruptcy Code without the prior written consent of the DIP Arrangers, (iii) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of the DIP Agent's post-petition liens and claims, (iv) to challenge the application of any payments or collections received by the DIP Agent or the DIP ABL Lenders to the obligations of Loan Parties as provided for herein, (v) to propose or support a chapter 11 plan that is not an Acceptable Plan, (vi) to surcharge the Collateral pursuant to Section 506(c) of the Bankruptcy Code, (vii) to seek application of the "equities of the case" exception of Section 552(b) of the Bankruptcy Code with respect to any

Collateral of the Pre-Petition Secured Parties or (viii) to seek relief under the Bankruptcy Code, including without limitation, under Section 105, to the extent any such relief would materially restrict or impair the rights and remedies of the DIP Agent or any DIP ABL Lender as provided herein, the DIP Loan Documents or the Financing Orders.

**USA PATRIOT Act:**   Each DIP ABL Lender subject to the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "<u>Act</u>") and the requirements of 31 C.F.R. §1010.230 (the "<u>Beneficial Ownership Regulation</u>") hereby notifies the Loan Parties that pursuant to the requirements of the Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of the Loan Parties and other information that will allow such DIP ABL Lender to identify such person in accordance with the Act and the Beneficial Ownership Regulation.  Loan Parties are hereby advised that any commitment that might at any time be issued is subject to reasonably satisfactory results of such verification.

**First Lien Term Loan Terms:**   Notwithstanding anything to the contrary set forth in this DIP Term Sheet, other than with respect to interest rates and fees, the terms of the DIP ABL Credit Facility shall be no less favorable to the DIP ABL Lenders in any material respect that any comparable terms set forth in the DIP Term Credit Facility.

SCHEDULE 1
TO
DIP TERM SHEET

<u>Interest and Certain Fees</u>

| | |
|---|---|
| **Interest Rate Options:** | Borrowers may elect that Revolving DIP Loans (other than DIP Swing Line Loans) bear interest at a rate per annum equal to (a) the Base Rate plus the Applicable DIP Margin or (b) the LIBOR Rate plus the Applicable DIP Margin.  DIP Swing Line Loans will bear interest at a rate per annum equal to the Base Rate plus the Applicable DIP Margin. |

As used herein:

"<u>Applicable DIP Margin</u>" means for the DIP ABL Credit Facility, (i) 2.50% as to Revolving DIP Loans bearing interest using the Base Rate and (ii) 3.50% as to Revolving DIP Loans bearing interest using the LIBOR Rate.

"<u>Base Rate</u>" means the greatest of (a) the Federal Funds Rate plus ½%, (b) the LIBOR Rate (which rate shall be calculated based upon an interest period of one month and shall be determined on a daily basis), plus one percentage point, and (c) the rate of interest which is published as the "Prime Rate" posted on the Money Rates page of the Market Data section of The Wall Street Journal (or, if more than one rate is published as the Prime Rate, then the highest of such rates).  If The Wall Street Journal no longer publishes the Prime Rate, or DIP Agent determines in good faith that the rate so published no longer accurately reflects an accurate determination of the prevailing Prime Rate, DIP Agent may select a reasonably comparable source to use as the basis for the Base Rate.

"<u>LIBOR Rate</u>" means the rate per annum as published by ICE Benchmark Administration Limited (or in any case, any successor page or other commercially available source as the DIP Agent may designate from time to time) as of 11:00 a.m., London time, two (2) Business Days prior to the commencement of the requested interest period, for a term, and in an amount, and in the currency, comparable to the interest period and the amount and currency of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrowers in accordance with this Agreement (and, if any such published rate is below zero, then the rate determined pursuant to this clause shall be deemed to be zero).    Each determination of the LIBOR Rate shall be made by the DIP Agent and shall be conclusive in the absence of manifest error. The LIBOR Rate shall be available for interest periods of one, two, three or six months.

Interest rate reference terms will be subject to customary provisions, including applicable reserve requirements, limits on the number of outstanding LIBOR Rate Loans and minimum amounts of each LIBOR Rate Loan.

| | |
|---|---|
| **Unused Line Fee:** | Borrowers shall pay to the DIP Agent, for the account of the DIP ABL Lenders (to the extent and in accordance with the arrangements by and among the DIP |

ABL Lenders) an unused line fee calculated at 0.375% per annum multiplied by the difference between the then applicable Maximum Credit and the average outstanding Revolving DIP Loans and DIP Letters of Credit during the immediately preceding month, payable monthly in arrears. DIP Swing Line Loans will not be considered in the calculation of the unused line fee.

**Letter of Credit Fees:** Borrowers shall pay to (a) the DIP Agent, for the account of the DIP ABL Lenders (to the extent and in accordance with the arrangements by and among the DIP ABL Lenders), on the daily outstanding balance of DIP Letters of Credit, a letter of credit fee calculated at a rate per annum based on the then Applicable Margin for LIBOR Rate Loans and (b) to DIP Issuing Banks, a fronting fee equal to 0.25% per annum, in each case under clauses (a) and (b), payable monthly in arrears. In addition, Borrowers shall pay customary issuance, arranging and other fees of the DIP Issuing Banks.

**Default Rate:** After an event of default and for so long as the same is continuing, the applicable rates of interest and rate for letter of credit fees shall be increased by 2.00% per annum above the otherwise then applicable rates.

**Rate and Fee Basis; Payment Dates:** All per annum rates and fees will be computed on basis of actual days elapsed over a 360 day year (or 365 or 366 days, as the case may be, in the case of Revolving DIP Loans for which the Base Rate is used). In the case of Revolving DIP Loans for which the LIBOR Rate is used, interest is payable on the last day of each relevant interest period or in the case of an interest period longer than 3 months, then within 3 months, in arrears, and in the case of Revolving DIP Loans for which the Base Rate is used, interest is payable monthly in arrears.

ANNEX I
TO
DIP TERM SHEET

<u>Conditions Precedent to Initial Borrowings under DIP ABL Credit Facility</u>

The conditions precedent to the initial borrowings under the DIP ABL Credit Facility will consist of the following:

(a)        Borrowers and Guarantors shall have commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court having exclusive jurisdiction over the Cases. Borrowers and Guarantors shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner reasonably acceptable to the DIP Arrangers and its counsel, with respect to the Interim Financing Order (as defined below) and the DIP Arrangers shall have received such evidence thereof as it shall reasonably require. No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Borrower or Guarantor or their respective business, properties or assets and no motion shall be pending seeking any such relief. Proposed forms of all first and second day motions and orders, in form and substance satisfactory to the DIP Arrangers, to be filed and all proposed first and second day orders to contain a provision that all such orders, including the cash management order, to be expressly subject to the terms of the Interim Financing Order. A cash management order approving the cash management arrangements of Borrowers and Guarantors consistent with the requirements under the DIP ABL Credit Facility shall have been entered, in form and substance satisfactory to the DIP Arrangers, and shall be in full force and effect. Simultaneously with the commencement of the Cases, the Debtors shall file a motion seeking approval of the commitment fees, expenses and obligations related to the exit financing as superpriority administrative expenses of each of the Debtors, in form and substance satisfactory to the Exit Arranger.

(b)        The Interim Financing Order as entered by the Bankruptcy Court authorizing the secured financing under the DIP ABL Credit Facility on the terms and conditions contemplated by this DIP Term Sheet and acceptable to the DIP Arrangers (the "<u>Interim Financing Order</u>"), and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described above, and granting a super-priority administrative expense claim to the DIP Agent and the DIP ABL Lenders with respect to all obligations to the DIP Agent and the DIP ABL Lenders, subject to no priority claim or administrative expenses of the Cases or any other entity, and any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within five (5) days after the commencement of the Cases and be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by the DIP Arrangers.

(c)        Receipt by the DIP Arrangers of a proposed Acceptable Plan, confirmation order and the cash management order, on terms and conditions satisfactory to the DIP Arrangers,

which provides for, among other things, the indefeasible payment in full in cash of all of the obligations owing under the DIP ABL Credit Facility (the modification or amendment of such provision requiring the written consent of the DIP Arrangers).

(d)    Receipt by the DIP Arrangers, each in form and substance reasonably satisfactory to the DIP Arrangers, of (i) the initial 13-Week Budget, and (ii) projected monthly balance sheets, income statements, statements of cash flows and availability of Borrowers and Guarantors for the period through the end of the term of the DIP ABL Credit Facility, in each case as to the projections, with the results and assumptions set forth in all of such projections reasonably satisfactory in form and substance reasonably satisfactory to DIP Arrangers, and an opening pro forma balance sheet for the Loan Parties in form and substance reasonably satisfactory to DIP Arrangers.

(e)    Execution and delivery of all DIP Loan Documents for the DIP ABL Credit Facility by the parties thereto (including the DIP ABL Intercreditor Agreement in form and substance satisfactory to DIP Agent) and receipt by the DIP Agent of customary legal opinions and other customary closing documents.  The DIP Agent, for the benefit of itself, the DIP ABL Lenders, DIP Issuing Banks and bank product providers, shall hold perfected, security interests in and liens upon the Collateral with the priorities set forth in the DIP Term Sheet, and the DIP Agent shall have received such evidence of the foregoing as it reasonably requires.

(f)    Minimum opening Excess Availability at closing after the application of proceeds of the initial Revolving DIP Loans, if any, on such date and after provision for payment of all fees and expenses of the transaction paid or payable on or about the DIP Closing Date, of not less than $21,500,000.

(g)    The DIP Arrangers shall have received all documentation and information at least three business days prior to the DIP Closing Date as is reasonably requested in writing by the DIP Arrangers about the Company and its subsidiaries required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act and a beneficial ownership certificate for any Borrower or Guarantor that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, in each case to the extent requested in writing at least ten business days prior to the DIP Closing Date.

(h)    No material adverse change in the business, operations, profits or assets of Borrowers and Guarantors, taken as a whole, shall have occurred since September 30, 2018 (it being understood that the commencement of the Cases, the events and conditions related and/or leading up thereto, any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof, reduction in payment terms by suppliers, and reclamation claims shall not be deemed a material adverse change).  No defaults or events of default on the closing date under any of the DIP Loan Documents for the DIP ABL Credit Facility prior to, or after giving effect to the Initial Borrowings under the DIP ABL Credit Facility, or on any other debt or any material contract of Borrowers or Guarantors shall exist (other than any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof).  DIP Agent and Lenders shall have received the payment of all fees required to be paid under the terms hereof or

otherwise under the Loan Documents.  There shall be no material misstatements in or omissions from the written materials previously furnished to DIP Agent by Borrowers and Guarantors, after giving effect to any supplements thereto.

(i)    All reasonable and documented out-of-pocket fees and expenses (including reasonable fees and expenses of outside counsel, financial advisors, appraisals and field examinations) required to be paid to the DIP Agent and the DIP ABL Lenders on or before the Petition Date shall have been paid.

(j)    On or prior to or substantially simultaneously with the initial extension of credit under the DIP ABL Credit Facility, the Borrowers shall have entered into the DIP Term Credit Facility on terms consistent in all respects with the DIP Term Loan Term Sheet (as defined in the Restructuring Support Agreement (in effect as of the date hereof)) as amended, modified or supplemented in a manner not materially adverse to the DIP ABL Lenders without the consent of the DIP Arrangers (such consent not to be unreasonably withheld, conditioned or delayed).

(k)    Prior to or substantially simultaneously with the initial extension of credit under the DIP ABL Credit Facility, the debt under the Existing Credit Agreement shall have been repaid in cash in full, at least partially with all of the proceeds of the DIP Term Credit Facility available on the Closing Date, pursuant to a payoff letter acceptable to the DIP Arrangers and in accordance with the Financing Orders; provided further that any surviving obligations expressly set forth in the Existing Credit Agreement, including, without limitation, any indemnification obligations of any Loan Party, shall continue after the Existing Credit Agreement has been indefeasibly repaid in full in cash.

(l)    The representations and warranties set forth in the Loan Documents shall be true and correct in all material respects on the Closing Date; provided that to the extent such representation and warranty refers to an earlier date, it shall be true and correct in all material respects as of such earlier date; provided, further, any representation and warranty that is qualified by materiality or similar language shall be true and correct in all respects on such respective dates.

ANNEX II
TO
DIP TERM SHEET

<u>Bankruptcy Milestones</u>

The Loan Parties shall achieve the following Bankruptcy Milestones by the dates set forth below (or such later date as may be agreed to by the DIP Arrangers):

(i)     No later than the close of business on the next business day following the Petition Date, Debtors shall have filed a motion with the Bankruptcy Court seeking approval of the DIP ABL Credit Facility.

(ii)    No later than the close of business on the next business day following the Petition Date, the Debtors shall have filed a disclosure statement and Acceptable Plan with the Bankruptcy Court.

(iii)   On or before five days after the Petition Date at 11:59p.m. prevailing Eastern time, the Interim Financing Order shall have been entered by the Bankruptcy Court.

(iv)    On or before 30 days after the Petition Date at 11:59p.m. prevailing Eastern time, the Final Financing Order shall have been entered by the Bankruptcy Court.

(v)    On or before 90 days after the Petition Date at 11:59p.m. prevailing Eastern time, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the DIP Arrangers, confirming the Acceptable Plan, which consent is not to be unreasonably withheld.

# EXHIBIT D

**DIP TERM LOAN TERM SHEET**

## CTI FOODS HOLDING CO., LLC
## DIP TERM FACILITY TERM SHEET

This term sheet (the "**DIP Term Facility Term Sheet**") sets forth the principal terms of a secured debtor-in-possession term loan credit facility (the "**DIP Term Facility**"; the credit agreement evidencing the DIP Term Facility, the "**DIP Term Credit Agreement**" and, together with the other definitive documents governing the DIP Term Facility, the "**DIP Term Documents**," each of which shall be in form and substance consistent with this DIP Term Facility Term Sheet and otherwise acceptable to the DIP Term Facility Borrower, the DIP Term Facility Agent and the DIP Term Lenders (each as defined herein)) to be entered into by the DIP Term Facility Borrower, certain of its subsidiaries and the Parent Guarantors (as defined herein) in connection with their respective cases under chapter 11 (the "**Cases**"; the debtors and debtors-in-possession thereunder, the "**Debtors**" and each, a "**Debtor**") of title 11 of the United States Code (the "**Bankruptcy Code**"). The DIP Term Facility will be subject to the approval of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and consummated in the Cases in accordance with (i) the DIP Orders (as defined herein) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Term Facility and (ii) the DIP Term Loan Documents (as defined herein) to be executed by the Debtors. Capitalized terms used herein but not defined have the meanings ascribed to such terms in the Restructuring Support Agreement to which this DIP Term Facility Term Sheet is attached (the "**Restructuring Support Agreement**").

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **DIP Term Facility Borrower** | CTI Foods Holding Co., LLC, as a debtor and debtor-in-possession (the "**DIP Term Facility Borrower**" or the "**Company**"). |
| **Guarantors** | (i) Chef Holdings, Inc., Chef Intermediate, Inc., CTIF Holdings, Inc., Chef Investment, LLC, CTI Foods Acquisition LLC and any other direct or indirect parent of the Borrower that provides a guaranty of the obligations under the DIP Term Facility (the "**Loan Guaranty**") (collectively, the "**Parent Guarantors**") and (ii) all subsidiaries of the DIP Term Facility Borrower other than Excluded Subsidiaries (as defined below), each as debtors and debtors-in-possession (collectively, the "**Guarantors**" and, together with the DIP Term Facility Borrower, the "**Loan Parties**").<br><br>"**Excluded Subsidiary**" means (a) any domestic subsidiary that is not a wholly-owned subsidiary, (b) any domestic subsidiary that is prohibited by law, regulation or contractual obligations from providing a Loan Guaranty or that would require a governmental (including regulatory) consent, approval, license or authorization to provide such Loan Guaranty, (c) any Disregarded Domestic Subsidiary (as defined below), (d) any foreign subsidiary that is a "controlled foreign corporation" within the meaning of Section 957(a) of the U.S. Tax Code (a "**Foreign Subsidiary**"), (e) any direct or indirect domestic subsidiary of a Foreign Subsidiary or a Disregarded Domestic Subsidiary, (f) any subsidiary for which the provision of a Loan Guaranty would result in material adverse tax consequences (as reasonably determined by the Required DIP Term Lenders and the DIP Term Facility Borrower) and (g) any other subsidiary with respect to which, in the reasonable judgment of the Required DIP Term Lenders and the DIP Term Facility Borrower, the burden or cost of providing a Loan Guaranty or a lien to secure such Loan Guaranty outweighs the benefits to be afforded thereby.<br><br>"**Disregarded Domestic Subsidiary**" means any domestic subsidiary |

|  | substantially all of the assets of which consist of equity interests of one or more Foreign Subsidiaries.

It is understood and agreed that each direct or indirect parent of the DIP Term Facility Borrower and each direct or indirect subsidiary of the DIP Term Facility Borrower that is an obligor under the DIP ABL Facility, the Pre-Petition First Lien Credit Agreement and/or the Pre-Petition Second Lien Credit Agreement (each as defined herein) shall be a Guarantor. |
|---|---|
| **DIP Term Facility Agent** | Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Term Facility Agent**"). |
| **DIP Term Lenders** | The Backstop Parties and the other Consenting Creditors that agree to provide the DIP Term Facility on the terms set forth herein (in such capacities, collectively, the "**DIP Term Lenders**"); provided that (x) $15 million of aggregate principal amount of the DIP Term Facility will be provided by the Backstop Parties (allocated based on their ratable share of the aggregate principal amount of the First Lien Term Loans) and (y) $60 million of aggregate principal amount of the DIP Term Facility will be provided by the participating Consenting Creditors (allocated based on their ratable share of the aggregate principal amount of the First Lien Term Loans and Second Lien Term Loans) and backstopped by the Backstop Parties in accordance with the Restructuring Support Agreement. |
| **Amount & Type** | A multiple-draw senior secured debtor-in-possession US dollar term loan credit facility in an aggregate principal amount not to exceed $75.0 million (the commitments under the DIP Term Facility, the "**DIP Term Commitments**"; the loans under the DIP Term Facility, the "**DIP Term Loans**"), subject to the terms and conditions of this DIP Term Facility Term Sheet and the DIP Term Loan Documents. The borrowing of DIP Term Loans shall permanently decrease the DIP Term Commitments, and any DIP Term Loans repaid may not be reborrowed.

The DIP Term Lenders shall make the DIP Term Loans available to the DIP Term Facility Borrower in up to two draws in the following manner (in each case upon the satisfaction of the conditions precedent described below):

(a)    The DIP Term Facility Borrower may make a single draw of DIP Term Loans on the closing date of the DIP Term Facility (the "**Closing Date"**) in an aggregate principal amount of up to $62.5 million.

(b)    The DIP Term Facility Borrower may make a single draw of DIP Term Loans on the date the Final Order has been entered by the Bankruptcy Court (the "**Delayed Draw Borrowing Date**") in an aggregate principal amount of up to $12.5 million (the "**Delayed Draw Loans**"); provided that the proceeds of the Delayed Draw Loans shall be deposited into the DIP Term Funding Account (as defined herein) concurrently with the funding thereof and the use of such proceeds shall be subject to the conditions set forth under the heading "DIP Term Funding Account."

"**Delayed Draw Commitment**" means the aggregate amount of the DIP Term |

| | |
|---|---|
| | Lenders' delayed draw commitments on the Closing Date not to exceed $12.5 million. |
| | The DIP Term Commitments will automatically terminate on the earlier to occur of (a) the date immediately following the Delayed Draw Borrowing Date and (b) the DIP Termination Date (as defined below). |
| | The "**DIP Termination Date**" shall mean the earliest of (a) the Initial Maturity Date (as defined herein) or, if extended as described below, the Extended Maturity Date, (b) the date of acceleration of the obligations under the DIP Term Facility and the termination of the unfunded DIP Term Commitments in accordance with the terms of the DIP Term Credit Agreement upon and during the continuance of an event of default, (c) the effective date of any Acceptable Plan of Reorganization (to be defined in a manner satisfactory to the DIP Required Lenders (as defined herein)) (the "**Plan Effective Date")** or any other plan of reorganization, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code and (e) the date that is thirty (30) days after the Petition Date (or such later date as may be agreed by the Required DIP Term Lenders), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| **Maturity Date** | The date (such date, the "**Initial Maturity Date**") falling 120 days after the commencement of the Cases (such commencement date, the "**Petition Date**"); provided that the DIP Term Facility Borrower shall have the right to extend the Initial Maturity Date for a period of up to 60 days (the "**Extended Maturity Date**") subject to the following conditions: (i) the Debtors have provided the DIP Term Facility Agent (for distribution to the DIP Term Lenders) with not less than 5 business days' prior written notice of such extension, (ii) the Debtors shall have filed an Acceptable Plan of Reorganization, (iii) a hearing seeking confirmation with respect to such Acceptable Plan of Reorganization shall have been scheduled prior to the Initial Maturity Date (for the avoidance of doubt, such hearing may take place before the Extended Maturity Date) and any continuance or adjournment to such hearing will require the written consent of the Required DIP Term Lenders, (iv) on or before the Initial Maturity Date, the DIP Term Facility Borrower shall have delivered to the DIP Term Facility Agent an updated DIP Budget covering the period up to the Extended Maturity Date in form and substance acceptable to the Required DIP Term Lenders, (v) the DIP Term Facility Borrower shall pay to the DIP Term Facility Agent, for the account of the DIP Term Lenders, an extension premium in an amount equal to 0.50% of the DIP Term Loans then outstanding, (vi) no default or event of default under the DIP Term Documents shall have occurred and be continuing and (vii) the maturity date under the DIP ABL Facility shall have been extended to a date that is not earlier than the Extended Maturity Date. |
| **Conversion** | On the Plan Effective Date, the aggregate outstanding principal amount of the DIP Term Loans will convert into loans under the Exit Term Loan Facility . |
| **Use of Proceeds** | Solely in accordance with the DIP Orders and the Approved Budget (as defined herein) (subject to any permitted variances) (i) to pay certain costs, fees and expenses related to the Cases, (ii) to pay certain adequate protection payments permitted by the DIP Orders, (iii) to repay a portion of the loans outstanding under the Pre-Petition ABL Facility (as defined herein), (iv) to fund the Carve- |

| | |
|---|---|
| | Out from and after the delivery of the Trigger Notice to make payments under the Carve-Out in accordance with the terms of the DIP Orders and (v) to fund the working capital needs and expenditures of the Debtors during the Cases; provided that up to $50,000 of any Carve-Out shall be made available to any official committee of unsecured creditors for investigation costs in respect of any Pre-Petition Facility and liens in accordance with the Interim Order or the Final Order, as applicable. |
| **DIP ABL Facility** | Concurrently with the entering into the DIP Term Facility, the Debtors will enter into a debtor-in-possession asset-based revolving facility in an aggregate principal amount of up to $80.0 million (the "**DIP ABL Facility**" and, together with the DIP Term Facility, the "**DIP Facilities**"), with Barclays Bank PLC as the administrative agent thereunder (the "**DIP ABL Facility Agent**" and, together with the DIP Term Facility Agent, the "**DIP Agents**"). |
| **Interest Rate** | LIBOR plus 8.00% per annum (or if applicable, ABR plus 7.00% per annum). |
| **Default Interest** | Upon the occurrence and during the continuation of an event of default, all obligations will bear interest at (i) in the case of principal and interest, a rate equal to 2.00% per annum, plus the otherwise applicable rate to the relevant DIP Term Loans and (ii) in the case of all other amounts, such amounts will bear interest at a rate equal to 2.00% per annum plus the rate applicable to DIP Term Loans that are ABR loans. |
| **Amortization** | None. |
| **Fees** | (a) *Upfront Fee*: 2.00% of (i) the aggregate principal amount of each DIP Term Lender's initial DIP Term Commitment on the Closing Date and (ii) the principal amount of each such DIP Term Lender's aggregate Delayed Draw Commitment on the Delayed Draw Borrowing Date.<br><br>(b) *Backstop Party Fee*: 4.50% of the aggregate amount of each Backstop Party's backstop obligations in respect of the aggregate DIP Term Commitments on the Closing Date, payable on the Plan Effective Date in the reorganized equity interests of the DIP Term Facility Borrower (or any direct or indirect parent thereof) pursuant to an Acceptable Plan of Reorganization; provided that if the RSA is terminated in accordance with its terms, such fee shall be payable in cash on the Termination Date.<br><br>(c) *Exit Fee*: 1.00% of the aggregate principal amount of the DIP Term Loans under the DIP Term Credit Agreement, which shall be payable in cash on the Plan Effective Date or, in the case of DIP Term Loans prepaid in whole or in part prior to the Plan Effective Date, on the date of such prepayment.<br><br>(d) *Unused Line Fee*: 0.375% on the average daily unused amount of the Delayed Draw Commitment of such Lender from and including the Closing Date to but excluding the Delayed Draw Commitment Termination Date. The Delayed Draw Commitment Fee shall be payable on the Delayed Draw Borrowing Date. |
| **Mandatory Prepayments** | Mandatory prepayments under the DIP Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness (with exceptions for permitted indebtedness), (b) sales or other dispositions (including casualty events) of any assets (excluding sales of inventory in the ordinary course of |

|  | business and other customary exceptions to the mutually agreed) in excess of $75,000 for any single transaction or series of related transactions and (c) extraordinary receipts in excess of $75,000 in the aggregate.<br><br>In addition, if, on the last day of any calendar week, the Loan Parties have any Excess Cash Balance (as defined below) on such day, on the following business day, such Excess Cash Balance shall be applied to prepay the outstanding DIP Term Loans.<br><br>"**Excess Cash Balance**" means at any time, the amount by which (a) the unrestricted cash and cash equivalents, <u>minus</u> (b) Excluded Funds, exceeds $6.0 million.<br><br>"**Excluded Funds**" means the sum of (a) the amount of any checks issued, wires initiated or ACH transfers initiated that have not yet cleared or been completed, <u>plus</u> (b) the amount of cash and cash equivalents held in accounts designated and used solely for payroll or employee benefits. |
|---|---|
| **Voluntary Prepayments** | Amounts outstanding under the DIP Term Facility may be voluntarily repaid at any time without premium or penalty, except as provided under the heading "Fees." |
| **Interim Order** | The interim order approving the DIP Facilities, which shall be in form and substance satisfactory to the Required DIP Term Lenders and the required lenders under the DIP ABL Facility (the "**Interim Order**"), shall, among other things, authorize and approve (i) the borrowing and making of the DIP Term Loans in an amount up to $62.5 million, (ii) the granting of the super-priority claims and liens against the Debtors and their assets in accordance with this DIP Facility Term Sheet and the DIP Term Loan Documents, (iii) the payment of all reasonable and documented fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Term Facility Agent and the DIP Term Lenders as described under the heading "Fees and Expenses & Indemnification" by the Debtors, (iv) the use of cash collateral; <u>provided</u> that adequate protection shall be granted consistent with the terms set forth in this DIP Term Facility Term Sheet and (v) the payment of the fees described under the heading "Fees," which payment shall not be subject to reduction, setoff or recoupment. |
| **Final Order** | The final order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the DIP Term Loans and the transactions contemplated by the DIP Term Loan Documents in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required DIP Term Lenders and the required lenders under the DIP ABL Facility) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required DIP Term Lenders in their sole discretion) as to which no stay has been entered approving the DIP Term Loan Facility (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"). |

| **Prepetition Facilities**[1] | "**Pre-Petition ABL Credit Agreement**" means that certain Revolving Credit Agreement, dated as of June 28, 2013, among Holdings, the Company, the other borrowers and guarantors named therein, the financial institutions named therein and Wells Fargo Bank, N.A., as the successor administrative agent (the "**Pre-Petition ABL Agent**"). The "Secured Parties" thereunder are referred to herein as the "**Pre-Petition ABL Secured Parties**." The indemnification claims under the Pre-Petition ABL Credit Agreement are referred to herein as the "**Pre-Petition ABL Indemnification Claims**" and the collateral securing such indemnification claims is referred to herein as the "**Pre-Petition ABL Collateral**." |
|---|---|
| | "**Pre-Petition First Lien Term Loan Agreement**" means that certain First Lien Term Loan Agreement, dated as of June 28, 2013, among Holdings, the Company, the guarantors named therein, the financial institutions named therein, and Morgan Stanley Senior Funding, Inc. (or its successor) as administrative agent (the "**Pre-Petition First Lien Agent**"). The "Secured Parties" thereunder are referred to herein as the "**Pre-Petition First Lien Secured Parties**." |
| | "**Pre-Petition Second Lien Term Loan Agreement**" means that certain Second Lien Term Loan Agreement, dated as of June 28, 2013, among Holdings, the Company, the guarantors named therein, the financial institutions named therein, and Morgan Stanley Senior Funding, Inc. (or its successor) as administrative agent (the "**Pre-Petition Second Lien Agent**"). The "Secured Parties" thereunder are referred to herein as the "**Pre-Petition Second Lien Secured Parties**." |
| | The Pre-Petition First Lien Term Loan Agreement and the Pre-Petition Second Lien Term Loan Agreement are referred to herein as the "**Pre-Petition Term Loan Agreements**," and the secured obligations thereunder, collectively, the "**Pre-Petition Term Loan Secured Obligations**," and all "Collateral" securing such Pre-Petition Term Loan Secured Obligations, the "**Pre-Petition Term Loan Collateral**." |
| | The Pre-Petition First Lien Secured Parties and the Pre-Petition Second Lien Secured Parties are collectively referred to herein as the "**Pre-Petition Term Loan Secured Parties**." The Pre-Petition Term Loan Secured Parties and the Pre-Petition ABL Secured Parties are referred to herein as the "**Pre-Petition Secured Parties**." |
| | The facilities governed by the Pre-Petition ABL Credit Agreement, the Pre-Petition First Lien Term Loan Agreement and the Pre-Petition Second Lien Term Loan Agreement are collectively referred to herein as the "**Pre-Petition Facilities**." |
| | The Pre-Petition ABL Agent, the Pre-Petition First Lien Agent and the Pre- |

---

[1] In each case, as amended, restated, supplemented or otherwise modified prior to the date of the Restructuring Support Agreement.

| | |
|---|---|
| | Petition Second Lien Agent are collectively referred to herein as the "**Pre-Petition Agents**." |
| **DIP Collateral** | All present and after acquired assets and property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including (without limitation) all accounts, all deposit accounts (including, without limitation, the DIP Term Funding Account), securities accounts and commodities accounts, inventory, equipment, capital stock in subsidiaries of the Loan Parties, including, for the avoidance of doubt, any equity or other interests in the Loan Parties' non-Debtor and/or jointly-owned subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law ("**Avoidance Actions**") but, subject to entry of the Final Order, including the proceeds thereof ("**Avoidance Proceeds**").  The collateral described above is collectively referred to herein as the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facilities are referred to herein as the "**DIP Liens**." <br><br> The relative rights and priorities in the DIP Collateral among the DIP Term Lenders and the lenders under the DIP ABL Facility will be set forth in an intercreditor agreement (the "**DIP ABL Intercreditor Agreement**"), which will be in form and substance consistent with that certain Intercreditor Agreement, dated as of June 28, 2013 (as amended, restated, supplemented or otherwise modified from time to time), among the Company, the other grantors party thereto, the Pre-Petition First Lien Agent, the Pre-Petition Second Lien Agent and the Pre-Petition ABL Agent (the "**Pre-Petition Intercreditor Agreement**"). <br><br> Notwithstanding anything to the contrary herein or in any other documentation governing the DIP ABL Facility, in no event shall the DIP Term Funding Account, all monies, securities, instruments and other investments held in the DIP Term Funding Account or credited thereto or any proceeds of any of the foregoing be included in the collateral securing the obligations under the DIP ABL Facility or any adequate protection claims set forth below (and the Debtors shall not grant a security interest in the DIP Term Funding Account or any of the other related assets to secure the obligations under the DIP ABL Facility). |

| | |
|---|---|
| **Priority Under the DIP Term Facility** | All obligations of the Loan Parties to the DIP Term Lenders and to the DIP Term Facility Agent (collectively, the "**DIP Obligations**") shall, subject to the Carve-Out (as defined below), at all times: |

(a). be entitled to superpriority administrative expense status in the Case of such Loan Party;

(b). be secured by a fully perfected (i) first priority security interest and lien on the DIP Collateral of each Loan Party that constitutes Term Loan Priority Collateral (to be defined in a manner consistent with Pre-Petition Intercreditor Agreement and such other modifications to reflect the commencement of the Cases) and (ii) second priority security interest and lien on the DIP Collateral of each Loan Party that constitutes the ABL Priority Collateral (to be defined in a manner consistent with Pre-Petition Intercreditor Agreement and such other modifications to reflect the commencement of the Cases), in each case that is not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date or (y) valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, excluding Avoidance Actions but including, subject to entry of the Final Order, Avoidance Proceeds;

(c). except as otherwise provided in clause (d) below with respect to the existing liens of the Pre-Petition Secured Parties with respect to Term Priority Collateral, (i) be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to (A) valid, perfected and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Pre-Petition Term Loan Agreements and (B) valid and non-avoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((i) and (ii) together, the "**Permitted Prior Liens**") and (ii) be secured by a junior perfected security interest and lien on the DIP Collateral that constitutes ABL Priority Collateral of each Loan Party to the extent subject to Pre-Petition ABL Secured Party Adequate Protection Liens; and

(d). be secured by a perfected priming security interest and lien on the DIP Collateral that constitutes Term Priority Collateral of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the obligations under the Pre-Petition Facilities.

The "**Carve-Out**" shall be in an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order or any other order of the Bankruptcy Court, all unpaid fees, costs, and expenses (the "Professional Fees") incurred or accrued by persons or firms retained by the

|   | Loan Parties pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and any official committee of unsecured creditors (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the day of delivery by a DIP Agent of a Carve-Out Trigger Notice (defined below), plus Professional Fees incurred after the Carve-Out Trigger Notice in an amount not to exceed $3,000,000 of Debtor Professionals; provided that under no circumstances shall any success, completion, or similar fees be payable from the Carve-Out following delivery of a Carve-Out Trigger Notice (collectively, the "**Carve-Out Amount**"), in each case subject to the limits imposed by the Financing Orders. |
|---|---|
|   | "**Carve-Out Trigger Notice**" shall mean a written notice delivered by any of the DIP Agents describing the event of default that has occurred and is continuing under the applicable loan documentation under the DIP ABL Facility or the DIP Term Facility.  Immediately upon delivery of a Carve-Out Trigger Notice, and prior to the payment to any Prepetition Secured Party on account of any adequate protection under the Interim Order or otherwise, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Agents or the Prepetition Agents (the "**Carve-Out Account**"), an amount equal to the Carve-Out Amount.  The funds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agents and the Prepetition Agents, each on behalf of itself and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall have a security interest upon any residual interest in the Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Carve-Out, and the priority of such lien on the residual should be consistent with the DIP ABL Intercreditor Agreement and the Interim Order. |
| **Adequate Protection** | Pre-Petition First Lien Secured Parties: |
|   | (a) the reasonable and documented prepetition and postpetition fees and expenses of the Pre-Petition First Lien Agent and the ad hoc group of lenders under the Pre-Petition First Lien Loan Agreement, including the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP, as primary counsel, Evercore Group L.L.C., as financial advisor, and one counsel retained by the Pre-Petition First Lien Agent; |
|   | (b) to the extent of diminution in value of their Pre-Petition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the Pre-Petition First Lien Secured Party Adequate Protection Claims (as defined below) (the "**Pre-Petition First Lien Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) any Pre-Petition ABL Secured Party Adequate Protection Liens (as defined below) in respect of ABL Priority Collateral, (iv) the DIP Liens securing the DIP Term Facility and (v) the DIP Liens on the ABL Priority Collateral securing the DIP ABL Facility; |
|   | (c) to the extent of diminution in value of their Pre-Petition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Pre-Petition First Lien Secured Party Adequate Protection Claims**"); |

(d) financial reporting and other reports and notices delivered by the DIP Term Facility Borrower under the DIP Term Facility; and

(e) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Pre-Petition First Lien Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required Pre-Petition First Lien Secured Parties (which shall mean Pre-Petition First Lien Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Pre-Petition First Lien Credit Agreement).

Pre-Petition Second Lien Secured Parties:

(a) to the extent of diminution in value of their Pre-Petition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the Pre-Petition Second Lien Secured Party Adequate Protection Claims (as defined below), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) any Pre-Petition ABL Secured Party Adequate Protection Liens in respect of ABL Priority Collateral, (iv) the DIP Liens securing the DIP Term Facility, (v) Pre-Petition First Lien Secured Party Adequate Protection Liens and (vi) the DIP Liens on the ABL Priority Collateral securing the DIP ABL Facility;

(b) to the extent of diminution in value of their Pre-Petition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Pre-Petition Second Lien Secured Party Adequate Protection Claims**"); and

(c) financial reporting and other reports and notices delivered by the DIP Term Facility Borrower under the DIP Term Facility.

Pre-Petition ABL Secured Parties:  Until the discharge of the obligations under the Pre-Petition ABL Credit Agreement as set forth in the Final Order:

(a) the reasonable and documented prepetition and postpetition fees and expenses of the Pre-Petition ABL Agent;

(b) to the extent of diminution in value of their Pre-Petition ABL Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the Pre-Petition ABL Secured Party Adequate Protection Claims (as defined below) and the Pre-Petition ABL Indemnification Claims (the "**Pre-Petition ABL Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the Pre-Petition First Lien Secured Party Adequate Protection Liens and the Pre-Petition Second Lien Secured Party Adequate Protection Liens, in each case in respect of Term Priority Collateral, (iv) the DIP Liens on the Term Priority Collateral securing the DIP Term Facility and (v) the DIP Liens on the ABL Priority Collateral securing the DIP ABL Facility;

(c) to the extent of diminution in value of their Pre-Petition ABL Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Pre-Petition ABL Secured Party Adequate Protection Claims**");

(d) financial reporting and other reports and notices delivered by the Company under the DIP ABL Facility; and

| | |
|---|---|
| | (e) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Pre-Petition ABL Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the required Pre-Petition ABL Secured Parties (which shall mean Pre-Petition ABL Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Pre-Petition ABL Credit Agreement). |
| **Milestones** | To be consistent with the milestones set forth in the Restructuring Support Agreement. |
| **Representations and Warranties** | Usual and customary for debtor-in-possession financings of this type, including (without limitation) representations with respect to the Initial DIP Budget (as defined herein), the Cases and the DIP Orders.<br><br>"**Initial DIP Budget**" means a budget in form and substance satisfactory to the Required DIP Term Lenders delivered on or prior to the Closing Date depicting on a weekly basis, among other things, the Debtors' projected operating receipts, vendor disbursements, total disbursements, liquidity, net operating cash flow, professional fee expenses and net cash flow during the period commencing from the Closing Date through the Initial Maturity Date.  The Initial DIP Budget may be updated from time to time upon the request of the Required DIP Term Lenders or the Company; provided that (i) in the case of a request by the Company, the DIP Term Lenders have received not less than 3 business days' prior written notice of the delivery of such updated DIP Budget, (ii) any such updated DIP Budget must be approved by the DIP Term Lenders constituting the Required DIP Term Lenders and (iii) to the extent any such updated DIP Budget is approved by the DIP Term Lenders constituting the Required DIP Term Lenders, the line item amounts set forth therein shall only be used to calculate the projected line items commencing with the week in which such updated DIP Budget is approved by the Required DIP Term Lenders and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable rolling four week period shall be calculated using the projected line items set forth in the applicable previously approved DIP Budget (the Initial Budget, together with any updated DIP Budget approved as set forth above, the "**Approved Budget**"). |
| **Affirmative Covenants** | Usual and customary for debtor-in-possession financings of this type, including (without limitation) weekly delivery of a rolling 13-week cash flow forecast in a form consistent with the Approved Budget, liquidity certificate and variance report, schedule of professional fees actually paid, delivery of annual, quarterly and monthly financial statements, monthly lender calls and priority of liens and claims. |
| **Negative Covenants** | Usual and customary for debtor-in-possession financings of this type, including (without limitation), the Financial Covenants (as defined herein) and covenants related to the RSA and other bankruptcy matters. |
| **Financial Covenants** | The DIP Term Facility shall contain the following financial covenants (the "**Financial Covenants**"):<br><br>(a).     *Budget Variance Covenant*:  Tested weekly, commencing on the second full calendar week following the Closing Date, with respect to each weekly period most recently ended: (a)(i) the negative variance of the actual operating cash receipts as compared to the budgeted operating |

|  | cash receipts set forth in the applicable Approved Budget must not exceed 20% during the first two full weeks ending after the Closing Date, calculated on a cumulative basis for such two week period, (ii) the negative variance of the actual operating cash receipts as compared to the budgeted operating cash receipts set forth in the applicable Approved Budget must not exceed 17.5% during the first thee full weeks ending after the Closing Date, calculated on a cumulative basis for such three week period and (iii) the negative variance of the actual operating cash receipts as compared to the budgeted operating cash receipts set forth in the applicable Approved Budget must not exceed 15% at all times following the first three full weeks ending after the Closing Date, calculated on a rolling four-week basis and (b)(i) the positive variance of the actual total disbursement amount (excluding professional fees) as compared to the total disbursement amount (excluding professional fees) set forth in the Approved Budget must not exceed 20% during the first two full weeks ending after the Closing Date, calculated on a cumulative basis for such two week period, (ii) the positive variance of the actual total disbursement amount (excluding professional fees) as compared to the total disbursement amount (excluding professional fees) set forth in the Approved Budget must not exceed 17.5% during the first three full weeks ending after the Closing Date, calculated on a cumulative basis for such three week period and (iii) the positive variance of the actual total disbursement amount (excluding professional fees) as compared to the total disbursement amount (excluding professional fees) set forth in the Approved Budget must not exceed 15% at all times following the first three full weeks ending after the Closing Date, calculated on a rolling four-week basis. |
|---|---|
|  | (b). *Liquidity*:  Liquidity (as defined below) at any time shall not be less than $10.0 million. |
|  | (c). *Professional Fees*:  Tested weekly, commencing on the first full calendar week following the Closing Date, with respect to the cumulative period since the Closing Date, the positive variance of the actual professional fee amount as compared to the budgeted professional fee amount set forth in the Approved Budget must not exceed (x) for the first month following the Closing Date, $500,000 and (y) at all times thereafter, $1 million. |
|  | "**<u>Liquidity</u>**" means an amount equal to (a) the unrestricted cash and cash equivalents of the Debtors at such time not to exceed $6.0 million <u>plus</u> (b) the principal amount of the loans available for borrowing under the DIP ABL Facility after giving effect to the outstanding extensions of credit thereunder, undrawn and drawn but unreimbursed letters of credit thereunder, the borrowing base formula and all applicable reserves, holdbacks, minimum availability tests and conditions to borrowing thereunder. |
| **Events of Default** | Usual and customary for debtor-in-possession financings of this type, including (without limitation), events of default related to dismissal or conversion of the Cases, amending or vacating the DIP Orders, the automatic stay, milestones and other bankruptcy-related events of default. |

12

| | |
|---|---|
| **Conditions Precedent to Closing** | Usual and customary for debtor-in-possession financings of this type, including (without limitation): (i) execution and delivery of the DIP Term Credit Agreement and the other DIP Term Loan Documents evidencing the DIP Term Facility; (ii) the Petition Date shall have occurred, and the DIP Term Facility Borrower and each Guarantor shall be a debtor and a debtor-in-possession; (iii) the entry of the Interim Order not later than five calendar days following the Petition Date, (iv) the delivery of the Initial DIP Budget, (v) the RSA shall have become effective and binding in accordance with its terms and (vi) the entry of all "first day" orders and related pleadings with the Bankruptcy Court that are acceptable in form and substance to the Required DIP Term Lenders. |
| **Conditions Precedent to the Extension of each DIP Term Loan** | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings including (without limitation): (i) no default or event of default; (ii) accuracy of representations and warranties in all material respects; (iii) the Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Term Lenders, (iv) delivery of a customary notice of borrowing, (v) satisfaction of all required milestones, (vi) the RSA shall be in full force and effect and (vii) with respect to the funding of the Delayed Draw Loans on the Delayed Draw Borrowing Date: (A) the Company shall have opened a segregated deposit account to be established in the name of the Company at a financial institution satisfactory to the Required DIP Term Lenders (the "**DIP Term Funding Account**"), (B) the DIP Term Facility Agent shall have received a fully executed account control agreement (in form and substance satisfactory to the Required DIP Term Lenders) covering the DIP Term Funding Account and (C) the proceeds of the Delayed Draw Loans shall be deposited into the DIP Term Funding Account concurrently with the making of the Delayed Draw Loans. |
| **DIP Term Funding Account** | Withdrawals from the DIP Term Funding Account shall be subject to the satisfaction of the following conditions:<br><br>(a). The DIP Term Facility Borrower shall deliver a written notice to the DIP Term Facility Agent (the "DIP Term Funding Account Withdrawal Notice") providing that the DIP Term Facility Borrower intends to withdraw funds on deposit in the DIP Term Funding Account and specifying the amount and date of such withdrawal, which such date shall be the second Business Day following the delivery of the Withdrawal Notice (the "Withdrawal Date");<br><br>(b). Concurrently with the delivery of a DIP Term Funding Account Withdrawal Notice, the DIP Term Facility Borrower shall deliver an updated liquidity certificate, which shall reflect the Debtors' Liquidity as of the end of business on the immediately preceding business day to be no greater than $15 million;<br><br>(c). The amount of such withdrawal shall not exceed the amount necessary to cause the Debtors' Liquidity to equal $15 million; and<br><br>(d). No default or event of default shall have occurred and be continuing. |

| | Upon the occurrence of the Plan Effective Date, the Company shall have the right to withdraw all funds remaining in the DIP Term Funding Account for remittance to another deposit account of the DIP Term Facility Borrower and subject to the use of proceeds provisions set forth in the credit agreement governing the Exit Term Loan Facilities. |
|---|---|
| **Voting** | Amendments and waivers of the DIP Term Facility will require the approval of DIP Term Lenders holding more than 50% of the outstanding unused DIP Term Commitment and DIP Term Loans (the "**Required DIP Term Lenders**"), subject to customary exceptions in debtor-in-possession financings of this type for certain provisions which shall require the consent of each affected DIP Term Lender or all DIP Term Lenders and customary protections for the DIP Facility Agent; provided that any extension of the outside date of effectiveness of the Acceptable Plan of Reorganization will require the approval of DIP Term Lenders holding more than 75% of the outstanding unused DIP Term Commitment and DIP Term Loans. |
| **Fees and Expenses & Indemnification** | Usual and customary for debtor-in-possession financings of this type. |
| **Assignments and Participations** | Usual and customary for debtor-in-possession financings of this type. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law) and, to the extent applicable, by the Bankruptcy Code. |
| **Counsel to DIP Term Facility Agent** | Davis Polk & Wardwell LLP. |
| **DIP ABL Facility** | Notwithstanding anything to the contrary set forth in this DIP Term Facility Term Sheet, other than with respect to interest rates and fees, the terms of the DIP Term Facility shall be no less favorable to the DIP Term Lenders in any material respects than any comparable terms set forth in the DIP ABL Facility. |

14

# **EXHIBIT E**

## **DISCLOSURE STATEMENT**

### **[Omitted]**

**EXHIBIT F**

**EXIT ABL TERM SHEET**

<u>**Exhibit A**</u>

<u>**CONFIDENTIAL**</u>

**Barclays Bank PLC**

**CTI FOODS HOLDINGS CO., LLC**

**$110,000,000 Senior Secured Asset-Based
Exit Revolving Credit Facility
("Exit ABL Credit Facility")**

**Summary of Principal Terms and Conditions
("Exit Term Sheet")**

This Summary of Principal Terms and Conditions (the "<u>Exit Term Sheet</u>") is subject to the terms and conditions of the Commitment Letter, dated of even date herewith, (the "<u>Commitment Letter</u>") by and among Barclays Bank PLC ("<u>Barclays</u>"), CTI Foods Holdings Co., LLC (the "<u>Company</u>"), CTI Foods Acquisition LLC ("<u>Holdings</u>"), Chef Holdings, Inc. ("<u>Parent</u>") and certain subsidiaries of the Parent. All capitalized terms used herein and not defined herein shall have the meanings given to them in the Commitment Letter to which this <u>Exhibit A</u> is attached (including the annexes and schedules hereto) or in the DIP ABL Credit Agreement, as applicable.

| | |
|---|---|
| **Cases:** | Parent, Holdings, the Company and all of the Parent's Subsidiaries that are debtors and debtors-in-possession in connection with their respective cases under chapter 11 (the "<u>Cases</u>") of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). |
| **Borrowers:** | The Company and any domestic subsidiaries of Holdings with assets to be included in the Borrowing Base (together with the Company, individually, a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"). All references to Borrowers shall mean the Company, Holdings and such subsidiaries of Holdings after giving effect to the Plan (as defined below). |
| **Guarantors:** | Parent and all of Parent's present and future subsidiaries that are not Borrowers (individually, a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>," and together with Borrowers, individually a "Loan Party" and collectively, "<u>Loan Parties</u>"). It is understood and agreed that each loan party under the Exit Term Loan Facility shall be a Loan Party. |
| **Sole Lead Exit Arranger and Sole Bookrunner:** | Barclays ("<u>Exit Arranger</u>"). |
| **Administrative and Collateral Exit Agent:** | Barclays (in such capacity, "<u>Exit Agent</u>"). |
| **Lenders:** | Barclays and such other institutions that may become parties to the financing arrangements as lenders (collectively, "<u>Exit ABL Lenders</u>"). |
| **Letter of Credit Issuer:** | Letters of credit under the Exit ABL Credit Facility will be issued by the Exit Agent and, if included as an additional Exit Issuing Bank, one or more Exit |

ABL Lenders acceptable to the Borrower and the Exit Agent (each, an "<u>Exit Issuing Bank</u>").

**Exit Swing Line Lender:**

Barclays (in such capacity, "<u>Exit Swing Line Lender</u>").

**Exit Term Loan Facility:**

Concurrently with the entering into the Exit ABL Credit Facility (as defined below), the Company, certain of its subsidiaries, Holdings and the lenders thereto will enter into a secured term loan credit facility in an aggregate principal amount of up to $125,000,000 (including, for the avoidance of doubt, both the "first out" and "last out" tranche thereunder) (the "<u>Exit Term Loan Facility</u>").

**Exit ABL Credit Facility:**

The Exit ABL Credit Facility will consist of a senior secured asset-based revolving credit and letter of credit facility of up to $110,000,000 provided to Borrowers, subject to the terms described below.

The revolving loans under the Exit ABL Credit Facility ("<u>Revolving Exit Loans</u>") will be available to Borrowers in a maximum principal amount at any one time of up to the lesser of (a) the aggregate commitments of Lenders in the Exit ABL Credit Facility or (b) the Borrowing Base as described below and subject to the terms and conditions of the Exit Loan Documents.

The term "Maximum Credit" as used herein means the aggregate of the commitments of Lenders for the Exit ABL Credit Facility. The term "Revolving Exit Loans" as used herein includes Exit Swing Line Loans, except as otherwise provided herein.

Revolving Exit Loans may be drawn, repaid and reborrowed.

**Exit Letters of Credit:**

A portion of the Exit ABL Credit Facility will be available for standby letters of credit arranged by Exit Agent and issued by the Exit Issuing Banks (sharing ratably in the Exit Letter of Credit Sublimit commitment) ("<u>Exit Letters of Credit</u>") in an aggregate amount at any time outstanding not to exceed $40,000,000 (the "<u>Exit Letter of Credit Sublimit</u>"). Exit Letters of Credit will reduce the amount of the Revolving Exit Loans available under the Borrowing Base and the Maximum Credit.

Exit Letters of Credit will be issued by the Exit Issuing Banks and each Lender will purchase an irrevocable and unconditional pro rata participation in each Letter of Credit. Letters of credit outstanding under the DIP ABL Credit Agreement on the Closing Date and issued by an Exit ABL Lender shall be rolled into the Exit ABL Credit Facility on the Closing Date.

**Exit Swing Line Loans:**

A portion of the Exit ABL Credit Facility will be available as swing line loans ("<u>Exit Swing Line Loans</u>") with a sublimit on Exit Swing Line Loans to Borrowers outstanding at any time of $15,000,000. Exit Swing Line Loans will reduce the amount of the Revolving Exit Loans available under the Borrowing Base and the Maximum Credit.

Exit Swing Line Loans will be made available by Exit Swing Line Lender and

each Lender will purchase an irrevocable and unconditional pro rata participation in each Exit Swing Line Loan.

**Increase Option:** None.

**Borrowing Base:** The Revolving Exit Loans and Exit Letters of Credit shall be provided to Borrowers subject to the terms and conditions of the Exit Loan Documents and availability under the Borrowing Base, which will be calculated as follows:

(a) 85% multiplied by the net amount of the eligible accounts of Borrowers, plus

(b) the amount equal to 85% of the NOLV Percentage of eligible inventory of Borrowers (net of reserves with respect to inventory not already reflected in the determination of the NOLV Percentage) multiplied by the value of such category of eligible inventory of Borrowers; plus

(a) 100% of Qualified Cash (as defined in the Existing Credit Agreement) subject to a cap to be agreed; minus

(c) reserves (as described below).

The "value" of each category of eligible inventory will be determined in accordance with the DIP ABL Credit Agreement.

"NOLV Percentage" means, with respect to inventory of any person, the net orderly liquidation value of inventory, expressed as a percentage of value, net of all reasonable costs and expenses of liquidation thereof, as determined based upon the most recent inventory appraisal conducted in accordance with the Exit Loan Documents (or the DIP ABL Credit Agreement, as the case may be).

The term "Permitted Discretion" as used in this Exit Term Sheet with reference to the Exit Agent, shall mean a determination made in good faith in the exercise of their reasonable business judgment based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances at the time with the information then available to it.

**Eligibility; Reserves:** Substantially the same as the DIP ABL Credit Agreement (other than bankruptcy related reserves therein which are no longer applicable for an exit facility) subject to additions or modifications made by the Exit Agent in its Permitted Discretion and as appropriate under the circumstances as reasonably determined by the Exit Agent in its Permitted Discretion pursuant to field examinations and other due diligence, provided, that, reserves will be established as may be applicable under the circumstances in connection with the confirmation by the U.S. Bankruptcy Court of the Plan, including (x) reserves in respect of administrative expenses, priority tax claims, and reclamation claims arising in the Cases and any other claims that remain outstanding after the Closing Date and (y) distributions that are not made pursuant to the Plan at closing, in each case to the extent resulting in liens on

the Borrowing Base assets that are senior to or pari passu with the Exit Agent's liens.

**Optional Prepayment and Commitment Reductions:**  Usual and customary for financings of this type consistent with the Documentation Principles.

**Mandatory Prepayments:**  Usual and customary for financings of this type consistent with the Documentation Principles.

**Interest and Fees:**  See Schedules 1 and 2 to this Exit Term Sheet.

**DIP ABL Facilities/DIP Term Loan Facilities**  The DIP ABL Credit Agreement means that certain senior secured superpriority debtor-in-possession asset-based revolving credit, of up to $80,000,000 provided to Borrowers, each as a debtor and debtor-in-possession upon the commencement of the Cases (the "DIP ABL Credit Agreement"). The lenders, thereunder the "DIP ABL Lenders" and the agent, thereunder the "DIP ABL Agent".

The DIP Term Loan Credit Agreement means that certain secured debtor-in-possession term loan credit facility in an aggregate principal amount of up to $75,000,000, provided to the Company and guaranteed by the Parent and each subsidiary of the Parent party thereto, each as a debtor and debtor-in-possession upon the commencement of the Cases (the "DIP Term Loan Credit Agreement"). The lenders, thereunder the "DIP Term Loan Lenders" and the agent, thereunder the "DIP Term Loan Agent".

"DIP Intercreditor Agreement" means that certain intercreditor agreement, (as amended, restated, supplemented or otherwise modified from time to time), among the Company, the other grantors party thereto, the DIP ABL Agent and the DIP Term Loan Agent.

**Pre-Petition Facilities:**  "Existing Credit Agreement" means that certain Revolving Credit Agreement, dated as of June 28, 2013, by and among the Company, Holdings and certain subsidiaries of the Company, Wells Fargo Bank, N.A. (as successor administrative and collateral agent to Goldman Sachs Lending Partners, LLC) (the "Existing Credit Agreement Agent") and the Lenders party thereto.

"Pre-Petition Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of June 28, 2013, by and among the Company, Holdings, certain subsidiaries of the Company, the Existing Credit Agreement Agent and the administrative agents under the First Lien Term Loan Agreement and Second Lien Term Loan Agreement (each as defined in the Restructuring Support Agreement).

**Collateral:**  To secure all obligations of each Loan Party under the Exit ABL Credit Facility, the following (the "Collateral"): (a) first priority, perfected security interest and lien on the collateral of each Loan Party that constitutes Revolving Facility Priority Collateral (to be defined in a manner consistent with the DIP Intercreditor Agreement); (b) second priority (subordinate only to the security interests and liens that secure the Exit Term Loan Facility), perfected security

interest and lien on the collateral of each Loan Party that constitutes the Term Loan Priority Collateral (to be defined in a manner consistent with the DIP Intercreditor Agreement); provided that, the Exit Agent shall have the right in its sole discretion to release its security interest in real property at any time.

The obligations secured may include hedging and bank product obligations of the Loan Parties where an Exit ABL Lender or an affiliate of an Exit ABL Lender is a counterparty.

**Use of Proceeds:**   The proceeds of the Exit ABL Credit Facility will be used to repay (i) the outstanding allowed administrative expenses and allowed claims all in accordance with the Plan, (ii) in full the obligations under the DIP ABL Credit Agreement and (iii) other debt to be specified, or costs, expenses and fees in connection with the Exit ABL Credit Facility in accordance with the Plan and for working capital and general corporate purposes of the Borrowers.

**Closing Date:**   The date on which all of the conditions precedent to the initial Revolving Exit Loans and Exit Letters of Credit under the Exit ABL Credit Facility are satisfied or waived (the "Closing Date"), but in no event later than four (4) months from closing date of the DIP ABL Credit Agreement, unless the maturity of the DIP ABL Credit Agreement has been extended in accordance with the terms thereof, then in that case, in no event later than six (6) months from closing date of the DIP ABL Credit Agreement.

**Term:**   The Exit ABL Credit Facility shall be for a term ending on the earlier of (a) four and half (4.5) years from the Closing Date and (b) six months prior to the maturity of the Company's Exit Term Loan Facility (the "Exit ABL Maturity Date").

**Documentation:**   For the Exit ABL Credit Facility, definitive loan documentation (collectively, the "Exit Loan Documents"), including a credit agreement, all supplemental security agreements, pledge agreements, guarantees, control agreements, intercreditor agreements, UCC financing statements, consents, waivers, acknowledgments and other agreements from third persons that Exit Arrangers may reasonably deem necessary or desirable, in each case consistent with this Exit Term Sheet, together with evidence of insurance coverage and a lender's loss payee endorsement in favor of Exit Agent as to casualty and business interruption insurance and any other agreements and documents related to the foregoing, each of the foregoing in form and substance reasonably satisfactory to the Exit Arrangers and the Company, and any other agreements and documents related to the foregoing, each in form and substance reasonably satisfactory to the Exit Arrangers and the Company; provided that the Exit Loan Documents will be based on the DIP ABL Credit Agreement and related documents, and the Pre-Petition Intercreditor Agreement and will include, but not be limited to, the confirmation by the U.S. Bankruptcy Court of the Plan, the terms and conditions set forth herein, the practices and procedures of the Exit Agent for exit financings, changes in law or accounting standards, EU Bail-in language, the Beneficial Ownership Regulation (as defined below), the operational practices and procedures of the Exit Agent and the results of updated field examinations and other due diligence (collectively, the

"<u>Documentation Principles</u>").

| | |
|---|---|
| **Representations and Warranties:** | Usual and customary for financings of this type consistent with the Documentation Principles and to include representations and warranties with respect to the Plan, its consummation and related bankruptcy matters. |
| **Affirmative Covenants:** | Usual and customary for financings of this type consistent with the Documentation Principles. |
| **Collateral Reporting:** | For the Exit ABL Credit Facility, collateral reporting shall be usual and customary for facilities of this nature and consistent with the Documentation Principles, including: |

    (a)  monthly borrowing base certificates, so long as a *Cash Dominion Event* does not exist, otherwise weekly (and in such event the delivery of borrowing base certificates on a weekly basis shall continue for not less than four (4) consecutive weeks);

    (b)  field examinations and appraisals as Exit Agent may from time to time require, but no more than:

        (i)  1 field examination and 1 appraisal in any fiscal year at the expense of Borrowers, or in the event that Excess Availability is less than the greater of (x) 15.0% of the Line Cap or (y) $16,500,000 for five consecutive business days, no more than 2 field examinations and 2 appraisals during any fiscal year at the expense of Borrowers,

        (ii)  such other field examinations and appraisals as Exit Agent may request at any time upon the occurrence and during the continuance of an event of default at the expense of Borrowers or otherwise at any time at the expense of the Exit Agent;

| | |
|---|---|
| **Financial Reporting:** | Usual and customary for financings of this type consistent with the Documentation Principles, including monthly and quarterly financial statements and annual audited financial statements and projections, except that, (i) annual audited financial statements shall be delivered within 120 days after the end of each fiscal year (or in the case of the fiscal year ended December 31, 2018, a later date to be agreed), (ii) quarterly financial statements shall be delivered within 45 days after the end of each of the first three fiscal quarters of each fiscal year and (iii) monthly financial statements, are to be delivered within 35 days following the end of each of the first two months of each fiscal quarter. |
| **Cash Management:** | For the Exit ABL Credit Facility, Loan Parties shall maintain their existing cash management system in a manner consistent with the terms of the DIP Credit Agreement, including that Exit Agent shall have the right to require the depository bank to transfer funds to Exit Agent for application to the obligations owing to Exit Agent and Lenders upon a Cash Dominion Event as defined below.  Loan Parties will continue to direct all customers making |

payments on receivables to remit payments to deposit accounts that are the subject of control agreements among the applicable Loan Party, Exit Agent, and the depository bank in form and substance reasonably satisfactory to Exit Agent.

For the Exit ABL Credit Facility, "Cash Dominion Event" means, at any time (a) an event of default under the Exit ABL Credit Facility or (b) Excess Availability shall have been less than the greater of (i) 12.5% of the Line Cap and (ii) $13,750,000 for five consecutive days and ending on the date that no event of default under the Exit ABL Credit Facility has existed and Excess Availability shall have been not less than the greater of such amount, in each case, for 30 consecutive calendar days.

"Line Cap" means, at any time, the lesser of the Borrowing Base at such time or the Maximum Credit.

"Excess Availability" means, an amount equal to (a) the Line Cap, *minus* (b) the amount of Revolving Exit Loans outstanding at such time.

**Negative Covenants:**   Usual and customary for financings of this type consistent with the Documentation Principles; provided that the negative covenants on investments, repayments of certain debt, dividends, distributions, redemptions and repurchases of capital stock will expressly allow such investments, repayments of debt, dividends, distributions, redemptions and repurchases, provided, that, as of the date of any such payment or transaction in respect thereof, and after giving effect thereto, each of the Payment Conditions is satisfied.

The definition of Payment Conditions is to be agreed.

Interest in respect of the Exit Term Loan Facility (for both the "first out" and "last out" tranches thereunder) shall be first required to be made by payment in kind up to the applicable payment in kind interest caps under the Exit Term Loan Agreement, in the event that, at any time such interest is due and payable, on a pro forma basis after giving effect to such interest payment, the average Excess Availability for such day and for the sixty (60) days immediately prior to the PIK election date under the Exit Term Loan Facility, is less than the greater of (i) 20.0% of the Line Cap and (ii) $22,000,000, which shall be certified by the chief financial officer of the Company.

**Financial Covenant:**   <u>Minimum Fixed Charge Coverage Ratio</u>. During any FCCR Test Period (as defined below) the Borrowers shall maintain a minimum fixed charge coverage ratio ("<u>FCCR</u>") of 1.00 to 1.00 to be tested quarterly, for the most recently-ended period for which quarterly financial statements have been received and each quarter thereafter for which a FCCR Test Period is in effect.

"FCCR Test Period" means a period (a) when an event of default under the Exit ABL Credit Facility has occurred and is continuing or (b) commencing on the day Excess Availability is less than the greater of (i) 12.5% of the Line Cap and (ii) $13,750,000 and continuing until the day, (a) no event of default under the Exit ABL Credit Facility shall have been continuing and (b) where Excess Availability has been greater than the greater of (i) 12.5% of the Line Cap and

(ii) $13,750,000 such amount, in each case, for a period of at least 30 consecutive days.

The definitions of EBITDA and Consolidated Net Income will be defined in the Exit Loan Documents as set forth on Annex 2 to this Exit Term Sheet.

**Events of Default:** Usual and customary for financings of this type consistent with the Documentation Principles; provided, that, the events of default for the Exit ABL Credit Facility will include, but not be limited to, the following: (a) any failure by Borrowers or Guarantors to observe or perform any of the material terms or conditions of any material order, stipulation, or other arrangement entered by or with the Bankruptcy Court in the Cases or otherwise under or in connection with the Plan; (b) any material provision of the Plan or Confirmation Order (as defined below) shall be vacated, reversed or stayed or modified or amended, without the consent of the Exit Arranger; and (c) Change of Control, which shall include, but not be limited to, no person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934 as in effect on the Closing Date), (x) shall have acquired Capital Stock representing 50.1% or more on a fully diluted basis of the total voting power of all of the outstanding voting stock of Parent or Holdings or (y) shall have the power, directly or indirectly, to appoint board members representing 50.1% or more of the total composition of the board of directors of Parent or Holdings (a "Change of Control Event"); provided, that none of the transactions contemplated or authorized by the Plan shall constitute, or be deemed to constitute, a Change of Control Event (it being understood and agreed for the avoidance of doubt that if any entity (together with its affiliates) acquires Capital Stock described in clause (x) above (including, without limitation, pursuant to a distribution under the Plan) or power described in clause (y) above, such occurrence shall constitute a Change of Control Event even if contemplated or authorized by the Plan).

**Conditions Precedent to all Borrowings:** Usual and customary for financings of this type consistent with the Documentation Principles.

**Conditions Precedent to Initial Borrowings:** The conditions precedent to the initial borrowings under the Exit ABL Credit Facility will consist of the Conditions Precedent set forth on Annex 1 to this Exit Term Sheet.

**Assignments; Participations:** Usual and customary for financings of this type consistent with the Documentation Principles.

**Amendments and Waivers:** Usual and customary for financings of this type consistent with the Documentation Principles.

**Governing Law:** New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York.

**Expenses, Waivers** Usual and customary for financings of this type consistent with the

**and Indemnity:**          Documentation Principles.

**USA PATRIOT Act:**        Each Lender subject to the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act") and the requirements of 31 C.F.R. §1010.230 (the "Beneficial Ownership Regulation") hereby notifies the Loan Parties that pursuant to the requirements of the Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of the Loan Parties and other information that will allow such Lender to identify such person in accordance with the Act and the Beneficial Ownership Regulation.  Loan Parties are hereby advised that any commitment that might at any time be issued is subject to satisfactory results of such verification.

SCHEDULE 1
TO
EXIT TERM SHEET

<u>Interest and Certain Fees</u>

**Interest Rate Options:** Borrowers may elect that Revolving Exit Loans (other than Exit Swing Line Loans) bear interest at a rate per annum equal to (a) the Base Rate plus the Applicable Margin or (b) the LIBOR Rate plus the Applicable Margin. Exit Swing Line Loans will bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin.

As used herein:

"Applicable Margin" means a percentage determined in accordance with the pricing grid attached hereto as Schedule 2 to Exhibit A.

"Base Rate" shall have the meaning set forth in the DIP ABL Credit Agreement.

"LIBOR Rate" shall have the meaning set forth in the DIP ABL Credit Agreement. The LIBOR Rate shall be available for interest periods of one, two, three or six months.

Interest rate reference terms will be subject to customary provisions, including applicable reserve requirements, limits on the number of outstanding LIBOR Rate Loans, minimum amounts of each LIBOR Rate Loan and LIBOR "replacement" language.

**Unused Line Fee:** Borrowers shall pay to Exit Agent, for the account of Lenders (to the extent and in accordance with the arrangements by and among Lenders), an unused line fee calculated at 0.375% per annum until the last day of the first full month after closing and adjusted thereafter every month to an amount equal to 0.375% per annum if the average outstanding Revolving Exit Loans and Exit Letters of Credit during the immediately preceding month are equal to or greater than 50% of the Maximum Credit and 0.50% per annum if the average outstanding Revolving Exit Loans and Exit Letters of Credit during the immediately preceding month are less than 50% of the Maximum Credit, multiplied by the difference between the Maximum Credit and the average outstanding Revolving Exit Loans and Exit Letters of Credit during the immediately preceding month, payable quarterly in arrears. Exit Swing Line Loans will not be considered in the calculation of the Unused Line Fee.

**Letter of Credit Fees:** Borrowers shall pay to (a) Exit Agent, for the account of Lenders (to the extent and in accordance with the arrangements by and among Lenders), on the daily outstanding balance of Exit Letters of Credit, a letter of credit fee calculated at a rate per annum based on the then Applicable Margin for LIBOR Rate Loans and (b) to the Exit Issuing Bank, a fronting fee equal to 0.25% per annum, in each case under clauses (a) and (b), payable quarterly in arrears. In addition, Borrowers shall pay customary issuance, arranging and other fees of the Exit

Issuing Bank.

**Default Rate:** After a payment event of default and for so long as the same is continuing, the applicable rates of interest and rate for letter of credit fees shall be increased by 2.00% per annum above the otherwise then applicable rates.

**Rate and Fee Basis; Payment Dates:** All per annum rates and fees will be computed on basis of actual days elapsed over a 360 day year (or 365 or 366 days, as the case may be, in the case of Revolving Exit Loans for which the Base Rate is used). In the case of Revolving Exit Loans for which the LIBOR Rate is used, interest is payable on the last day of each relevant interest period or in the case of an interest period longer than 3 months, then within 3 months, in arrears, and in the case of Revolving Exit Loans for which the Base Rate is used, interest is payable quarterly in arrears.

SCHEDULE 2
TO
EXIT TERM SHEET

<u>Revolving Exit Loan Applicable Margin</u>

| Tier | Quarterly Average Excess Availability | Applicable LIBOR Margin | Applicable Base Rate Margin |
|------|---------------------------------------|-------------------------|-----------------------------|
| 1 | Equal to or greater than 66% of the Maximum Credit | 1.75% | .75% |
| 2 | Greater than or equal to 33% of the Maximum Credit but less than 66% of the Maximum Credit | 2.00% | 1.00% |
| 3 | Less than 33% of the Maximum Credit | 2.25% | 1.25% |

The Applicable Margin for the interest rates shall be the applicable percentage calculated based on the percentage set forth in Tier 2 of the chart above until the last day of the first full quarter after the Closing Date.  The interest rates will be adjusted every quarter thereafter based on the chart above.

The Applicable Margin shall be calculated and established once every quarter, effective as of the first day of such quarter and shall remain in effect until adjusted thereafter as of the last day of such quarter.

The term "Applicable Margin" as used in the Term Sheet means, at any time (subject to the paragraph above), (a) as to Revolving Exit Loans for which interest is calculated based on the Base Rate, the Applicable Base Rate Margin as set forth above, and (b) as to Revolving Exit Loans for which interest is calculated based on LIBOR, the Applicable LIBOR Margin as set forth above.

The term "Quarterly Average Excess Availability" shall mean, at any time, the daily average of the aggregate amount of the Excess Availability for the immediately preceding calendar quarter, commencing on the first day of such calendar quarter.

ANNEX I
TO
TERM SHEET

<u>Conditions Precedent to Initial Borrowings under Exit ABL Credit Facility</u>

The conditions precedent to the initial borrowings under the Exit ABL Credit Facility will consist of the following:

(a)  Exit Agent shall have received a docketed copy of the order confirming the plan of reorganization of Borrowers (the "<u>Plan</u>") in the Cases (the "<u>Confirmation Order</u>"), which order shall be in form and substance acceptable to Exit Arranger, entered by the U.S. Bankruptcy Court after due notice to all creditors and other parties-in-interest and as entered on the docket of the Clerk of such Bankruptcy Court, and there shall be no appeal or other contest or certiorari proceeding taken or pending with respect to such order and the time to appeal or contest such order shall have expired and such Confirmation Order shall be in full force and effect and neither the Plan nor the Confirmation Order shall have been modified, reversed, stayed or vacated.  Exit Agent shall have received all information as to the amounts of significant administrative expenses, priority tax claims, and reclamation claims arising in the Chapter 11 Cases that are to be paid at closing or to the extent to remain outstanding after closing are in the amounts set forth in the projections received by Exit Agent prior to the date hereof.

(b)  The Plan and any amendments and supplements thereto (other than the Plan Supplement (except for the Exit ABL Agreement and the New Intercreditor Agreement, the form and substance of which are subject to the relevant documentation provisions of this Exit Term Sheet), which shall be governed by condition precedent (o) below) shall be in form and substance acceptable to the Exit Arranger.  The Plan shall be substantially consummated and effective concurrently with the closing of the Exit ABL Credit Facility and all agreements and undertakings of the parties thereunder to be performed by such time shall have been satisfied and performed or waived in writing, the Confirmation Order shall be final, valid, subsisting and continuing and all conditions precedent to the effectiveness of the Plan shall have been fulfilled, including, without limitation, the settlement and/or payment of all other debt and claims payable under the Plan.  No motion, action or proceeding shall be pending against a Borrower or Guarantor by any creditor or other party-in-interest in the Bankruptcy Court or any other court of competent jurisdiction that adversely affects or may reasonably be expected to adversely affect the Plan in any material respect, the post-consummation business of any Borrower or Guarantor in any material respect or the Exit ABL Credit Facility.

(c)  Receipt by Exit Arranger, each in form and substance reasonably satisfactory to Exit Arranger, of (i) audited consolidated balance sheets and related statements of income and cash flows of the Company and its subsidiaries for the fiscal years ended December 31, 2017 and December 31, 2016, (ii) unaudited consolidated balance sheets and related statements of income and cash flows of the Company and its subsidiaries for the fiscal year ended December 31, 2018, if the Closing Date shall not have occurred prior to 90 days after December 31, 2018, (iii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Company and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 45 days before the Closing Date, (iv) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available and will include each month ended at least 45 days before the Closing Date, (v) projected monthly balance sheets, income statements, statements of cash flows and availability of Borrowers and Guarantors for the period beginning on the Closing Date through the first anniversary of the Closing Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to Exit Arranger, and an opening pro forma balance sheet for the Loan Parties in form and substance acceptable to Exit Arranger, (vi) projected

quarterly balance sheets, income statements, statements of cash flows and availability of Borrowers and Guarantors for the period beginning on the first anniversary of the Closing Date through the third anniversary of the Closing Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to Exit Arranger, (vii) projected annual balance sheets, income statements, statements of cash flows and availability of Borrowers and Guarantors for the period beginning on the third anniversary of the Closing Date through the Exit ABL Maturity Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to Exit Arranger and (viii) any updates or modifications to the projected financial statements of Borrowers and Guarantors previously received by Exit Arranger, in each case in form and substance satisfactory to Exit Arranger.

(d)    Exit Agent shall have received a certificate from the chief financial officer of the Company certifying that the Loan Parties, taken as a whole and after giving effect to the transactions contemplated by the Exit Loan Documents to occur at closing, are solvent.

(e)    Execution and delivery of all Exit Loan Documents for the Exit ABL Credit Facility by the parties thereto that are required to be executed on the Closing Date, which shall include: (i) customary legal opinions, (ii) customary evidence of authority from each Loan Party, (iii) customary officer's certificates from each Loan Party, (iv) good standing certificates in the respective jurisdictions of organization of each Loan Party, (v) lien searches with respect to each Loan Party, (vi) UCC financing statements for each Loan Party and (vii) security and pledge agreements consistent with this Exit Term Sheet.  Exit Agent, for the benefit of itself, the Exit ABL Lenders, Exit Issuing Banks and bank product providers, shall hold perfected security interests in and liens upon the Revolving Facility Priority Collateral and the Term Loan Priority Collateral with the priorities set forth in the Exit Term Sheet to which this Annex is attached; provided that it is understood and agreed that there shall be no requirement to perfect any security interest in any Collateral as a condition to closing hereunder other than the filing of UCC financing statements and the delivery of certificated equity securities as and to the extent required under the Exit Loan Documents.

(f)    The Exit Term Loan Facility shall be consistent in all respects with the Exit Term Loan Term Sheet and shall have been consummated and the proceeds thereof shall have been or, substantially concurrently with the initial borrowing under the Exit ABL Credit Facility, received by the Loan Parties.  Exit Arranger shall have received a fully executed copy of the intercreditor agreement between the Exit Agent and the agent under the Exit Term Facility substantially in the form of the Pre-Petition Intercreditor Agreement with such changes reasonably satisfactory to the Exit ABL Arranger.

(g)    Minimum opening Excess Availability on the Closing Date after the application of proceeds of the initial Revolving Exit Loans, if any, on such date and after provision for payment of all fees and expenses of the transaction paid or payable on or about the Closing Date, of not less than $30,000,000.

(h)    Minimum Liquidity on the Closing Date after the application of proceeds of the initial Revolving Exit Loans, if any, on such date and after provision for payment of all fees and expenses of the transaction paid or payable on or about the Closing Date, of not less than $35,000,000. "Liquidity" means, the sum of (i) unrestricted Cash and Cash Equivalents held by the Loan Parties, plus (ii) Excess Availability.

(i)    Maximum funded indebtedness on the Closing Date under the Exit ABL Credit Facility and the Exit Term Facility shall not be in excess of $175,000,000.

(j)    The Exit Agent shall have received all documentation and information at least three business days

prior to the Closing Date as is reasonably requested in writing by the Exit Agent about the Company and its subsidiaries required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act and a beneficial ownership certificate for any Borrower or Guarantor that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, in each case to the extent requested in writing at least ten business days prior to the Closing Date.

(k)  No material adverse change in the business, operations, profits, assets or prospects of Borrowers and Guarantors shall have occurred since September 30, 2018 (it being understood that the commencement of the Cases, any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof, reduction in payment terms by suppliers, and reclamation claims shall not be deemed a material adverse change).  No defaults or events of default (including without limitation a default or Event of Default arising in connection with a Change of Control Event) on the Closing Date under any of the Exit Loan Documents shall exist. There shall be no material misstatements in or omissions from the written materials previously furnished to Exit Agent by Borrowers and Guarantors, after giving effect to any supplements thereafter.

(l)  The representations and warranties set forth in the Exit Loan Documents shall be true and correct in all material respects on the Closing Date; provided that to the extent such representation and warranty refers to an earlier date, it shall be true and correct in all material respects as of such earlier date; provided, further, any representation and warranty that is qualified by materiality or similar language shall be true and correct in all respects on such respective dates.

(m)  All reasonable and documented out-of-pocket fees and expenses (including reasonable fees and expenses of outside counsel, financial advisors, appraisals and field examinations) required to be paid to the Exit Agent and the Exit ABL Lenders on or before the Closing Date shall have been paid to the extent invoiced not less than two (2) business days prior to the Closing Date.

(n)  Prior to or substantially simultaneously with the initial extension of credit under the Exit ABL Credit Facility, with respect to any obligations under the DIP ABL Credit Agreement (i) the indefeasible payment in full in Cash of such obligations, (ii) to the extent not otherwise rolled into and deemed issued under the Exit ABL Credit Facility or backstopped in a manner reasonably satisfactory to the issuer of such letter of credit, the termination, cash collateralization or replacement in accordance with the DIP ABL Credit Agreement of all undrawn letters of credit outstanding thereunder, and (iii) the termination of all commitments under the DIP ABL Credit Agreement, at least partially with the full proceeds of the Exit ABL Credit Facility, pursuant to a payoff letter acceptable to the Exit Agent; provided further that any surviving obligations expressly set forth in the DIP ABL Credit Agreement, including, without limitation, any indemnification obligations of any Loan Party, shall continue after the DIP ABL Credit Agreement has been indefeasibly repaid in full in cash.

(o)  Any of the documents executed in connection with the implementation of the Plan, to the extent they contain provisions differing in any material respect from, or not described in, the Plan, that are adverse in any material respect to the rights or interest of any or all of the Exit Arranger, the Exit Agent and the Lenders, in their capacities as such, shall be in form and substance satisfactory to the Arranger.

(p)  Prior to or substantially simultaneously with the initial extension of credit under the Exit ABL Credit Facility, the remaining proceeds of the DIP Term Loan Agreement, not to exceed $12,500,000, that were funded into a restricted and/or blocked account for the benefit of the DIP Term Loan Lenders shall have been released from such account.

ANNEX 2
TO
TERM SHEET

"**Consolidated Adjusted EBITDA**" means, as to any Person for any period, an amount determined for such Person on a consolidated basis equal to the total of (a) Consolidated Net Income for such period plus (b) the sum, without duplication, of (to the extent deducted in calculating Consolidated Net Income) the amounts of:

(i)      consolidated interest expense (including (A) fees and expenses paid to the Administrative Agent in connection with its services hereunder and to the administrative agent under any First Lien Facility, any Second Lien Facility, (B) other bank, administrative agency (or trustee) and financing fees, (C) costs of surety bonds in connection with financing activities, (D) commissions, discounts and other fees and charges owed with respect to letters of credit, bank guarantees, bankers' acceptance or any similar facilities or financing and hedging agreements and (E) amortization of debt discounts or premiums);

(ii)      Taxes paid (including pursuant to any Tax sharing arrangements) and provisions for Taxes of the Borrower Agent and its Subsidiaries, including, in each case federal, state, provincial, local, foreign, unitary, franchise, excise, property, withholding and similar Taxes, including any penalties and interest, plus, without duplication, Tax Distributions paid or accrued during such period;

(iii)     total depreciation and amortization expense;

(iv)     other non-Cash charges or losses, including the excess of GAAP rent expense over actual Cash rent paid during such period due to the use of a straight line rent for GAAP purposes; provided that if any such non-Cash charge, loss or expense represents an accrual or reserve for potential Cash items in any future period, (A) the Borrower Agent may determine not to add back such non-Cash charge, loss or expense in the current period and (B) to the extent the Borrower Agent does decide to add back such non-Cash charge, loss or expense, the Cash payment in respect thereof in such future period shall be subtracted from Consolidated Adjusted EBITDA in the period in which such payment is made;

(v)      transaction fees, costs and expenses incurred in connection with the consummation of any transaction (or any transaction proposed and not consummated) permitted under this Agreement, including the issuance or offering of Capital Stock, Investments, acquisitions, Dispositions, recapitalizations or the incurrence, repayment, refinancing, amendment or modification of Indebtedness (including any amortization or write-off of debt issuance or deferred financing costs, premiums and prepayment penalties);

(vi)     the amount of any costs, charges, accruals, reserves or expenses in connection with (A) the consolidation or closing of facilities, branches or distribution centers or plants during such period and (B) the closure, consolidation or transfer of production lines;

(vii)    the amount of any costs and expenses of the type set forth in the Initial Budget (as defined in the DIP ABL Credit Agreement) for "Professional Fees" incurred in connection with the Cases;

(viii)   proceeds of business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace (whether or not received so long as such Person in good faith expects to receive the same within the next four Fiscal Quarters (it being understood that to the extent not actually received within such Fiscal Quarters, such proceeds shall be deducted in calculating Consolidated Adjusted EBITDA for such Fiscal Quarters));

(ix)     unrealized net losses in the fair market value of any arrangements under Hedge Agreements and losses, charges and expenses attributable to the early extinguishment or conversion of Indebtedness, arrangements under Hedge Agreements or other derivative instruments (including deferred financing expenses written off and premiums paid); and

(x)     SAP implementation costs, cost savings, and restructuring expenses in an amount to be agreed.

   minus (c) to the extent such amounts increase Consolidated Net Income:

(i)     other non-Cash items, including deductions for the excess of actual Cash rent paid over GAAP rent expense during such period due to the use of a straight line rent for GAAP purposes; provided that if any non-Cash gain or income relates to potential Cash items in any future periods, such Person may determine not to deduct such non-Cash gain or income in the current period;

(ii)     unrealized net gains in the fair market value of any arrangements under Hedge Agreements;

(iii)     the amount added back to Consolidated Adjusted EBITDA pursuant to clause (b)(viii) above to the extent such business interruption proceeds were not received within the time period required by such clause; and

(iv)     Tax credits for federal, state, provincial, local, foreign, unitary, franchise, excise, property, withholding and similar Taxes.

"**Consolidated Net Income**" means, as to any Person (the "Subject Person") for any period, the net income (or loss) of the Subject Person on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP; <u>provided</u> that there shall be excluded, without duplication,

        (a)      the income (or loss) of any Person (other than a Subsidiary of the Subject Person) in which any other Person (other than the Subject Person or any of its Subsidiaries) has a joint interest, except, with respect to any income, to the extent of the amount of dividends or distributions or other payments (including any ordinary course dividend, distribution or other payment) paid in Cash (or to the extent converted into Cash) to the Subject Person or any of its Subsidiaries by such Person during such period,

        (b)      gains, income, losses, expenses or charges (less all fees and expenses chargeable thereto) attributable to asset Dispositions (including asset retirement costs) or returned surplus assets of any Pension Plan outside of the ordinary course of business,

        (c)      gains, income, losses, expenses or charges from (i) extraordinary items and (ii) nonrecurring or unusual items (including (x) costs of and payments of actual or prospective legal settlements, fines, judgments or orders and (y) gains, income, losses, expenses or charges arising from insurance claims and settlements),

        (d)      any unrealized or realized net foreign currency translation or transaction gains or losses impacting net income (including currency re-measurements of Indebtedness and any net gains or losses resulting from Hedge Agreements for currency exchange risk associated with the above or any other currency related risk and those resulting from intercompany Indebtedness),

        (e)      any (i) write-off or amortization made in such period of deferred financing costs and premiums paid or other expenses incurred directly in connection with any early extinguishment of Indebtedness, (ii) good will or other asset impairment charges, write-offs or write-downs or (iii) amortization of intangible assets, and

effects of adjustments (including the effects of such adjustments pushed down to the Subject Person and its Subsidiaries) in the Subject Person's consolidated financial statements pursuant to GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue, leases and debt line items thereof) resulting from the application of recapitalization accounting or acquisition or purchase accounting, as the case may be, in relation to any consummated acquisition or the amortization or write-off of any amounts thereof and (ii) the cumulative effect of changes in accounting principles.

## **EXHIBIT G**

### **EXIT TERM LOAN TERM SHEET**

# CTI FOODS HOLDING CO., LLC
## EXIT TERM FACILITIES

*This term sheet (this "__Exit Term Facilities Term Sheet__") sets forth the principal terms of a first lien first out exit term facility and a first lien second out exit term facility to be provided to CTI Foods Holding Co., LLC, as borrower. Capitalized terms used herein but not defined have the meaning ascribed to such terms in the Restructuring Support Agreement (the "__Restructuring Support Agreement__") to which this Exit Term Facilities Term Sheet is attached.*

## PARTIES

| | |
|---|---|
| Borrower: | CTI Foods Holding Co., LLC, a Delaware limited liability company, as a reorganized debtor (the "__Borrower__"). |
| Guarantors: | Chef Holdings, Inc., a Delaware corporation ("__Parent__"), and all restricted subsidiaries of Parent (other than the Borrower), subject to certain exceptions to be agreed (the "__Guarantors__" and, together with the Borrower, the "__Loan Parties__"). |
| Exit Term Agent and Collateral Agent: | Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, the "__Exit Term Agent__"). |
| Exit Term Lenders: | With respect to the First Out Term Facility, initially the lenders under the Borrower's senior secured super-priority debtor-in-possession term loan agreement (the "__DIP Term Loan Agreement__" and the loans thereunder, the "__DIP Term Loans__") (together with their permitted assignees, the "__First Out Term Lenders__"). |
| | With respect to the Second Out Term Facility (as defined below), initially the lenders under that certain First Lien Term Loan Agreement, dated as of June 28, 2013, among CTI Foods Acquisition LLC ("__Holdings__"), the Borrower, the guarantors named therein, the financial institutions named therein and Cortland Capital Markets Services LLC, as successor administrative agent and collateral agent, as amended, supplemented or otherwise modified prior to the date of the Restructuring Support Agreement (the "__Prepetition First Lien Term Loan Agreement__") (together with their permitted assignees, the "__Second Out Term Lenders__"). |
| | The First Out Term Lenders and the Second Out Term Lenders are collectively referred to herein as the "__Exit Term Lenders__". |

## TYPE AND AMOUNT OF EXIT TERM FACILITIES

| | |
|---|---|
| First Out Term Facility: | A 5-year first lien first out term loan facility (the "__First Out Term Facility__") in an aggregate initial principal amount equal to the principal amount of the term loans outstanding under the DIP Term |

Loan Agreement as of the Closing Date, which amount shall not exceed $75 million in any event (the loans thereunder, the "**First Out Term Loans**").

| | |
|---|---|
| Second Out Term Facility: | A 5-year first lien second out term loan facility (the "**Second Out Term Facility**" and, together with the First Out Term Facility, the "**Exit Term Facilities**") in an aggregate initial principal amount of up to $50 million, which will be increased on a dollar-for-dollar basis for any DIP Term Loans that are repaid or prepaid in accordance with the DIP Term Loan Agreement prior to the Closing Date, subject to an aggregate cap of $125 million after giving effect to such increase, it being understood and agreed that the total funded indebtedness of the Borrower and its restricted subsidiaries on the Closing Date under the Exit ABL Facility (as defined below) and the Exit Term Facilities shall not exceed $175 million (the loans thereunder, the "**Second Out Term Loans**" and, together with the First Out Term Loans, the "**Exit Term Loans**"). |
| Amortization: | First Out Term Facility: Annual amortization (payable in equal quarterly installments beginning at the end of the first full quarter after the Closing Date) of the First Out Term Facility shall be required in an aggregate annual amount equal to 1.0% of the original principal amount of the First Out Term Facility. The remaining aggregate principal amount of the First Out Term Loans shall be payable in full on the First Out Maturity Date (as defined below). |
| | Second Out Term Facility: Annual amortization (payable in equal quarterly installments beginning at the end of the first full quarter after the Closing Date) of the Second Out Term Facility shall be required in an aggregate annual amount equal to 1.0% of the original principal amount of the Second Out Term Facility. The remaining aggregate principal amount of the Second Out Term Loans shall be payable in full on the Second Out Maturity Date (as defined below). |
| Incremental Facilities: | None. |
| Ranking: | The First Out Term Facility will be secured on a pari passu basis with the Second Out Term Facility but will rank ahead of the Second Out Term Facility on a "first-out" basis in the payment waterfall. The Exit Term Facilities will be secured on a first-priority basis with respect to the Term Loan Priority Collateral (as defined below) and secured on a second-priority basis with respect to the ABL Priority Collateral (as defined below), in each case, in accordance with the terms of the ABL Intercreditor Agreement. |
| Maturity: | The First Out Term Facility will mature on the date that is 5 years following the Closing Date (the "**First Out Maturity Date**"). |
| | The Second Out Term Facility will mature on the date that is 5 |

years following the Closing Date (the "**Second Out Maturity Date**").

Use of Proceeds:

The proceeds of the First Out Term Loans will be used (or deemed to be used) to refinance in full or in part the DIP Term Loans.

The proceeds of the Second Out Term Loans will be used (or be deemed to be used) to refinance a portion of the loans outstanding under the Prepetition First Lien Term Loan Agreement.

Once repaid, Exit Term Loans may not be reborrowed.

## CERTAIN PAYMENT PROVISIONS

Interest Rates Provisions:

The Borrower may elect that the First Out Term Loans comprising each borrowing bear interest at a rate per annum equal to (a) ABR (which shall not be less than 2.00% per annum) *plus* the First Out Applicable Margin (as defined below) or (b) the Eurodollar Rate, which shall not be less than 1.00% per annum, *plus* the First Out Applicable Margin.

"**First Out Applicable Margin**" means (a) 6.00% in the case of ABR Loans and (b) 7.00% in the case of Eurodollar Loans.

Interest on the First Out Term Loans shall be payable in cash ; provided, that, from the Closing Date until the second anniversary of the Closing Date, the Borrower may elect, upon written notice to the Exit Term Agent delivered to the Exit Term Agent at least five (5) Business Days prior to the interest payment date, to pay up to 300 basis points of the First Out Applicable Margin with respect to such accrued interest "in kind" (by adding such amount to the outstanding principal amount of the First Out Term Loans).

The Borrower may elect that the Second Out Term Loans comprising each borrowing bear interest at a rate per annum equal to (a) ABR (which shall not be less than 2.00% per annum) *plus* the Second Out Applicable Margin (as defined below) or (b) the Eurodollar Rate, which shall not be less than 1.00% per annum, *plus* the Second Out Applicable Margin.

"**Second Out Applicable Margin**" means (a) 8.00% in the case of ABR Loans and (b) 9.00% in the case of Eurodollar Loans.

Interest on the Second Out Term Loans shall be payable in cash; provided, that, from the Closing Date until the second anniversary of the Closing Date, the Borrower may elect, upon written notice to the Exit Term Agent delivered to the Exit Term Agent at least five (5) Business Days prior to the interest payment date, to pay up to 600 basis points of the Second Out Applicable Margin with respect to such accrued interest "in kind" (by adding such amount to the

outstanding principal amount of the Second Out Term Loans).

Default Interest:

After an event of default and for so long as the same is continuing, the applicable rates of interest shall be increased by 2.00% per annum above the otherwise then applicable rates.

Exit Term Agent Fees:

To be set forth in a separate fee letter agreement between the Exit Term Agent and the Borrower.

Optional Prepayments:

The Borrower may prepay the Exit Term Loans, in whole or in part, in minimum amounts to be agreed, subject to the following: (i) notice requirements to be agreed; (ii) reimbursement of the Exit Term Lenders' redeployment costs in the case of a prepayment of Eurodollar Loans prior to the last day of the relevant interest period and (iii) in the case of any such prepayment made on or prior to the six month anniversary of the Closing Date, a prepayment premium equal to 1.00% of the principal amount prepaid; provided that such optional prepayment of the Second Out Term Loans may only occur at any time following (but not before) the prepayment in full of all outstanding principal and accrued and unpaid interest and other obligations under the First Out Term Facility.

Mandatory Prepayments:

The following amounts shall be applied to prepay the Exit Term Loans, in each case consistent with the Documentation Principles (as defined below):

(a)     100% of the net cash proceeds of any incurrence of debt by the Borrower and its restricted subsidiaries (other than debt otherwise permitted under the Exit Term Facilities Documentation (other than certain permitted refinancing debt));

(b)     100% of the net cash proceeds (above a threshold to be agreed per fiscal year) of any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Borrower or any of its restricted subsidiaries, except for (i) sales or other dispositions of inventory, (ii) sales or other dispositions of obsolete or worn-out property, (iii) sales or other dispositions of property no longer useful in such person's business, (iv) sales in connection with securitization transactions, (v) other customary exceptions to be agreed upon (subject to reinvestment of such proceeds in assets useful in the operations of the Borrower or its restricted subsidiaries within 12 months following receipt (or if the Borrower or its restricted subsidiaries have committed to reinvest such proceeds within such 12 month period, reinvestment within 6 months following such 12 month period) and (vi) dispositions of ABL Priority Collateral, to the extent the net cash proceeds thereof are required to be applied to repay revolving loans under the Exit ABL Facility in order to be in compliance with the borrowing base thereunder); and

(c)      100% of certain extraordinary receipts.

Mandatory prepayments shall be applied <u>first</u> to prepay outstanding First Out Term Loans in full and <u>second</u> to prepay outstanding Second Out Term Loans.

Any Exit Term Lender may elect not to accept any mandatory prepayment, but in the case of <u>clause (a)</u> above, solely to the extent not representing a refinancing of the Exit Term Loans. Any prepayment amount declined by a First Out Term Lender shall be re-offered to non-declining First Out Term Lenders and to the extent such non-declining First Out Term Lenders elect not to accept their pro rata share of such re-offered prepayment amount, such remaining amount shall be offered to the Second Out Term Lenders. Any prepayment amount declined by a Second Out Term Lender shall be re-offered to non-declining Second Out Term Lenders and to the extent such non-declining Second Out Term Lenders elect not to accept their pro rata share of such re-offered prepayment amount, such amounts may be retained by the Borrower.

| | |
|---|---|
| Collateral: | The obligations with respect to the Exit Term Facilities and the obligations of each other Loan Party under the guaranty in respect of the Exit Term Facilities (the "**Obligations**") shall be secured by a perfected, first-priority security interest (subject to permitted liens and exceptions to be set forth in the Exit Term Facilities Documentation (the "**Excluded Assets**")) in all now owned or hereafter acquired Term Loan Priority Collateral, and a perfected, second-priority security interest in the ABL Priority Collateral (junior to the liens on the ABL Priority Collateral securing the exit ABL facility of the Borrower and certain of its subsidiaries (the "**Exit ABL Facility**") to be entered into substantially concurrently with the Exit Term Facilities). |

"**Term Loan Priority Collateral**" shall mean substantially all assets of the Loan Parties that are not ABL Priority Collateral (including, without limitation, (x) a pledge of the capital stock of the Borrower owned by Holdings and a pledge of the capital stock of each Loan Party's direct subsidiaries and (y) mortgages on owned real property); <u>provided</u> that Term Loan Priority Collateral shall not include any Excluded Assets.

"**ABL Priority Collateral**" shall mean each Loan Party's now owned or hereafter acquired accounts receivable, inventory, deposit accounts, other bank or securities accounts and any cash or other assets in such accounts (other than designated accounts containing cash or other assets consisting solely of the proceeds of the sale of Term Loan Priority Collateral or accounts containing cash constituting permitted liens or trust funds) and general intangibles, chattel paper, documents, supporting obligations, certain other assets and books and records related to the foregoing and, in each

case, proceeds thereof; <u>provided</u> that ABL Priority Collateral shall not include any Excluded Assets.

"**Collateral**" shall mean, collectively, Term Loan Priority Collateral and ABL Priority Collateral.

Intercreditor Agreement:

The lien priority, relative rights and other creditors' rights in respect of the Exit Term Facilities and the Exit ABL Facility shall be set forth in an intercreditor agreement (the "**ABL Intercreditor Agreement**") in form and substance consistent with the Documentation Principles and to be otherwise satisfactory to the Exit Term Agent, the Required Lenders, the agent under the Exit ABL Facility and the Borrower.

## CONDITIONS

Conditions to Closing:

The closing of the Exit Term Facilities will be subject to satisfaction of the following: (a) all of the representations and warranties in the Exit Term Loan Documents shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date; (b) no default or event of default under the Exit Term Facilities shall have occurred and be continuing or would result from such extension of credit; (c) delivery of a customary borrowing notice and (d) the occurrence of those conditions listed on Annex I hereto. "**Closing Date**" shall mean the date on which all conditions listed in this paragraph and in Annex I shall have been satisfied and the Exit Term Facilities shall have been funded (or be deemed to have been funded) in full.

## DOCUMENTATION

Exit Term Facilities Documentation:

The Exit Term Facilities will be evidenced by a credit agreement (the "**Exit Term Loan Agreement**") which shall be in form and substance based on the Prepetition First Lien Term Loan Agreement (with such modifications as are necessary to reflect the terms set forth in this Exit Term Facilities Term Sheet and the nature of the Exit Term Facilities and to reflect (i) administrative agency and operational matters of the Exit Term Agent, (ii) EU bail-in provisions, (iii) LIBOR replacement provisions, (iv) Delaware limited liability company division provisions and (v) other modifications (including with respect to negative covenants and events of default) as may be reasonably agreed among the Exit Term Agent, the Exit Term Lenders and the Borrower, the "**Documentation Principles**")), security documents and other legal documentation (collectively, together with the Exit Term Loan Agreement, the "**Exit Term Loan Documents**"), which Exit Term Loan Documents shall be in form and substance consistent with the Documentation Principles and otherwise satisfactory to the Exit

Term Agent, the Exit Term Lenders and the Loan Parties.

| | |
|---|---|
| Representations and Warranties: | Usual and customary for facilities of this type consistent with the Documentation Principles. |

Affirmative Covenants:

Usual and customary for facilities of this type consistent with the Documentation Principles; provided that annual audited financial statements for the fiscal year ended December 31, 2018 shall be delivered within a time period to be agreed.

The Borrower shall use commercially reasonable efforts to obtain no later than a date to be agreed and thereafter maintain a private rating (but no specific rating) of the Exit Term Facilities, as a whole, and each of the First Out Term Facility and the Second Out Term Facility, individually, from a nationally recognized rating agency to be agreed.

Financial Covenant:

None.

Negative Covenants:

Usual and customary for facilities of this type consistent with the Documentation Principles, with levels, amounts and baskets acceptable to the Required First Out Lenders, including without limitation, limitations on (i) indebtedness, (ii) liens, (iii) negative pledges, (iv) restricted payments and certain payments of indebtedness, (v) subsidiary distributions, (vi) investments, (vii) fundamental changes and disposition of assets, (viii) sales and lease-backs, (ix) transactions with affiliates, (x) conduct of business, (xi) amendments or waivers of organizational documents, (xii) amendments of or waivers with respect to restricted debt, (xiii) fiscal year and (xiv) holding company activities.

Events of Default:

Usual and customary for facilities of this type consistent with Documentation Principles; provided that until all of the obligations owing to the First Out Term Lenders have been repaid in full, any payment event of default resulting from a failure to pay any amounts owing to the First Out Term Lenders shall not constitute an event of default with respect to the Second Out Term Lenders unless and until the Required First Out Lenders shall have declared all amounts outstanding under the First Out Term Facility and such declaration has not been rescinded by the Required First Out Lenders on or before such date (this proviso, the "**Specified First Out Default**").

Voting/Required Lenders:

Usual and customary for facilities of this type consistent with Documentation Principles; provided that (i) matters relating solely to the First Out Term Facility (including the Specified First Out Default) shall be restricted to the approval, consent or vote of the First Out Term Lenders holding more than 50% of the outstanding First Out Term Loans (the "**Required First Out Lenders**") and (ii) matters relating solely to the Second Out Term Facility shall be

|  | restricted to approval, consent or vote of the Second Out Term Lenders holding more than 50% of the outstanding Second Out Term Loans. Exit Term Lenders holding more than 50% of the outstanding principal amount of the Exit Term Loans are referred to herein as the "**Required Lenders**". |
|---|---|
| Assignments and Participations: | Usual and customary for facilities of this type consistent with Documentation Principles. |
| Other Provisions: | The Exit Term Loan Documents shall include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |
| Expenses and Indemnification: | Usual and customary for facilities of this type consistent with Documentation Principles. |
| Governing Law and Forum: | State of New York. |
| Counsel to the Exit Term Agent: | Davis Polk & Wardwell LLP. |

## ADDITIONAL CONDITIONS TO CLOSING

The borrowing (or deemed borrowing) under the Exit Term Facilities shall be subject only to the following additional conditions precedent:

1.  A final non-appealable order of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") confirming the plan of reorganization in form and substance satisfactory to the Exit Term Agent and the Required Lenders, which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interest of the Exit Term Lenders and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the Exit Term Loan Documents shall have been entered and shall have become a final order of the Bankruptcy Court.

2.  The execution and delivery by each of the Loan Parties of (i) the Exit Term Loan Documents (including the ABL Intercreditor Agreement (which may be in the form of an acknowledgement by the Loan Parties) (it being understood and agreed that this condition shall be satisfied in the case of the Exit Term Loan Agreement if executed by the Borrower and the Exit Term Agent)), (ii) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) in the jurisdiction of organization of each Loan Party, (iii) a solvency certificate executed by the chief financial officer or other officer of equivalent duties and (iv) all documents and instruments required to create and perfect the Exit Term Agent's security interests in the Collateral under the Exit Term Facilities which shall be, if applicable, in proper form for filing (it being understood and agreed that mortgages or amended mortgages may be provided within a number of days to be agreed after the Closing Date).

3.  The Exit Term Agent shall have received (i) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the fiscal years ended December 31, 2017 and December 31, 2016, (ii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for the fiscal year ended December 31, 21018, if the Closing Date shall not have occurred prior to 90 days after December 31, 2018, (iii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 45 days before the Closing Date, (iv) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available and will include each month ended at least 45 days before the Closing Date, (v) projected monthly balance sheets, income statements, statements of cash flows of the Borrower and the Guarantors for the period beginning on the Closing Date through the first anniversary of the Closing Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Required Lenders, and an opening pro forma balance sheet for the Loan Parties in form and substance acceptable to the Required Lenders, (vi) projected quarterly balance sheets, income statements, statements of cash flows and availability of the Borrower and the Guarantors for the period beginning on the first anniversary of the Closing Date through the third anniversary of the Closing Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Required Lenders, (vii) projected annual balance sheets, income statements, statements of cash flows and availability of the Borrower and the Guarantors for the period beginning on the third anniversary of the Closing Date through the date that is six months prior to the fifth anniversary of the Closing Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Required Lenders, (viii) any updates or modifications to the projected financial statements of the Borrower and the Guarantors previously received by the Exit Term Agent, in each case in form and substance satisfactory to the Required Lenders.

4.    The Exit Term Agent shall have received, at least 3 business days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act and, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower, that has been requested in writing by the Exit Term Lenders at least 10 business days prior to the Closing Date.

5.    All fees required to be paid on the Closing Date and reasonable and documented out-of-pocket expenses (including legal expenses) required to be paid on the Closing Date, to the extent invoiced at least 3 business days prior to the Closing Date, shall, upon the initial borrowing (or deemed borrowing) of the Exit Term Facilities, have been paid.

6.    The maximum funded indebtedness on the Closing Date under the Exit Term Facilities and the Exit ABL Facility shall not be in excess of $175 million.

7.    The Exit ABL Facility shall have become effective and shall be consistent in all respects with the term sheet describing the Exit ABL Facility as reviewed and agreed to by the Required Lenders.

## <u>EXHIBIT H</u>

## **FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS**

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●], 2019 (as amended, supplemented, or otherwise modified from time to time, the "***Agreement***"), by and among the Company, and, among others, the holders of certain principal amounts outstanding under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement (together with their respective successors and permitted assigns, the "***Consenting Creditors***" and each, a "***Consenting Creditor***") is executed and delivered by _____ (the "***Joining Party***") as of [●], 2019. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of the First Lien Term Loans and Second Lien Term Loans, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in <u>Section 8</u> of the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING CREDITOR**

**[●]**

By: _____

Name: _____

Title: _____


Principal Amount of First Lien Term Loans:  $_____

Principal Amount of Second Lien Term Loans:  $_____



Notice Address:

_____

_____

_____
Fax: _____
Attention:_____
Email:_____

Acknowledged:

**CHEF HOLDINGS, INC.**

By:_____
Name:
Title:


*[Signature Page to Joinder Agreement]*

**<u>EXHIBIT I</u>**

**DIP COMMITMENTS**

**[TO COME]**

## **EXHIBIT J**

### DIP BACKSTOP COMMITMENTS

| Backstop Party | Commitment |
|---|---|
| Barings | ██████████ |
| Guggenheim | ██████████ |
| Black Diamond | ██████████ |
| | Total: $75,000,000 |